1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Shahriar "Sean" Loloee, et al.,<br><br>Defendants. | No. 2:23-cr-00320-KJM<br><br>ORDER |

Law enforcement officers conducted searches at several residential and commercial properties affiliated with Viva Supermarkets and their owner, defendant Shahriar "Sean" Loloee, in 2023. He and three codefendants now move to suppress the evidence the government obtained in those searches, arguing the underlying search warrants violated the Fourth Amendment and were based on an unconstitutionally misleading affidavit. As explained in this order, the affidavit made no material omissions, the warrants were based on probable cause and the applications were sufficiently specific. The motion is **denied**.

I.    BACKGROUND

In Fall 2023, the government applied to a magistrate judge of this court for warrants to search several properties owned by Loloee and his companies, which operate several Sacramento-area grocery stores known as Viva Supermarkets.[1] The government suspected Loloee and others

---

[1] The warrants and respective applications can be found on the dockets of the respective "sw" cases, Nos. 23-1070, 23-1071, 23-1072, 23-1073, 23-1074, and 23-1075. Redacted copies

had violated several federal laws, including prohibitions against hiring people who do not have permission to work in the United States, laws punishing forced labor, tax statutes, and criminal prohibitions against making false statements to the government, wire fraud, and conspiracy. *See* Aff. ¶ 8 (citing 18 U.S.C. §§ 371, 1001, 1324, 1324a, 1324c, 1343, 1589 and 26 U.S.C. §§ 7201, 7202, 7206). The affidavit attached to the government's warrant application was prepared by a Special Agent with the Internal Revenue Service, Robbie Henwood. *See id.* ¶ 1. He explained the government's investigation had begun with a tip. *See id.* ¶ 11. The tipster—the "reporting party," as the affidavit describes that person—claimed Loloee was hiring workers who did not have permission to work in the United States. *See id.* ¶¶ 11, 13. The tipster also told the government Loloee was threatening these workers with deportation. *See id.* ¶ 13.

Agents from Homeland Security Investigations began looking into these allegations. *See id.* ¶ 11. According to the Special Agent's affidavit, they interviewed seven current and former Viva employees, who produced pay stubs and work schedules to confirm they had in fact worked for the store. *Id.* ¶¶ 14–15. The seven witnesses claimed they had worked at Viva between 2014 and 2021, and they admitted they were undocumented when they did, as was true of "the majority of Viva's workforce," in their estimation. *Id.* ¶ 15. Some of the seven employees claimed Loloee and the store's general manager, Karla Montoya, also a defendant in this action, knew the store's employees were not documented. *Id.* ¶ 14. They claimed Montoya had even "advised them where they could obtain fraudulent employment documents." *Id.* ¶ 15. Loloee also allegedly had threatened the employees with deportation if they did not "comply with his demands." *Id.* Since 2020, however, some of the employees claimed Viva stores had stopped hiring undocumented workers, as Loloee was running for the Sacramento City Council during that year. *Id.* ¶ 17.

The affidavit describes how investigators then went back to check the employees' claims, first by looking into federal immigration records. *See id.* ¶¶ 15–16. They confirmed, for one, that

---

are available on the docket of this action at ECF Nos. 125-1 through 125-7. Each application attaches an affidavit by Robbie Henwood, a Special Agent with the United States Department of the Treasury, which the court cites as "Aff." in this order. Each application also includes an attached list of items to be seized as Attachment B, which the court cites as "Attach. B" in this order.

the seven employees they interviewed did not have current or pending legal status in the United States. *Id.* Nor did Montoya. *See id.* ¶ 15. Investigators also obtained and reviewed a list of Viva employees from the U.S. Department of Labor. *Id.* ¶ 16. That list identified more than 550 people who had worked at Viva between 2016 and 2020. *Id.* Almost half of those employees had "unknown" status, "meaning there is no record of them in any immigration database and they possibly entered the United States without being inspected at a U.S. Port of Entry." *Id.*

The search warrant affidavit offers an explanation for why several undocumented workers would be willing to come forward and speak with investigators from the Department of Homeland security: the government granted six of the seven employees "a two-year term of Continued Presence status" in the United States. *Id.* ¶ 15 n.4. That status allowed them "to remain, and seek employment, in the United States." *Id.* The government also had renewed that status for some of the employees, and it expected to renew it for all six until the investigation was resolved. *Id.*

In addition to supporting immigration violations, the employees' claims led agents to suspect Loloee and Viva stores were not paying all of the federal taxes they owed. *See id.* ¶ 18. According to at least two of the employee witnesses, some workers at Viva stores had received two paychecks: blue and green. *Id.* ¶¶ 18, 19. The blue paychecks had "a detailed statement of earnings and a list of withheld taxes." *Id.* ¶ 18. The green paychecks, by contrast, did not. *Id.* At least one employee even brought copies of these green and blue paystubs to show the investigators. *Id.* That employee also offered an explanation for the multi-colored checks. Loloee had said "the green checks were not real checks to be taken to a bank and had to be cashed at Western Union booths located inside the Viva stores," which a Viva manager explained was intended to offer "protection from immigration." *Id.* A different employee told investigators Loloee and Montoya had even responded to complaints about the multicolored check system with a veiled threat: "Do you need the job or not?" *Id.* ¶ 19. Based on these allegations, the government began investigating Viva's and Loloee's financial records as well. The evidence they found raised further suspicions of tax violations.

For example, investigators found tax and bank records showing Loloee was the sole owner of a company called Fresh Pak Produce, LLC. *Id.* ¶ 21. Fresh Pak had reported no salary or wage expenses on its corporate tax returns for the 2016, 2017, 2018 or 2019 tax years. *Id.* But bank records showed Fresh Pak had in fact issued checks to "various Viva employees and to Loloee's wife," and four Viva employees provided investigators pay stubs from Fresh Pak. *Id.* ¶ 22. Combined, the bank and tax records suggested Viva and Loloee had wrongly failed to report about $150,000 of the wages paid to just these four employees between 2017 and 2019. *See id.*

Investigators also checked the tax records for the seven employees who had spoken with them about potential immigration violations at Viva stores. Five of the seven had worked at Viva during the relevant years, i.e., between 2017 and 2020. *Id.* ¶ 23. Over that period, the employees' tax records seemed to confirm Viva had underreported their wages. At first, for the 2017 tax year, all five employees had received W-2 forms. *Id.* For the 2018 tax year, however, three did not receive W-2 forms from any source. *Id.* And in the next year, 2019, none of the corporate entities affiliated with Viva issued any W-2s for the same group, and none of the five employees received W-2s. *Id.* But then in the 2020 tax year—the year Loloee was elected to the City Council, and the year the employees claimed Viva had stopped hiring undocumented workers—all five employees again received W-2s. *Id.*

According to the Special Agent's affidavit, Viva's corporate tax returns exhibited similarly suspicious patterns over the same period. Between 2017 and 2020, Viva stores reported steadily increasing gross receipts. *See id.* ¶¶ 23–24. The store with the largest gross receipts, for example, reported gross receipts of about $10.8 million in 2017, $11.3 million in 2018, $12.5 million in 2019, and $14.6 million in 2020. *Id.* ¶ 24. Salaries and wages, by contrast, generally declined between 2017 and 2019, then spiked in 2020. *See id.* The largest-grossing store, for example, reported it paid about $1.0 million in salaries and wages in 2017, but despite making more money the next year, it reported paying lower wages: less than $800,000 in 2018 and 2019. *See id.* In 2020, however, the same store reported salaries and wages of more than double that amount: $1.8 million. *See id.*

4

Investigators also pulled together the tax forms Loloee and his wife had filed over the same general period. These filings exhibited suspicious trends as well. In 2017, for example, the couple's Form 1040s reported wages of only $7,000. *See id.* ¶ 25. Their bank account statements, however, showed someone had deposited several checks issued by Fresh Pak—the same company that had paid wages to Viva employees without reporting those wages—and those checks looked very much like wages: they had been issued every other week, they had memos showing they were tied to specific "periods," such as "Period Ended 09-24-2017," and they resembled the checks Fresh Pak sent to other Viva employees. *See id.* ¶ 26. In total, Fresh Pak paid $35,000 to Loloee's wife in 2017. *See id.* And there were several other anomalies in the couple's 2018, 2019, 2020 and 2021 tax documents. In 2018, for example, Loloee sent a mortgage company a Form W-2 to substantiate his income. *See id.* ¶ 28. The W-2 purported to show one of the Viva stores had paid him more than $200,000 in wages that year. *See id.* Loloee's tax return for that same year, however, reported only about $42,000 in wages, and nothing from that Viva store. *See id.* Another example is found in the 2020 tax records. A Viva store sent a check for $500,000 to Loloee's wife's account with a memo, "For Return of loan." *Id.* ¶ 33. But the store's tax returns did not report any such debts. *Id.* These are only a few examples of the checks and transactions detailed in the affidavit, which collects and explains many more. *See id.* ¶¶ 25–37.

Finally, the Special Agent summarized an investigation into potential pandemic relief fund violations. Records from the Small Business Administration showed Loloee had signed an application for a Restaurant Revitalization Grant in 2021, and he had received a grant of about $1.2 million. *Id.* ¶ 38. In the grant application, Loloee reported a particular Viva store had earned gross receipts of about $5.2 million in 2020. *Id.* But for that same year, the store reported larger income in its tax return: more than $7.6 million. *Id.* And the year before, the same store had reported an income of about $6.5 million. *Id.* This meant the store's revenues had not declined between 2019 and 2020, but rather had increased, which in turn showed the store was not actually eligible for the grant it had been awarded. *See id.*

1      The government's warrant application sought permission to search six addresses.  First, it

2    targeted a Sacramento residential property, which Loloee had purchased in 2019.  *See id.* ¶ 39.

3    Based on evidence disclosed in a separate investigation into Loloee's residency conducted at the

4    request of the Mayor of Sacramento, the government believed the Sacramento property was

5    Loloee's primary residence.  *See id.* ¶ 40.  Other evidence suggested Montoya, the Viva store

6    manager mentioned above, also was living at the address and had brought documents home to

7    that address from work.  *Id.* ¶¶ 40–42.  Based on this evidence and the IRS Special Agent's

8    training and experience, he believed it was likely the government would find banking and tax

9    records at the property that would shed further light on the suspected tax and immigration crimes.

10   *See id.* ¶ 41.

11     Second, the government requested a warrant to search a residential property in Granite

12   Bay, California.  *See id.* ¶ 43.  Mortgage records showed the owner of that property was a trust

13   affiliated with Loloee's wife.  *See id.*  The Granite Bay address also was listed on some of the

14   couple's bank records, discussed above, and agents had found mail addressed to Loloee in the

15   trash outside that property.  *See id.*  The Special Agent again believed, based on his training and

16   experience, that officers would find relevant banking and tax records at this property.  *See id.*

17     The third, fourth and fifth properties identified in the government's warrant application

18   were three Viva supermarkets, each with a Western Union office inside, where employees had

19   allegedly cashed their green "paychecks."  *See id.* ¶ 44.  The Special Agent believed, again based

20   on his training and experience and after surveillance of the stores, the government was likely to

21   find paperwork and office equipment, financial records, wage statements and other employment

22   records inside the stores and the Western Union offices.  *See id.* ¶¶ 44–48.

23     The sixth and final property listed in the warrant application was an office building that

24   served as the headquarters for the corporate entities that owned each of the Viva stores.  *See id.*

25   ¶ 49.  The stores had listed that address on their tax filings, and it appeared on their bank

26   statements.  *Id.*

27     The government's warrant application specifically asked the magistrate judge to approve a

28   search and seizure of extensive digital information, including computers, electronics, and storage

1    devices agents executing the warrant might find.  *See id.* ¶¶ 50–66.  The Special Agent began this

2    section of the affidavit by noting his awareness that people who "commit tax violations use

3    computers, smart phones and other electronic media to conduct their trade, keep track of

4    accounting records, store and file tax documents and communicate with co-conspirators."  *Id.*

5    ¶ 50.  Later, he also cited evidence showing Loloee and his companies had used accounting

6    software to run their business, as was common in the Special Agent's experience.  *See id.* ¶ 53.

7    The pay stubs the Viva employees had provided to Homeland Security investigators were

8    computer generated.  *See id.*  And the information on those paystubs suggested agents would find

9    detailed and relevant wage and employment records on any computers they might find at the six

10   addresses described above.  *See id.*

11        The affidavit also relayed the agent's belief, based on his training and experience, that

12   officers would find evidence of crimes in emails and email accounts.  *See id.* ¶ 52.  "[E]mployers

13   who maintain and use a business email account will typically use this account for business-related

14   activities including direction to subordinates, hiring, staffing, financial dealings, and regulatory

15   compliance, among other usage."  *Id.*  Loloee and Viva had in fact used specific email addresses

16   to correspond with banks and the U.S. Department of Labor, and Loloee had listed a Viva

17   company email address on Fresh Pak's corporate tax returns.  *See id.* ¶ 51.

18        The affidavit further specifically asked the magistrate judge to approve the collection of

19   digital evidence both on site, during the search, and the removal of that evidence for later analysis

20   at a different location.  The affidavit explained this request by describing how some digital

21   information is "volatile" in the sense that it can be lost once a computer or device loses power or

22   is turned off: "[O]nsite forensic analysis is needed to preserve volatile data."  *Id.* ¶ 54.  Other data

23   and files, by contrast, the affidavit explained, "can be recovered months or even years after they

24   have been downloaded onto a storage medium, deleted, or viewed."  *Id.* ¶ 55.  Specialized

25   "forensic tools," expertise and software may be necessary to recover that evidence.  *See id.* ¶¶ 55–

26   56.  Data might not be kept in obvious places, or someone might have attempted to hide or delete

27   it.  *Id.* ¶ 60.  Digital evidence might also be lost or inaccessible without "the entire computer's

28   input/output periphery," such as a keyboard, mouse, monitor, printer and other devices, and any

1    "related documentation, passwords and security devices." *Id.* ¶ 58. Finding and analyzing digital

2    data can also take a long time—"weeks or months"—given the potentially large sizes or volume

3    of the files or data, the variety of different formats or types of data seized, the complexity of the

4    necessary forensic analysis, and whether it is necessary to thwart a suspect's attempts to conceal

5    or destroy any incriminating evidence. *See id.* ¶¶ 62–64. An on-site search of this type would be

6    intrusive and impractical. *See id.* And so, in the Special Agent's estimation, an off-site search by

7    qualified experts in a "controlled environment" was necessary in addition to the time agents

8    might spend at the six properties on the day of the search. *See id.* ¶¶ 58, 61.

9         The warrant applications defined the search targets by referring to an attached list of

10   "items to be seized." *See* Attach. B. at 1. Loloee focuses several arguments on the specific items

11   on this list, so it is worth describing in detail.

12        The list is organized into thirteen paragraphs. Some paragraphs identify specific targets

13   for the search. For example, the seventh paragraph authorizes a search for "[s]urveillance video."

14   *Id.* ¶ 7. But most of the thirteen paragraphs give broader instructions, usually grouping objects by

15   subject matter. The first paragraph, for example, instructs officer to search for and seize

16   "[r]ecords, documents, programs, applications, or materials regarding the nationality, immigration

17   status, verification of identity, and employment authorization of individuals hired for employment

18   in the United States." *Id.* ¶ 1. Other paragraphs describe employment records, *see id.* ¶ 2;

19   banking and tax records, *id.* ¶ 3; information about loans, gifts, and grants, *id.* ¶ 4; property

20   ownership, *id.* ¶ 5; contracts or other legal documents, *id.* ¶ 6; safes and other similar containers,

21   *id.* ¶ 9; and passwords and other codes, *id.* ¶ 10. Several paragraphs also offer examples of the

22   types of documents or materials to be seized. The first paragraph, for example, identifies

23   "passports, visas, permanent resident (Green) cards and Forms I-9." *Id.* ¶ 1.

24        The final three paragraphs on the list differ from the previous ten in that they focus

25   exclusively on digital devices, storage media and related records. Paragraph eleven instructs

26   officers to seize "[a]ny digital devices or other electronic storage media and/or their components

27   ////

28   /////

8

used as a means to commit the violations described above." *Id.* ¶ 11.  It then lists illustrative examples in lettered subparagraphs:

> a. any digital device or other electronic storage media capable of being used to commit, further, or store evidence or fruits of the offenses listed above;

> b. any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

> c. any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

> d. any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

> e. any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

> f. any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

> g. any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

*Id.*

Next, the twelfth paragraph refers back to the "digital devices or other electronic storage media" listed above, and for each of those devices, it instructs officers to seize evidence, also identified in several lettered subcategories:

> a. evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

f. evidence of the times the digital device or other electronic storage media was used;

g. passwords, encryption keys, seed words, and other access devices that may be necessary to access the digital device or other electronic storage media;

h. documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media;

i. contextual information necessary to understand the evidence described in this attachment.

*Id.* ¶ 12.

Finally, in paragraph thirteen, the list of items to be seized instructs officers to seize "[r]ecords and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet." *Id.* ¶ 13. Here again the application identifies several examples, including "routers, modems, and network equipment used to connect computers to the internet, . . . firewall logs, caches, browser history and cookies . . . and records of user-typed web addresses." *Id.*

The magistrate judge granted the government's warrant applications. *See supra* note 1. According to the government's opposition, the case agent then emailed copies of the warrants and affidavit to the officers who would conduct the searches at each of the six locations. *See* Opp'n Mot. Suppress at 23, ECF No. 89. Officers executed the warrants on the morning of October 26,

10

1    2023.  *See, e.g.*, Cal. Dep't J., Investigation Rep. (Oct. 26, 2023), ETAL_767–68.[2]  Inventories of

2    the search returns show officers seized dozens of files, documents, phones and other devices, and

3    copies of several computers and drives.  *See, e.g.*, Corporate Office Inventory (Oct. 26, 2023),

4    ETAL_297–303; Granite Bay Inventory (Oct. 26, 2023), ETAL_304–05.

5         While officers searched the corporate offices, they saw the building had two addresses on

6    its exterior: both the address the government had obtained a warrant to search and a different

7    address.  *See* Lopes Aff. ¶ 6, Case No. 23-sw-1091, ECF No. 1 (under seal).  Inside the building,

8    however, no walls or partitions separated the interior of the building.  *See id.*  Loloee told an

9    officer over the phone that the two sides of the office were for different businesses, a Viva

10   employee at the office building told officers both spaces were used for Viva business, and officers

11   saw Viva documents in both office spaces.  *See id.*  The government then sought, and a magistrate

12   judge granted, a warrant to search the second space as well.  *See* Warrant, Case No. 23-sw-1091,

13   ECF No. 1.

14        About two months later, in December 2023, a grand jury charged Loloee and Montoya

15   with conspiracy to defraud the government, immigration crimes, obstruction of Department of

16   Labor proceedings, falsifying records, and wire fraud.  *See generally* Indictment, ECF No. 1.  Still

17   a few months later, in a superseding indictment, the government added charges against two more

18   Viva employees: Mirwais Shams, allegedly the companies' controller and auditor, and Ahmad

19   "Shah" Shams, who allegedly worked as the companies' human resources manager, among other

20   responsibilities.  *See* Superseding Indictment ¶¶ 7–8, ECF No. 33.  The superseding indictment

21   also added charges for willful failures to collect and pay taxes, filing false tax returns, money

22   laundering, and perjury against Loloee, Montoya or both.  *See generally id.*  According to the

23   superseding indictment, Viva stores had hired workers who did not have authorization to work in

24   the United States for many years, among other reasons "because it was Loloee's view that

25   undocumented workers were easier to control," and because hiring undocumented workers

---

[2] In citing these documents produced in discovery, the court follows the parties'
convention of using the prefix "ETAL" and "AEO" as shorthand for the Bates prefixes
"LOLOEE_ETAL" and "FOR_ATTORNEYS_EYES_ONLY," respectively.  The court has also
omitted leading zeros from Bates range page numbers.

1  allowed Viva stores to reduce labor and tax costs. *See id.* ¶¶ 18–20. The government alleges

2  Loloee and the other defendants paid employees off the books, manipulated time sheets, falsified

3  tax documents, obstructed investigations into these practices, and made false statements to federal

4  investigators, among other things. *See id.* ¶¶ 23–57.

5      As noted, Loloee moves to suppress evidence obtained through execution of the search

6  warrants approved by the magistrate judge. *See generally* Loloee Warrant Mot., ECF No. 68;

7  Original Loloee Warrant Mem., ECF No. 68-1; Revised Loloee Warrant Mem., ECF No. 75-1.

8  He relies on two basic arguments. First, he contends the warrants violated the Fourth

9  Amendment because they were not based on probable cause and did not "particularly" describe

10  the "things to be searched." *See* Revised Loloee Warrant Mem. at 2–3, 25–49. Second, he argues

11  the government intentionally or recklessly misled the magistrate judge by omitting exculpatory

12  information from its warrant applications. *See id.* at 49–72. He requests a hearing under *Franks*

13  *v. Delaware* to challenge the validity of the affidavit. *See id.* at 72–74 (citing 438 U.S. 154

14  (1978)).

15      Montoya joins Loloee's motion. *See generally* Montoya Joinder, ECF No. 82. Mirwais

16  Shams also joins the motion based on his objection to the search of his person, his office, and the

17  computers he used on the job. *See* M. Shams Joinder, ECF No. 79. Finally, Shah Shams joins

18  the motion to the extent it relates to the search of his office at the corporate headquarters and two

19  Viva stores. *See generally* S. Shams Joinder, ECF No. 81.

20      The government opposes the motion. *See generally* Opp'n, ECF No. 89. It argues first

21  that each of defendants, except Montoya, lacks standing to contest many of the searches in

22  question. *See id.* at 2–8; *see also* Stmt. re Montoya Joinder at 2, ECF No. 90. It also contends the

23  warrants established probable cause and were particularized as required. *See* Opp'n at 9–49. It

24  argues no *Franks* hearing is warranted, *id.* at 49–51, because it argues the alleged omissions were

25  not intentional, not reckless and not material in any event, *id.* at 52–64.

26      Loloee and the other defendants made several new arguments and offered new evidence in

27  response to the government's arguments in opposition about their standing. *See generally* Loloee

28  Reply, ECF No. 104; Montoya Reply, ECF No. 109; S. Shams Decl., ECF No. 100; M. Shams

1    Suppl. Mem., ECF No. 101.  The United States therefore requested an evidentiary hearing.  *See*

2    *generally* ECF No. 110.  The court held a hearing, but denied the government's request for an

3    evidentiary hearing on the standing question, opting instead to permit the government to file a

4    surreply in response to the defendants' new evidence and arguments.  *See* Mins., ECF No. 118;

5    Min. Order, ECF No. 119.  The government has filed its surreply.  *See* Surrreply, ECF No. 122.

6    Shah Shams also requested permission to file a surreply on standing, ECF No. 123, and the

7    government stipulated to allowing that filing and then filed its own response, ECF Nos. 128–29.

8         The court addresses each of these disputes in the sections below, starting with defendants'

9    standing.

10   **II.    STANDING**

11        Persons have standing to challenge a search under the Fourth Amendment if they have

12   experienced a violation to them "personally."  *United States v. SDI Future Health, Inc.*, 568 F.3d

13   684, 695 (9th Cir. 2009) (citing *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968)).  A person must

14   have a "a legitimate expectation of privacy in the invaded place."  *Rakas v. Illinois*, 439 U.S. 128,

15   143 (1978).  This expectation must be both "a subjective expectation of privacy in the area

16   searched, and the[] expectation must be one that society would recognize as objectively

17   reasonable."  *United States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1996).  The person seeking

18   suppression must prove both elements.  *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir.

19   2007).

20        **A.    Residential Properties**

21        The court begins with the residential properties—the two homes in Sacramento and

22   Granite Bay.  Loloee challenges the searches of both homes, and Montoya challenges the search

23   of the Sacramento home.  *See* Loloee Reply at 4; Montoya Join. Mot. Suppr. at 1.  The

24   government does not dispute that Loloee has a reasonable expectation of privacy in his Granite

25   Bay home.  Surreply at 1.  Nor does the government dispute that Montoya has a reasonable

26   expectation of privacy in the Sacramento home.  *Id.* at 1 n.1.  The government originally argued

27   Loloee had standing to challenge the search of only his private office in the Sacramento home.

28   Opp'n at 1.  But in its surreply, it no longer disputes Loloee's standing to challenge the premises

1    searches at both of "his residences." Surreply at 1. The government does not elaborate on its

2    change in position. The court will therefore evaluate Loloee's standing with respect to both

3    residential properties.

4         The court agrees Montoya has standing to bring Fourth Amendment challenges related to

5    the search of the Sacramento residential property and Loloee has standing to bring a challenge

6    related to both residential property searches. "It is a 'basic principle of Fourth Amendment law'

7    that searches and seizures inside a home without a warrant are presumptively unreasonable."

8    *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S.

9    443, 477–78 (1971)). There is no dispute the Sacramento home is where Montoya lives, and

10   there is no dispute Loloee maintains a residence, at least some of the time, in the Granite Bay

11   property where his wife and children live. And to support his claim about his residence at the

12   Sacramento home, Loloee has relied on a 2022 internal investigation conducted by the

13   Sacramento City Council, noted above. *See* Loloee Reply at 4 & Attach. C & D at 86–110, ECF

14   No. 104-1. The government relied on a similar report in its affidavit to search the home. Reply

15   at 5; Aff. ¶ 40. According to that report, Loloee "maintains his clothes, shoes, work areas, and

16   personal belongings in his room and bathroom." Aff. ¶ 40. Loloee also has stated that he

17   received important mail at the property. *Id.* ¶¶ 39–40. The continued presence of Loloee's

18   belongings throughout the Sacramento home establishes Loloee's residency there and in turn his

19   standing to assert claims about searches of the entire home.

20        **B.    Commercial Properties**

21        The remaining properties are all commercial: the three Viva stores and the Duckhorn

22   Drive office building. Loloee challenges all of these searches. Shah Shams challenges the search

23   of his office at the Rancho Cordova Store and an office in the Duckhorn Drive office building.

24   *See* S. Shams Join. Mot. Suppr. at 1, ECF No. 81; S. Shams Decl. ¶ 2, ECF No. 100-1. Mirwais

25   Shams challenges the search of his office at Duckhorn Drive. M. Shams Join. Mot. Suppr. at 1,

26   ECF No. 79; Mirwais Shams Decl. ¶¶ 3–9, ECF, No. 101-1. The court first reviews the relevant

27   legal standards, then evaluates each defendant's standing.

1        **1.      Legal Standards**

2        "[P]roperty used for commercial purposes is treated differently for Fourth Amendment

3    purposes from residential property." *SDI Future Health*, 568 F.3d at 695 (citations and quotation

4    marks omitted).  Nevertheless, there is a strong tradition of granting Fourth Amendment

5    protections to workspaces.  The strongest protections are afforded to personal offices, whether

6    private or shared.  *See Mancusi*, 392 U.S. at 369.  Courts also have granted protections to a

7    variety of other workspaces.  Courts consider whether a person has standing based on a

8    reasonable expectation of privacy in those areas "on a case by case basis."  *SDI Future Health*,

9    568 F.3d at 695 (citations and quotation marks omitted).  The analysis generally turns on whether

10   the person enjoys exclusive use over the space in question.  *Id.*  Exclusive, however, need not

11   mean solitary.  *See Mancusi*, 392 U.S. at 369 (granting privacy protections to an office even

12   though others shared it).  Nor does it mean singular: an individual can have a reasonable

13   expectation of privacy in multiple workspaces or offices.  *See, e.g.*, *United States v. Torres-*

14   *Ramos*, No. 06-656, 2008 WL 4667119, *5 (C.D. Cal. Oct. 17, 2008).  To show exclusive use,

15   however, courts require more than "blanket assertions" of exclusive control.  *United States v.*

16   *Omidi*, No. 17-661, 2021 WL 7629927 (C.D. Cal. Sept. 1, 2021).  Courts consider, for example,

17   whether the person used the workspace regularly, maintained personal items in that space when

18   they were absent and any nexus between the space and their employment.  *See, e.g.*, *United States*

19   *v. Chaves*, 169 F.3d 687, 691 (11th Cir. 1999); *Torres-Ramos*, 2008 WL 4667119, at *11.

20        A person's title or managerial control of a company as a whole does not alone show that

21   person has a reasonable expectation of privacy in a particular workspace.  *See SDI Future Health*,

22   568 F.3d at 696.  Managers and owners, however, may have standing to challenge searches of an

23   office building if they "exercise day-to-day physical access to and control over the facilities as

24   part of their daily management of a closely held small business."  *United States v. Galecki*,

25   89 F.4th 713, 725 (9th Cir. 2023) (citing *United States v. Gonzalez*, 412 F.3d 1102, 1116–17

26   (9th Cir. 2005)).  The Ninth Circuit's opinion in *Gonzalez* is often cited as an illustration of how

27   this rule operates.  In that case, the Circuit applied the longstanding rule "that owners of a

28   premises where an illegal wiretap occurs have standing to challenge the interception, even if the

15

1  owners did not participate in the intercepted conversations."  412 F.3d at 1116 (citing *Alderman*

2  *v. United States*, 394 U.S. 165, 175–76 (1969)).  The defendants in *Gonzalez* owned the office

3  building where the government had secretly recorded employee conservations, so under the

4  longstanding rule and decisions like *Alderman*, the defendants would have standing to challenge

5  the wiretap.  *See id.*  The government argued they did not, pointing out the building was a

6  commercial property, not a residential property.  *See id.*  The Circuit rejected the government's

7  argument based on its assessment of the "nature of the location" and the defendants' involvement

8  in the company's "day-to-day operations."  *Id.* at 1117.  The office building itself "was a small,

9  family-run business housing only 25 employees at its peak," and the defendants had "full access

10  to the building."  *Id.*

11       Setting aside the features of the location or building itself, people might also reasonably

12  expect privacy in any personal property found in a building or office if they have a "personal

13  connection to the places searched and the materials seized."  *SDI Future Health*, 568 F. 3d at 698.

14  Courts evaluate whether a person had the necessary "personal connection" by asking "(1) whether

15  the item seized is personal property or otherwise kept in a private place separate from other work-

16  related material; (2) whether the defendant had custody or immediate control of the item when

17  officers seized it; and (3) whether the defendant took precautions on his own behalf to secure the

18  place searched or things seized from any interference without his authorization."  *Id.* (footnote

19  omitted).

20                    **2.    Loloee**

21       Turning to Loloee's standing, the court begins with the supermarkets.  Loloee argues he

22  has standing to challenge searches of the cashier's office, the manager's office, the point-of-sale

23  (POS) office (which also serves as the manager's office in the Marysville Store), and a private

24  area in the Norwood store.  Loloee Reply at 7–9.[3]  Each grocery store is an "S corporation," and

25  Loloee is the sole shareholder and president of each.  Loloee Decl. ¶ 3, ECF No. 105.  In a

26  declaration, he claims he works "12–13 hours a day" operating his grocery business.  *Id.* ¶ 5.  He

---

[3] Images of these offices are available on the docket at ECF No. 105-1.

1    splits those hours between the three stores and the corporate office building.  *Id.*  He visits his

2    stores every week "to varying degrees, sometimes once a week, sometimes several times a week."

3    *Id.*  He has keys to all the private offices at each of the three stores.  *See id.* ¶¶ 6–10.  At the

4    Norwood store, he holds meetings and reviews paperwork in the manager's office, and he stores

5    his personal effects in both the cashier's office and the manager's office when he is there.  *Id.*

6    ¶ 16.  He has slept in the private area on occasion after long workdays and has kept private

7    belongings there.  *Id.*  His declaration includes similar claims about the managerial spaces at the

8    other two stores as well.  *See id.* ¶¶ 17–18.

9         This evidence does not show Loloee has exclusive use over these portions of the grocery

10   stores.  Unlike the defendant in *Chaves*, for example, cited above, Loloee does not keep his

11   personal belongings or private papers at the stores except when he is physically present.

12   *Compare* Loloee Decl. ¶¶ 16–18 *with* 169 F.3d at 691.  And unlike the defendant in *Torres-*

13   *Ramos*, also cited above, he does not keep a regular and day-to-day work schedule at any

14   individual store.  *Compare* 2008 WL 4667119, at *11 *with* Loloee Decl. ¶ 5.  Nor, again unlike

15   the defendant in *Torres-Ramos*, is there a precise connection between his role as owner and a

16   given space at any of the stores.  *Id.*  He holds "meetings with vendors, managers and others" for

17   example, but he does not discuss the specifics of those meetings or their regularity in his

18   declaration.  *See* Loloee Decl. ¶¶ 16–18.  As described in his declaration, the store facilities are

19   general corporate meeting rooms and storage spaces open to all of the stores' managers, not

20   offices or workspaces over which any particular employee has exclusive control, with the

21   exceptions noted below for Shah Shams and in the Rancho Cordova store.

22        Loloee cannot rely on the Ninth Circuit's decision in *Gonzalez* to claim the stores are

23   small, closely held businesses in which he had a reasonable expectation of privacy.  Loloee has

24   not proven that only a small number of people worked at the grocery stores, and the number of

25   employees is a key factor to consider under *Gonzalez*.  *See* 412 F.3d at 1116–17.  Nor has Loloee

26   demonstrated he had "day-to-day control" over the operations in each store, as the owners did in

27   *Gonzalez*.  *Id.* at 1117.  Loloee visited each of the stores only about once a week.  *See* Loloee

28   Decl. ¶ 5.  Nor has Loloee established a personal connection to any of the items seized from the

1    supermarkets.  He relies on a declaration by a retained consultant, Greg Nelson, who offers his

2    opinion that Loloee used two iPhones and two apple computers that were seized from his Granite

3    Bay residential property and the corporate office building.  Second Nelson Decl. at 2, ECF No.

4    106; *see also* First Nelson Decl., ECF No. 68-4 (identifying items and locations of seizures).

5    None of these devices were found in the supermarkets.

6         Moving, then, to the corporate offices, the government contends Loloee's standing is

7    limited to the search of his personal office on the second floor of the Duckhorn building.

8    Surreply at 1.  Loloee argues he has standing to challenge the search of the whole building.  He

9    claims he is the sole member and owner of the limited liability company that purchased the

10   Duckhorn office building in 2014.  Loloee Decl. ¶ 4.  He also claims he personally guaranteed the

11   loan for the purchase and remains personally liable for its repayment.  *Id.* ¶ 8.  He claims the

12   building is private and locked, even during the day.  *Id.*  ¶ 9.  He claims he works in the office

13   building for a "significant part" of each day, *id.* ¶ 4, he claims he keeps personal items in the

14   building, and he offers evidence to show he even used the building's address on his driver's

15   license, *see id.* & Ex. 1, ECF No. 105-1.  Only three or four other people work in the office

16   building on any given day.  Loloee Decl. ¶ 9.

17        Based on this evidence, Loloee has shown he has standing to challenge the search of the

18   entire office building.  As in *Gonzalez*, the business is a small one: Loloee is the only member of

19   the limited liability company that owns the office.  *Compare* Loloee Decl. ¶ 4 *with Gonzalez*, 412

20   F.3d at 1116–17.  As in *Gonzalez*, only a small number of people work in the Duckhorn building:

21   three or four in this case, far fewer than the twenty-five in *Gonzalez*.  *Compare* Loloee Decl. ¶ 9

22   *with Gonzalez,* 412 F.3d at 1116–17.  As did the defendants in *Gonzalez*, Loloee exercises daily

23   control over the office space and has access to it.  He works there every day, and he keeps

24   personal effects in the building.  *Compare* Loloee Decl. ¶ 10 *with Gonzalez*, 412 F.3d at 1116–17.

25        The government argues Loloee's business is actually much larger than the business at

26   issue in *Gonzalez*.  *See* Surreply at 4.  It points out that Viva supermarkets overall employed more

27   than 250 employees in 2020, 2021 and in 2022, and it cites evidence showing the grocery business

28   "cleared over $30 million in gross receipts" in those years.  Opp'n at 5.  The government

1    argues "[i]t does not matter that a smaller group of employees worked at the Duckhorn corporate

2    offices as compared to the entire grocery chain," citing *SDI Future Health* and attempting

3    implicitly to distinguish this case from *Gonzalez*. *Id.* at 6–7.

4          Both decisions support Loloee's position, as they confirm it is not the overall headcount

5    that matters, but rather the number of people who work in a particular place. In *Gonzalez*, the

6    company that was the subject of the disputed wiretap was a bus company, and it had hundreds of

7    employees in both Arizona and California. *See Gonzalez*, 412 F.3d at 1106–08; *see also United*

8    *States v. Salyer*, 814 F. Supp. 2d 984, 989 n.7 (E.D. Cal. 2011) (collecting references to record in

9    *Gonzalez*, showing more than five hundred employees total). The large overall headcount did not

10    concern the appellate panel; it emphasized that only twenty-five employees worked at the

11    company headquarters. *See id.* at 1116. The Circuit applied the same reasoning in *SDI Future*

12    *Health*, though it came to the opposite conclusion. The controlling shareholders in that case did

13    not meet the small business exception in part because the company's headquarters—again, as in

14    *Gonzalez*, not the total headcount across the entire business—was "twice the size of the office at

15    issue in *Gonzalez*." *SDI Future Health*, 568 F.3d at 697. And so, under binding Circuit

16    precedent, it is the small number of employees who work at the grocery store's corporate offices

17    that matters, not the large number of employees who have worked in Viva grocery stores over the

18    years. *See* Loloee Decl. ¶ 9.

19          The government also contends in its surreply that there are "fundamental differences"

20    between this case and *Gonzalez*. Surreply at 4. It points out that the seizures in this case were

21    physical, in-person searches of the premises themselves, not a wiretap, as in *Gonzalez*. *Id.*

22    According to the government, "the *Gonzalez* court did not consider room-by-room the

23    defendant's potential privacy interest in the headquarters in that case." *Id.* The court is not

24    persuaded by this argument either. In *Gonzalez*, the Circuit made no distinction between wiretaps

25    and premises searches. And in *SDI Future Health*, the court applied the *Gonzalez* standard to a

26    premises search for physical objects. 568 F.3d at 692. It did the same in *Galecki*, 89 F.4th at

27    723–25.

Finally, the government argues Loloee cannot rely on the small business exception because he did not own the office building personally and directly, but rather indirectly through a limited liability company; here the government relies on *United States v. Salyer*. *See* Surreply at 4 (citing 814 F. Supp. 2d at 1989). In *Salyer*, another judge of this court read the Ninth Circuit's decision in *Gonzalez* and the Supreme Court's earlier decision in *Alderman* as resting primarily on the fact of the defendants' personal ownership of the disputed building, not on the size of the business. The government's argument also finds some support in the Circuit's decision in *SDI*: in that case, the defendants were controlling shareholders, not outright owners, putting their case in a "gray area" where *Gonzalez* was not directly controlling. 568 F.3d at 697. But the court cannot agree with the government that these decisions mean direct or personal ownership is required. Loloee has offered evidence to show he owns the building in practical terms. Loloee Decl. ¶¶ 7–8. Unlike the defendants in *SDI Future Health*, Loloee is the sole member of the limited liability company that bought the building in 2014, not merely a controlling shareholder. *See id.* Further, he personally guaranteed the loan to purchase the office. *Id.* ¶ 8.

In sum, Loloee does not have standing to challenge the three grocery store searches, but he does have standing to challenge the search of the Viva corporate offices on Duckhorn Drive.

### 3.    Shah Shams

Shah Shams challenges the searches of a backroom office in the Rancho Cordova supermarket and of an office at the building on Duckhorn Drive. *See* S. Shams Join. Mot. Suppr. at 1; S. Shams Decl. ¶ 2; S. Shams Sur-Reply at 1–2, ECF No. 123. The government challenges Shah Shams' standing assertions with respect to both locations. Surreply at 1–3; Opp'n S. Shams's Surreply, ECF No. 129.

Shah Shams has standing to challenge the search of the office at the Rancho Cordova store. He has a key to the office and the government found him at the store the day of the search. *See* Ahmad Shams Decl. ¶ 3; Loloee Decl. ¶ 9. Further, a government witness has testified that Shams regularly worked in the Rancho Cordova office. *See* S. Shams Surreply at 1.

Shah Shams also has standing to challenge the search of the first-floor office in the building on Duckhorn Drive. He and Loloee both state in declarations that the first-floor office is

1  where Shah Shams primarily worked in 2023 on most days.  S. Shams Decl. ¶ 5; Loloee Decl.

2  ¶ 13.  He had a key.  S. Shams Decl. ¶ 5.  Another witness, Mohd Shams, also has identified Shah

3  Shams as an employee who worked in the corporate offices.  *See* Surreply at 2.

4  　　　The government doubts Shah Shams's claims about the office.  It argues he has been

5  inconsistent in describing his job title.  *See id.* at 1–2.  He has previously described his work as

6  "IT" support or "Customer Service Manager."  *Id.*  "If a register goes down, if printer goes down,

7  if the register doesn't work if any monitor goes down, I will go there and take care of it," he has

8  testified.  *Id.*  According to the government, "Neither of these two job titles—IT or customer

9  service—is the kind of job that would be consistent with having an interior office at Duckhorn

10  that contained boxes of personnel files."  *Id.*  The court perceives no such inherent conflict

11  between Shah Shams's statements.  A person can work in an office regularly, even daily, while

12  also traveling to several local stores to solve IT and customer service problems.

13  　　　Shah Shams has standing to challenge the searches of his Duckhorn office and the

14  backroom office at the Rancho Cordova Store.

15  　　　　　**4.　　Mirwais Shams**

16  　　　Mirwais Shams challenges the search of his office in the building on Duckhorn Drive,

17  which the government has described as "Room I" in its map.  Map of Duckhorn at 2, ECF

18  No. 110-1; *see also* M. Shams Join. Mot. Suppr. at 1; M. Shams Decl., ECF No. 101-1.  The

19  government "does not dispute" Mirwais Shams's standing to contest the search of that office

20  under the Fourth Amendment.  *See* Surreply at 1 n.1.  The court agrees he has standing to do so.

21  He relies on his declaration, in which he states he is an employee of Food Plus LLC and worked

22  from an office in the building on Duckhorn Drive that only he and Loloee used.  M. Shams Decl.

23  ¶¶ 2–3.  He had a key to the office and locked it as he was leaving work.  *Id.*  He kept personal

24  items in the office, including his personal medical information, family documents, checkbook and

25  personal bank account information.  *Id.* ¶ 6.

26  **III.　　ALLEGED OMISSIONS FROM THE AFFIDAVIT**

27  　　　Because each of the defendants has standing to challenge at least some of the disputed

28  searches, the court now turns to those challenges.  The best place to start is the defendants'

1    contention that the government should not have obtained the warrants in the first place because it

2    obtained those warrants by omitting relevant information from the affidavit.  If the affidavit was

3    in fact misleading, then it could be premature to decide whether the warrant otherwise fell short

4    of the Fourth Amendment, as a hearing under the Supreme Court's decision in *Franks v.*

5    *Delaware* might be necessary.

6          Loloee details nearly eighty individual alleged omissions in a ten-page table attached to

7    his motion.  *See* Revised Loloee Warrant Mot. Attach. D, ECF No. 75-1.  Rather than considering

8    each of these alleged omissions one-by-one, the court reviews them by category, as other courts

9    have done in similar cases.  *See, e.g.*, *Gonzalez*, 412 F.3d at 1110–11 (condensing one hundred

10   pages of attachments and claims of omissions into four categories of misrepresentations).  Here,

11   the alleged omissions fall into three categories.

12         First, Loloee contends the government initiated the investigation based on a politically

13   motivated tip, and he argues the affidavit misleadingly failed to disclose information about his

14   history with the person who came to the government with the tip, i.e., the "reporting party" the

15   Special Agent mentions in his affidavit.  That history began, for purposes of this motion, in July

16   2019, when Loloee announced his candidacy to represent District 2 on the Sacramento City

17   Council.  *See* Dupre Decl. Ex. 1, ECF No. 68-3.  Over the next several months, as the primary

18   election approached, two people publicly accused Loloee of "labor trafficking."  One of these

19   people was Maria Grijalva.  Her picture appears in a local news article about Viva stores from

20   that time.  *See* "National Hotline Tip [00667776] Potential Labor Trafficking; Sacramento, CA"

21   (Feb. 6, 2020), ETAL_894593; Crescenzo Vellucci, "Latino Viva Supermarket Employees File

22   Suit Against 'Tyrant' Owner/Sacramento City Council Candidate," Davis Vanguard (Feb. 12,

23   2020).[4]  This picture, in addition to another,[5] leaves little doubt about her negative opinion of

24   Loloee and his candidacy: she is depicted standing atop a Loloee campaign sign.  *See* Vellucci,

25   *supra*.  The second person who accused Loloee of labor offenses was Ramona Landeros, who was

---

[4] https://davisvanguard.org/2020/02/latino-viva-supermarket-employees-file-suit-against-tyrant-owner-sacramento-city-council-candidate/ (visited Feb. 27, 2024).

[5] *See* Loloee Mot. Attach. E, ECF No. 75-1.

1    vying for the same City Council position Loloee was in the primary election.  Despite the

2    accusations, Loloee ultimately prevailed over Landeros in the primary election, and he prevailed

3    in the general election as well.  *See* Dupre Decl. Exs. 2–3, ECF No. 68-3.

4         After the election, Landeros contacted the United States Attorney's Office to make a

5    complaint related to Loloee and Viva stores.  U.S. Dep't Homeland Sec. Rep., "Case Opening"

6    (Dec. 1, 2020), ETAL_939–41.  The government does not dispute Landeros is the tipster—the

7    "reporting party"—the Special Agent mentions in the affidavit.  Grijalva also was speaking to

8    representatives of the California Department of Justice, who passed on her information to federal

9    authorities as well.  *See* U.S. Dep't Homeland Sec. Rep., "Information from California

10   Department of Justice" (Dec. 1, 2020), ETAL_942–44.  Loloee claims, moreover, that all of the

11   Viva employees who ultimately came forward to make allegations of labor trafficking and

12   immigration violations against him and his companies were referred by Landeros or Grijalva or

13   both, *see* Loloee Warrant Mot. at 10, and the government does not currently dispute that claim.

14   Loloee argues the affidavit was misleading due to its omission of any information about

15   Landeros's and Grijalva's connections to the investigation.  His motion expressly portrays his

16   prosecution as a successful campaign for political revenge.  *See, e.g.*, Loloee Mem. at 21 ("Mses.

17   Landeros and Grijalva, having tried to prevent Mr. Loloee's election, and having continued their

18   machinations after his election, had succeeded in their efforts. . . .  In a very real way, Landeros

19   and Grijalva were able to facilitate the destruction of a political career and simultaneously elevate

20   themselves.").

21        Beyond his contentions about this political rivalry, in a second category of arguments,

22   Loloee contends the Special Agent's affidavit left out a variety of information about the

23   credibility, reliability, motivations and biases of the former employees who gave information to

24   government investigators.  Loloee argues the Special Agent's affidavit did not make clear how

25   many or which of the government's witnesses were current employees, which people had worked

26   at Viva stores in recent years, and which people had worked at Viva long ago—he argues many

27   witnesses had not worked at his stores for multiple years, which shows in his view that their

28   claims were unreliable.  *See* Loloee Warrant Mot. at 57 & nn.162–64.  Other alleged omissions

1    include information on specific witnesses' trustworthiness or the reliability of their claims.  The

2    affidavit does not disclose, for example, that one witness had exhibited symptoms of poor mental

3    health and delusional thinking, which led investigators to refer her for a mental health

4    examination.  *See id.* at 70 & nn.219–20.  Nor does the affidavit mention that Viva had fired

5    another witness for stealing money from a cash register.  *See id.* at 58 & nn.165–68.  Nor did it

6    inform the magistrate judge that another witness had given inconsistent statements about whether

7    Viva had paid wages in cash.  *See id.* at 69 & nn.213–15.  Some employees appeared also to have

8    an incentive to help the government; they did not have legal status within the United States and

9    were eager to stay.  *See id.* at 66–67 & nn.202–04.  Still other employees had been involved in

10    civil litigation against the company related to their wages and hours.  *See id.* at 67.  And in

11    arguing an overarching concern, Loloee emphasizes the affidavit often referred to the employee

12    witnesses as a group, rather than giving them specific identifiers, such as numbers, which would

13    have allowed the magistrate judge to consider objectively whether each particular employee had a

14    particular credibility problem, and if so, to what extent.

15    Finally, in a third category of arguments, Loloee faults the affidavit for omitting

16    information that was at least consistent with law-abiding behavior.  Most of his arguments in this

17    category relate to the potential forced labor charges.  He points out the affidavit did not inform

18    the magistrate judge that some employees had decided to give Viva fraudulent documentation on

19    their own initiative, rather than in response to instructions from Loloee, Montoya or another Viva

20    manager.  *See id.* at 71–72 & nn.226–28.  Some aspects of the employees' work histories also

21    suggest, in Loloee's telling, that they had not been coerced to work at Viva stores.  For example,

22    the affidavit did not explain that some employees had resigned from Viva voluntarily, had been

23    fired, or had returned to work at the store.  *See id.* at 68 & nn.206–09.  Nor did the affidavit note

24    that an employee had engaged a law firm in connection with allegations of forced labor at a Viva

25    store, but the firm did not find the evidence sufficient to pursue a case.  *See id.* at 66–67 & n.202.

26    Loloee similarly faults the affidavit for omitting information showing some witnesses did not

27    claim to have been forced to work long hours or accept pay "under the table."  *See id.* at 70–71 &

28    nn.222–24.  Some of the arguments in this category concern matters unrelated to the forced labor

1   charges.  Loloee argues the affidavit should have informed the magistrate judge that Loloee had

2   refused one of his employee's requests to stop deducting taxes from the employee's paycheck.

3   *Id.* at 70 & n.221.  Loloee also argues the government wrongly failed to explain that federal

4   regulations permitted him to rely on a specific type of accounting information in his pandemic

5   relief application.  *See id.* at 50–53.

6       Based on these omissions, Loloee argues both that he is entitled to a hearing under the

7   Supreme Court's decision in *Franks v. Delaware* and that the court should suppress any evidence

8   the government obtained in its searches.  The court first reviews the relevant legal standards

9   applicable to Loloee's *Franks* hearing request.

10      **A.**     **Legal Standards**

11      In *Franks v. Delaware*, the Supreme Court held if a defendant makes a "substantial

12  preliminary showing" the government included false statements in a warrant application

13  "knowingly and intentionally, or with reckless disregard for the truth," and "if the allegedly false

14  statement is necessary to the finding of probable cause," then "the Fourth Amendment requires

15  that a hearing be held at the defendant's request."  438 U.S. at 155–56.  But "to mandate an

16  evidentiary hearing," the Court held, "the challenger's attack must be more than conclusory. . . .

17  There must be allegations of deliberate falsehood or reckless disregard for the truth, and those

18  allegations must be accompanied by an offer of proof."  *Id.* at 171.  The Court also cautioned that

19  "[a]llegations of negligence or innocent mistake are insufficient" and cannot alone entitle

20  defendant to a *Franks* hearing.  *Id.*  Defendants must instead "point out specifically the portion of

21  the warrant affidavit that is claimed to be false," and they should provide "a statement of

22  supporting reasons."  *Id.*

23      Lower federal courts, including the Ninth Circuit, have interpreted the Supreme Court's

24  decision in *Franks* as applying to more than just affirmative falsehoods.  Under these decisions,

25  "deliberate or reckless omissions of facts that tend to mislead" may also require a *Franks* hearing.

26  *United States v. Stanert*, 762 F.2d 775, 781 *as amended by* 769 F.2d 1410 (9th Cir. 1985).  "By

27  reporting less than the total story, an affiant can manipulate the inferences a magistrate [judge]

28  will draw."  *Id.*

1          In practice, defendants must make a twofold showing about the supporting affidavit to

2    support their request for a hearing under *Franks* based on arguments about omissions.  First, the

3    defendant must show the omission was "intentional or reckless."  *United States v. Bennett*,

4    219 F.3d 1117, 1124 (9th Cir. 2000).  These terms connote a "high degree of awareness of

5    probable falsity."  *United States v. Senchenko*, 133 F.3d 1153, 1158 (9th Cir. 1998).  But clear

6    proof of deliberate or reckless omissions is not necessary to obtain a hearing under *Franks*; a

7    substantial showing supporting a finding of recklessness or intent suffices.  *Gonzalez*, 412 F.3d at

8    1111; *see also, e.g.*, *United States v. Norris*, No. 11-00188, 2013 WL 4737197, *3–4 (E.D. Cal.

9    Sept. 3, 2013) (applying these rules), *aff'd*, 938 F.3d 1114 (9th Cir. 2019).  In previous cases,

10   defendants have made the necessary showing by offering evidence illustrating how the affiant

11   played a "key role in the investigation" and, therefore, knew or should have known the affidavit's

12   description of that investigation was inaccurate or misleading.  *Gonzalez*, 412 F.3d at 1111.

13   Courts also have inferred recklessness or deliberate action from an affiant's selective inclusion of

14   "information bolstering probable cause, while omitting information that did not."  *United States v.*

15   *Perkins*, 850 F.3d 1109, 1117 (9th Cir. 2017).  And in some circumstances, the government's later

16   admission that some types of information were excluded can support a defendant's position.  In

17   *United States v. Bennett*, for example, the government conceded information about its informant's

18   past perjuries, arrests and failures to pay taxes had been omitted from the affidavit, and it likewise

19   conceded those omissions "must be deemed reckless."  219 F.3d at 1124.

20         Second, the defendant must show the omission was "material."  *Id.*  That is, the defendant

21   must show if there had "been no omission, the affidavit would have been insufficient to establish

22   probable cause."  *United States v. Kyllo*, 37 F.3d 526, 529 (9th Cir. 1994).  In evaluating this kind

23   of argument, the court incorporates the omitted facts into the affidavit, then evaluates "whether

24   the affidavit, once corrected and supplemented, would provide a magistrate [judge] with a

25   substantial basis for concluding probable cause existed."  *Stanert*, 762 F.2d at 780–81; *see also*

26   *Kyllo*, 37 F.3d at 529.  There is no "neat set of legal rules for evaluating probable cause."  *Chism*

27   *v. Washington State*, 661 F.3d 380, 389 (9th Cir. 2011) (citations and quotation marks omitted).

28   The question is "whether there is a fair probability that evidence of a crime will be found."  *Id.*

1 (citations and quotation marks omitted).  The court presumes the warrant and the supporting

2 affidavit are valid.  *See Franks*, 438 U.S. at 171; *United States v. Meek*, 366 F.3d 705, 716 (9th

3 Cir. 2004).  The court is "limited to the information and the circumstances contained within the

4 four corners of the underlying affidavit," as corrected.  *Crowe v. County of San Diego*, 608 F.3d

5 406, 434 (9th Cir. 2010) (quoting *Stanert*, 762 F.2d at 775, 778).  Probable cause is then

6 determined "by viewing the 'totality of the circumstances' set forth in the affidavit."  *Stanert*, 762

7 F.2d at 778 (quoting *Illinois v. Gates*, 462 U.S. 213 (1983)).

8 **B.      Omissions Intentional or Reckless?**

9 Under the first part of the two-part test, Loloee must show an omission was intentional or

10 reckless.  The government concedes at least four omissions "probably should have" or "could

11 have" been included in the affidavit:

12 • It concedes "the affidavit could have additionally informed the magistrate judge

13 that the reporting party was a former political rival of Loloee."  Opp'n at 53.

14 • It agrees "one of the witnesses requested a T-visa following his interview," and it

15 agrees "[t]he affidavit could have included this potential source of bias."  *Id.* at 55.

16 • It "concedes that one of the sources in the affidavit did admit to agents that she

17 stole from the cash registers on different occasions and that she was fired for

18 stealing."  *Id.* at 56.

19 • It agrees with Loloee "that the witness in paragraph 19 of the affidavit has made

20 statements that may be indicative of a mental health concern and that DHS made a

21 referral on this basis," and it agrees "this fact should have been included in the

22 affidavit."  *Id.* at 59.

23 Loloee takes these statements as implied concessions that he has made a substantial

24 preliminary showing of recklessness and materiality.  Loloee Reply at 24.  At hearing, the

25 government conceded neither point.  Rather, it contends none of the approximately eighty alleged

26 omissions was reckless because "Ninth Circuit law does not require the encyclopedic recitation of

27 facts in an investigation."  Opp'n at 52.  Similarly, the government denies recklessness by

1    explaining the affidavit was already "27 pages" long, and it argues the additional facts would

2    "have the tendency to overwhelm the factual narrative and be confusing." *Id.*

3            Although the government is correct that the Fourth Amendment does not require an

4    "encyclopedic" explanation of probable cause, an affiant does have "a duty to provide, in good

5    faith, all relevant information to the magistrate [judge]," even if that information is voluminous.

6    *Perkins*, 850 F.3d at 1116 (citing *United States v. Hill*, 459 F.3d 966, 971 n.6 (9th Cir. 2006)).

7    The government's concerns about "overwhelming" or "confusing" a duly appointed magistrate

8    judge, selected based on merit, are misplaced if not condescending or patronizing.  Its position

9    runs the risk of usurping "the magistrate judge's duty to conduct an independent evaluation of

10   probable cause." *United States v. Wright*, 431 F. Supp. 3d 1175, 1183 (D. Nev. 2020) (quoting

11   *Perkins*, 850 F.3d at 1118), *aff'd*, No. 20-10303, 2022 WL 67341 (9th Cir. Jan. 6, 2022) (internal

12   citations omitted).  Affiants must not allow efforts at purported clarity or streamlining to "mislead

13   a magistrate [judge] 'by reporting less than the total story.'" *Perkins*, 850 F.3d at 1117–18

14   (quoting *Stanert*, 762 F.2d at 781) (alterations omitted).

15           Fairly assessed, Loloee's evidence of recklessness is not as strong as that in other cases,

16   and it is far from conclusive, but it suffices to make out the necessary "substantial showing" about

17   the Special Agent's state of mind.  The government does not dispute the Special Agent knew

18   about the omitted information based on his involvement in the investigation.  Nor does the

19   government dispute at least some of the omitted information could potentially have raised doubts

20   about its sources' and witnesses' motives, the reliability of their statements or their credibility in

21   general.  Other courts have found similar information can support a defendant's claim of

22   recklessness or intentional omissions.  *See, e.g.*, *United States v. Sheikh*, 481 F. Supp. 3d 1052,

23   1055 (E.D. Cal. 2020) (discussing government's provision of food, housing, temporary status and

24   possibly permanent residency to sources who assisted investigation and finding omission of such

25   information reckless).  For these reasons, Loloee has met his preliminary burden of showing at

26   least recklessness under the first part of the *Franks* test.

**C.    Materiality of Omissions?**

Although Loloee has met his burden on the first part of the test, he is entitled to a hearing under *Franks* only if he shows the affidavit would not have supported a finding of probable cause after the omissions were corrected.  He has not done so and reaching this conclusion is not a close call.  As explained below, even if the affidavit had included the information Loloee points to, the reviewing magistrate judge could readily have found probable cause to approve the disputed warrants.

First, for clarity, the court notes some of the information Loloee cites was not actually omitted from the affidavit.  For example, the affidavit does not obscure the fact that some of the government's witnesses were former employees who had not worked at the grocery stores for some time.  The Special Agent stated expressly that some of the employee witnesses were not current employees, and he noted the dates of their employment.  *See* Aff. ¶ 14 ("[The witnesses] were employed at Viva at various times between 2014 and 2021 . . . ."); *id.* ¶ 23 ("Of the seven Viva employees referred to in paragraph 14 above, . . . five continued to work at Viva during the period from 2017 through 2020.").  Nor did the affidavit mislead the magistrate judge about the employees' lack of authorization to live and work long-term in the United States and the likely incentives of that status, given their participation in the investigation.  The government expressly cautioned in a footnote that it was allowing six employees to stay and work in the United States while the investigation was ongoing.  *See id.* at 6 n.4.  The affidavit also disclosed there had been civil litigation between Loloee and some former employees in the past.  *See id.* 6 n.3.

Additionally, some of the allegedly omitted information, if included, would have strengthened the government's case rather than undermined it, and so cannot support Loloee's motion.  That is true, for example, of the allegedly omitted details about Viva employees' confessions to the government that they had relied on fraudulent documentation in their applications.  That evidence—an admission against the witness's interest—would arguably have corroborated the government's claims that Viva stores employed people who were not authorized to work in the United States.  The same is true of the allegedly omitted details about Loloee's pandemic relief fund application.  Loloee does not refute the government's persuasive argument

1    showing why, if the affidavit had included the additional details he discusses, it would have

2    supported the conclusion his store's pandemic relief application was intentionally misleading.

3    *See* Opp'n at 62–64.

4        Some of the information Loloee points to in his motion also is irrelevant. Loloee cites, for

5    example, Landeros's and Grijalva's connections to an organization called the "Benito Juarez

6    Association." *See, e.g.*, Revised Loloee Mem. at 9–10. He implies the organization did not

7    actually exist, or at minimum was never formally established. *See id.* at 10. He also cites social

8    media posts about a "Fundraising Gala & Awards Night" the association held in 2023 with

9    sponsorship from state law enforcement agencies. *See id.* at 12. But he does not explain how the

10   association, the gala or the sponsorships were relevant to a federal investigation into potential

11   immigration, labor and tax crimes.

12       The question is somewhat more difficult for the other allegedly omitted information, but

13   not significantly more. As summarized above, Loloee contends the government wrongly failed to

14   inform the magistrate Judge that its investigation had roots in a tip from a political rival, that the

15   government's witnesses had connections to that rival, that several of the witnesses' credibility

16   could be called into question, and that some evidence was consistent with Loloee's having acted

17   lawfully.

18       It is far from unusual for those who come to the government as tipsters or informants to

19   have ulterior motives. "It would have to be a very naive magistrate [judge] who would suppose

20   that a confidential informant would drop in off the street with such detailed evidence and not have

21   an ulterior motive." *United States v. Strifler*, 851 F.2d 1197, 1201 (9th Cir. 1988). But when the

22   government has reason to doubt the veracity and credibility of a reporting party or informant,

23   "that red flag may [be] sufficient to create a duty of further inquiry." *United States v. Tanguay*,

24   787 F.3d 44, 53 (1st Cir. 2015) (citing *United States v. Chesher*, 678 F.2d 1353, 1361–62

25   (9th Cir. 1982)). It may be necessary to test the person's claims or find and report other

26   corroborating information. *See, e.g.*, *United States v. Miller*, 753 F.2d 1475, 1480 (9th Cir.

27   1985); *United States v. Freitas*, 716 F.2d 1216, 1222 (9th Cir. 1983).

1    And so, in this case, if the Special Agent had explained the political rivalries and history

2  between and among Loloee, Landeros and Grijalva, and if the affidavit had then relied on

3  Landeros's and Grijalva's claims alone to establish probable cause, the government would likely

4  have failed to show probable cause.  But the government did not rely directly on either Landeros

5  or Grijalva as a source of information in the affidavit, or rely on them alone.  Nor did the affidavit

6  report any statements or allegations by Landeros or Grijalva.  It did not ask the magistrate judge

7  to accept or rely on their claims as evidence any crimes had occurred.  It offered other evidence.

8    The government did offer the accounts of several employee witnesses, so the omission of

9  information about their credibility and reliability could be problematic.  If the affidavit had

10  disclosed in detail that some of the employee witnesses had exhibited signs of mental health

11  problems or delusional thinking, had stolen from Viva cash registers, had been removed from the

12  United States in the past, were worried about being deported and wanted to curry government

13  favor, then their credibility would likely need to have been salvaged or their claims corroborated.

14  *See United States v. Reeves*, 210 F.3d 1041, 1045 (9th Cir. 2000); *Tanguay*, 787 F.3d at 53

15  (noting "duty of further inquiry" where credibility questionable).  A magistrate judge must have

16  sufficient evidence to make credibility determinations about the affiant's sources.  *See Gates*,

17  462 U.S. at 240–41 (describing determinations of informant credibility and reliability as core to

18  magistrate judges' evaluation of affidavits).

19    But as summarized in the background section above, the government did not take the

20  employee witnesses' claims at face value.  Investigators used their claims as a starting point.

21  They attempted to verify the claims.  They reviewed the employees' paychecks, checked their

22  allegations against federal immigration records, and analyzed tax and bank records.  The

23  government's investigation revealed evidence from multiple, independent sources suggesting

24  Loloee and his companies had employed people who were not authorized to work in the United

25  States, maintained a system to track fraudulent social security numbers, issued paychecks with

26  fraudulent information, manipulated financial records, and concealed wages from federal tax

27  authorities.  In sum, when all the alleged omissions about employees' credibility or motivations

28  are incorporated, the affidavit still would have permitted the magistrate judge "to make a

31

practical, common-sense decision whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Stanert*, 762 F.2d at 778–79 (quoting *Gates*, 462 U.S. at 238).  As corrected, the affidavit would have painted the following picture:

- A political rival who had run against Loloee and who had long accused him of violating the law came to state and federal authorities with complaints.

- The rival and her associate identified several Viva employees and helped the government secure interviews with them.  In the interviews, the employees alleged Loloee and Viva had hired many people who were not authorized to work in the United States and were using misleading accounting practices to reduce their tax liability and avoid detection.

- There were several reasons not to take the employees' claims at face value.  Some of them had not worked at Viva for some time.  One might have been suffering from a mental health problem.  Another had been fired from Viva after stealing from a cash register.  Others had been involved in civil litigation against Viva.  Many were also living and working in the United States without authorization and had an incentive to curry favor with law enforcement officers.  For that reason, investigators would need to corroborate the employees' claims.

- Investigators found immigration records showing Viva had employed many people who did not appear to be authorized to work in the United States, including Montoya, Viva's General Manager.  Aff. ¶¶ 15–16.

- Bank and tax records showed Loloee's companies had underreported wages paid to the Viva employees to whom the government had spoken.  *See, e.g., id.* ¶¶ 21, 22.

- Salaries and wages reported by Viva stores decreased significantly from 2017 to 2018 and then inexplicably doubled from 2019 to 2020, when Loloee was elected to the Sacramento City Council.  *Id.* ¶¶ 17, 24.

- Bank and tax records from many of the same years suggested Loloee had not accurately reported income paid to him by Viva and its affiliated companies and had used misleading accounting practices to obfuscate the amount of wages Viva had paid to his employees, and there were many other inconsistencies and oddities in these records.  The affidavit details these findings extensively.  *See id.* ¶¶ 25–37.

- Loloee filed an application for pandemic relief funds in 2021, and that application suffered from some of the same types of misleading reports as the bank and tax records cited above.  *See id.* ¶ 38.

In other words, a magistrate judge could quite readily have found that, in these circumstances, officers were likely to find evidence of immigration, labor, tax and other similar crimes in Loloee's homes, stores, and offices.

As noted, Loloee also repeatedly contends the affidavit improperly failed to disclose that some of the government's sources had been fired from their positions at Viva stores, had voluntarily resigned, or had later sought reemployment at a Viva store.  *See* Revised Loloee Mem. at 68–69.  By Loloee's reasoning, evidence that any Viva employees made their own affirmative choices or were fired is exculpatory to a charge under 18 U.S.C. § 1589.  *Id.* at 68.  This reasoning rests on an unduly narrow reading of § 1589.  Voluntary choices and terminations do not disprove an allegation of forced labor.  Forced labor in violation of § 1589 can take many forms, including threats of immigration consequences, financial hardship, reputational harms, and related harms to family members.  All can support a forced labor allegation under § 1589.  *See United States v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011); *see also Estavilla v. Goodman Grp., LLC*, No. 21-68, 2022 WL 539192, at *12 (D. Mont. Feb. 23, 2022) (reasoning similarly and collecting authority).  "[M]ultiple jurisdictions have found that the threat of deportation may itself constitute a threat sufficient" to a finding of forced labor in violation of § 1589.  *Echon v. Sackett*, No. 14-3420, 2017 WL 4181417, at *14 (D. Colo. Sept. 20, 2017); *see also Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923, 953 (N.D. Cal. 2019).  In short, nothing in § 1589 suggests employees cannot be victims of forced labor offenses if they quit, are fired or come back to the job.  An

1    employee's willingness to return to a job where they were threatened might even be evidence the

2    threat was effective.

3        Loloee is not entitled to a hearing under *Franks*.

4  **IV.    SPECIFICITY**

5        Defendants also contend the warrants violated the Fourth Amendment because they did

6    not specifically describe the things and places to be searched.  The Fourth Amendment provides

7    "no Warrants shall issue, but upon probable cause, supported by Oath of affirmation, and

8    particularly describing the place to be searched, and the persons or things to be seized."

9    U.S. Const. am. IV.  The Ninth Circuit has interpreted this language as imposing two distinct

10   requirements: search warrants must be particular, and they must not be overbroad.  *See, e.g.*, *In re*

11   *Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856 (9th Cir. 1991).  "Only after the

12   content of 'the search warrant' is established, however, can the warrant be tested to see if it meets

13   these requirements."  *United States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993).  The parties

14   disagree whether the supporting affidavit is part of the "warrant" in this case—and thus whether

15   and to what extent the court should consider it.  *Compare* Opp'n at 23 *with* Reply at 15–18.  The

16   court begins with that question.

17       **A.    Incorporation**

18       If an affidavit is incorporated into a warrant, it can potentially "cure" any shortcomings in

19   that warrant.  *See Towne*, 997 F.2d at 544.  An affidavit is incorporated if the warrant expressly

20   incorporates it by reference and if the affidavit is either physically attached to the warrant or at

21   least accompanies the warrant at the search.  *See id.*  These requirements are intended to ensure a

22   would-be curative affidavit actually "limit[ed] the discretion of the officers executing the

23   warrant."  *SDI Future Health*, 568 F.3d at 699 (quoting *Towne*, 997 F.2d at 545).

24       Regarding the first requirement, the search warrants in this case expressly incorporated the

25   supporting affidavit by reference: they identified the affidavit as "attached hereto and

26   incorporated by reference."  *E.g.*, Duckhorn Drive Warrant, Case No. 23-sw-1075 (Oct. 20,

27   2023), ECF No. 1 (under seal).  As for the second requirement, the government argues the

28   affidavit was "available to the search team" because the case agent emailed copies to the

                                        34

1    members of the search team before the search began.  *See* Opp'n at 23.  It relies on the Ninth

2    Circuit's decision in *SDI Future Health*, cited above, and on a decision by another judge of this

3    court in *United States v. Smith*, Case No. 21-136, 2022 WL 12073875 (E.D. Cal. Oct. 20, 2022).

4    The court agrees those decisions support the conclusion the warrant incorporated the affidavit.  In

5    *SDI Future Health*, it was "unclear whether each member of the [search] team had his own copy

6    [of the affidavit] as he conducted the search."  568 F.3d at 701.  But the record did show the

7    affidavit "was available during the search for reference by any member of the Government's

8    search team."  *Id.*  The Circuit held "[n]othing more [was] necessary to ensure 'that the discretion

9    of the officers executing the warrant is limited.'"  *Id.* (quoting *Towne*, 997 F.2d at 548).  In *Smith*,

10    the court found an affidavit was similarly "available" to the executing officer because an

11    electronic copy had been emailed before the search.  *See* 2022 WL 12073875, at *5 (citing *SDI*

12    *Future Health* and *United States v. Taylor*, No. 17-00191, 2019 WL 281457, at *5 (N.D. Cal.

13    Jan. 22, 2019)).  In this case, by sending copies of the affidavit to the other officers before the

14    search, the Special Agent similarly made that affidavit "available."

15         Loloee argues the affidavit was not actually "available" because at the site of one search,

16    an officer referred an attorney to another officer for a copy of affidavit, and the other officer did

17    not produce a copy for about thirty minutes.  *See* Reply at 17–18.  Loloee also contends officers

18    refused to provide copies of the affidavit altogether at the site of a different search.  *See id.*  The

19    Ninth Circuit and Supreme Court have made clear, however, that the Fourth Amendment does not

20    require that officers produce copies of the warrant or affidavit at the site of a search.  *See SDI*

21    *Future Health*, 568 F.3d at 701 ("[T]he Constitution protects property owners not by giving them

22    license to engage the police in a debate over the basis for the warrant, but by interposing, *ex ante*,

23    the deliberate, impartial judgment of a judicial officer between the citizen and the police, and by

24    providing, *ex post*, a right to suppress evidence improperly obtained and a cause of action for

25    damages." (quoting *United States v. Grubbs*, 547 U.S. 90, 99 (2006))).

26         Because the warrant here expressly incorporated the affidavit by reference, and because

27    the affidavit was available at the search, it was incorporated into the warrant and could potentially

1   "cure" any problems, including a lack of particularity or overbreadth, within that warrant.  The

2   court now turns to those questions.

3       **B.**    **Particularity**

4         The requirement that a warrant satisfy particularity means "the warrant must clearly state

5   what is sought." *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006) (quoting *United States v.*

6   *Hill*, 322 F. Supp. 2d 1081, 1087 (C.D. Cal. 2004)).  It "prevents officers from engaging in

7   general, exploratory searches by limiting their discretion and providing specific guidance as to

8   what can and cannot be searched and seized." *United States v. Adjani*, 452 F.3d 1140, 1147

9   (9th Cir. 2006).  To be valid, a warrant must "make clear to the executing officer exactly what it is

10  that he or she is authorized to search for and seize." *SDI Future Health*, 568 F.3d at 702 (quoting

11  *In re Grand Jury Subpoenas*, 926 F.2d at 857).  Whether a warrant meets this standard depends

12  "on the circumstances of the case and the type of items involved." *Hill*, 459 F.3d at 973 (quoting

13  *Hill*, 322 F. Supp. 2d at 1088).  Precise descriptions might not be possible. *Adjani*, 452 F.3d at

14  1147–48.  If not, a warrant might be sufficiently particular even if it identifies only the "category

15  of items" to be seized. *Hill*, 459 F.3d at 973 (quoting *Hill*, 322 F. Supp. 2d at 1088).

16        The warrants in this case meet the Fourth Amendment's particularity requirement.  Many

17  of the descriptions within them are quite granular.  Officers on the scene of the search would not

18  have had any trouble understanding, for example, the warrants' instruction to seize any

19  "[s]urveillance video" or "passwords" they might find.  Warrant Attach. B. ¶¶ 7, 10.  The

20  warrants also identified many specific documents, such as "[c]ashier's checks," *id.* ¶ 8, "safes,"

21  *id.* ¶ 9, tax forms, *id.* ¶ 2, "deeds," *id.* ¶ 6, "[l]ease agreements," *id.*, and "financial statements,"

22  *id.*  The warrants' lists of digital storage devices were similarly specific.  They instructed officers

23  to seize, among other things, "any magnetic, electronic or optical storage device capable of

24  storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical

25  disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers,

26  electronic notebooks, and personal digital assistants." *Id.* ¶ 11.c.  The same can be said of the

27  warrant's instructions to seize "evidence of who used, owned, or controlled the digital device or

28  other electronic storage media." *Id.* ¶ 12.a.  They listed "logs, registry entries, configuration files,

1   saved usernames and passwords, documents, browsing history, user profiles, email, email

2   contacts, 'chat,' instant messaging logs, photographs, and correspondence." *Id.*  Or as a final

3   example, the warrants provided specific instructions to seize "routers, modems, and network

4   equipment used to connect computers to the internet"; "records of Internet Protocol addresses

5   used"; and "records of internet activity, including firewall logs, caches, browser history and

6   cookies, 'bookmarked' or 'favorite' web pages, search terms that the user entered into any

7   internet search engine, and records of user-typed web addresses." *Id.* ¶ 13.

8          Courts repeatedly have upheld searches conducted and seizures made under warrants with

9   similarly specific terms and lists of examples.  In *Adjani*, for example, the government was

10  investigating an international extortion scheme carried out over email and instant message.  *See*

11  452 F.3d at 1143–44.  It obtained a warrant instructing officers to seize, among other things,

12  "[a]ny and all evidence of travel," with examples: "hotel bills and receipts, gasoline receipts,

13  plane tickets, bus tickets [and] train tickets." *Id.* at 1144.  The warrant also instructed officers to

14  seize any "[c]omputer[s], hard drives, computer disks, CD's, and any other computer storage

15  devices" they found.  *Id.*  The warrant complied with the Fourth Amendment.  *See id.* at 1148–50.

16         The Ninth Circuit's opinion in *United States v. Giberson* is another similar example.  *See*

17  *generally* 527 F.3d 882 (9th Cir. 2008).  Officers were investigating whether a man had used false

18  identities to evade his child support obligations.  *See id.* at 884.  The warrant included a long list

19  of "records or documents" to be seized, as in this case.  *See id.*  It identified, for example,

20  documents "that appear to show ownership of assets or property," "records or documents from

21  financial institutions," "records and correspondence relating to identifications cards," "tax

22  records," and "documents or records showing receipt of income or expenditure of funds." *Id.*

23  The Ninth Circuit held this list "clearly limited the types of documents and records that were

24  seizable" using objective terms and "adequate specificity." *Id.* at 886 (citation and quotation

25  marks omitted).  These examples mirror the warrants in this case and support the government's

26  position here.

27         The warrants do use broad or generic language at some points, as Loloee contends.  *See*,

28  *e.g.*, Revised Loloee Mem. at 33.  For example, they instruct officers to seize "any digital device

37

1   or other electronic storage media capable of being used to commit, further, or store evidence of

2   fruits of the offenses listed above."  Attach. B ¶ 11.a.  A bare reference to "offenses" or suspected

3   crimes does not suffice on its own when a warrant otherwise includes only generic descriptions.

4   *See, e.g.*, *United States v. Spilotro*, 800 F.2d 959, 965 (9th Cir. 1986).  But when these generic

5   descriptions are read in their context, they make clear what officers could and could not seize, as

6   the Fourth Amendment requires.  Immediately before the warrant's instruction to seize digital

7   devices and storage media, it lists many specific types of materials that officers should seek out,

8   such as surveillance video, property records, loan records, tax records, and passwords.  *See*

9   Attach. B ¶¶ 4–10.  And immediately after the generic terms, the warrants use specific language

10  to identity the types of digital devices and storage media officers should seize, such as scanners,

11  CDs, and DVDs.  *See id.* ¶¶ 11.b–c.  The incorporated affidavit also described the suspected

12  crimes in detail, as summarized in the background section above.  In this way, the generic

13  descriptions communicate where officers may search for the more specifically identified items.

14          Federal courts have long held that if a search warrant properly authorizes officers to

15  search for and seize specific materials, then it also authorizes them to search or seize "objects that

16  could contain those materials."  *Giberson*, 527 F.3d at 886.  If, for example, a warrant instructs

17  officers to search for evidence of drug trafficking and discussions of drug transactions, then

18  officers may search and seize devices that could contain drugs and recordings of drug

19  transactions, such as briefcases and cassette tapes.  *See United States v. Gomez-Soto*,

20  723 F.2d 649, 655 (9th Cir. 1984).  If a warrant instructs officers to search for and seize evidence

21  of identity theft, then they may seize a desktop computer they encounter during the search if it is

22  reasonable for them to believe the computer includes evidence of identity theft, perhaps because

23  there are false IDs on a printer connected to that computer.  *See Giberson*, 527 F.3d at 884–85,

24  889.  This is true even if the warrant does not specifically identify "briefcases," "microcassette

25  tapes," and "desktop computers."  *See id.*  It is not "fatal" that the government did not "anticipate

26  the precise container."  *Gomez-Soto*, 723 F.2d at 655.  The warrants here were sufficiently

27  particular under the Fourth Amendment.

Loloee relies primarily on three cases to argue otherwise. First, he cites the Circuit's memorandum disposition in *Moore v. Garnand*. *See* Revised Loloee Mem. at 33–35 (citing No. 22-16236, 2023 WL 6372972 (9th Cir. Sept. 29, 2023) (unpublished)). In *Moore*, a civil case brought under 42 U.S.C. § 1983 to challenge an abandoned criminal investigation by a local police department, the plaintiffs alleged two police officers had violated the First and Fourth Amendments. *See Moore v. Garnand*, No. 19-0290, 2022 WL 3028000, at *1 (D. Ariz. July 29, 2022), *aff'd in part, rev'd in part, and remanded*, No. 22-16236, 2023 WL 6372972 (9th Cir. Sept. 29, 2023); *see also Moore v. Garnand*, 83 F.4th 743 (9th Cir. 2023) (concurrently filed opinion on First Amendment claim), *cert. denied*, 144 S. Ct. 1098 (2024). Their Fourth Amendment claim targeted two search warrants. *See* 2023 WL 6372972, at *1. The second of these warrants permitted the officers to search for and seize "a vast array" of "financial information" and electronics, but it was based on an affidavit that made no connection between those electronics and any suspected crimes. *See id.* at *2. For that reason, the Ninth Circuit held the warrant was unconstitutionally overbroad, not that it fell short of the Fourth Amendment's particularity requirement. *See id. Moore* does not show the warrants in this case were insufficiently particular.

Second, Loloee cites the district court's decision in *United States v. Pilling*. *See* Mem. at 34–35 (citing 721 F. Supp. 3d 1113 (D. Idaho 2024)). In that case, the government had obtained two warrants to search the defendant's Google and Apple accounts, respectively. *See id.* at 1118–19. In the prosecution that followed, the defendant moved to suppress the evidence obtained from both warrants based on the argument they were overbroad and not particular, contrary to the Fourth Amendment. *See id.* at 1120. The district court held the first warrant for the Google account was particular and not overbroad, as it was tied to specific bids, emails, attachments, buildings and suspected violations of the Clean Air Act. *See id.* at 1122–24. But the second warrant for the Apple account "did not adequately describe the things to be seized." *Id.* at 1124. It "authorized a search of the defendant's entire iCloud account for 'fruits, contraband, evidence, and instrumentalities of violations' of five statutes." *Id.* It "did not state the identity and 'nature of the items to be seized,' . . . did not describe, in *any* detail, 'the items one

39

1    commonly expects to find on premises used for the criminal activities in question,'" and it could

2    have been more specific, for example by incorporating the supporting affidavit or describing the

3    things to be seized.  *Id.* at 1126–27 (emphasis in original) (quoting *Adjani*, 452 F.3d at 1148–49).

4    The warrants in this case resemble the first *Pilling* warrant, sent to Google, more than the second,

5    sent to Apple.  Like the warrant sent to Google, the warrant in this case identifies specific types of

6    information, such as tax forms and security video, as discussed above.  *Pilling* therefore supports

7    the government's position on particularity, not Loloee's.

8         Third, Loloee cites the district court's decision in *United States v. Hill*.  *See* Mem. at 34–

9    35 (citing No. 20-0239, 2022 WL 2644102 (N.D. Cal. July 8, 2022)).  In that case, the

10   government alleged the defendant had participated in an armed robbery at a Walgreens pharmacy.

11   *See id.* at *1.  It had obtained a search warrant for the defendant's Google account.  *See id.* at *2.

12   The defendant moved to suppress the evidence obtained in that search, and the district court

13   granted the motion.  *See id.* at *4–5.  The supporting affidavit did not offer any reason to suspect

14   the search would turn up evidence related to the robbery or drug crimes.  *See id.* at *4.  The

15   affiant had said simply "that, in his experience, Google accounts 'may' be used for drug

16   trafficking and other criminal offenses."  *Id.*  The district court was concerned that the warrant

17   "represent[ed] an unwarranted intrusion into Hill's privacy rights," as it permitted searches for the

18   entire account, from contacts and messages to photos and payment records.  *See id.* at *5.  The

19   affidavit and warrant in this case, by contrast, rest on more than just an agent's conjecture that

20   relevant evidence might be found, and the warrant lists many specific types of documents and

21   evidence to be seized, as discussed above.

22        At various points in his argument, Loloee also emphasizes the large volume of electronic

23   data the government has seized and retained.  *See, e.g.*, Revised Loloee Mem. at 41; Reply at 17.

24   As noted above, the Ninth Circuit has maintained that a warrant's breadth and scope are distinct

25   from the particularity of its descriptions.  *SDI Future Health*, 568 F.3d at 702.  After all, a warrant

26   can be particular and yet very broad, as long as it describes "many, many items" with

27   particularity.  *United States v. McClintock*, 748 F.2d 1278, 1283 (9th Cir. 1984).  Courts also have

28   long understood that computers, flash drives, smartphones and other electronics store much more

1    information than can be stuffed in a briefcase or filing cabinet. *See, e.g.*, *Adjani*, 452 F.3d at

2    1152. Electronic devices can "be repositories of innocent and deeply personal information," as

3    well. *Id.* But the Ninth Circuit has specifically declined to use a different standard for electronics

4    than for physical boxes or cabinets. *Giberson*, 527 F.3d at 888; *Adjani*, 452 F.3d at 1149–50.

5         None of Loloee's arguments undermines the court's conclusion that the particularity

6    requirement is satisfied.

7    **C.    Breadth**

8         Beyond particularity, the Fourth Amendment's specificity requirement demands the

9    government have "probable cause to seize the particular thing[s] named in the warrant." *SDI*

10   *Future Health*, 568 F.3d at 702–03 (alteration in original) (quoting *In re Grand Jury Subpoenas*,

11   926 F.2d at 857). That is, officers cannot seize a thing if they do not have probable cause to do so,

12   no matter how particularly the warrant might describe that thing. *See id.* As summarized in

13   section III.A. above, probable cause is "not certainty or even a preponderance of the evidence,"

14   but rather a "fair probability" based on the "totality of the circumstances." *United States v.*

15   *Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc) (quotation marks omitted) (quoting *Gates*,

16   462 U.S. at 246).

17        Loloee trains most of his overbreadth arguments on the warrants' instructions to search for

18   and seize a broad variety of digital and electronic evidence. *See, e.g.*, Revised Loloee Mem. at

19   27–32. Broad warrants for large collections of electronics and devices are not necessarily

20   unconstitutional; the Fourth Amendment permits broad searches and seizures if the evidence

21   justifies them. *See, e.g.*, *United States v. Schesso*, 730 F.3d 1040, 1042 (9th Cir. 2013) (collecting

22   authority). Courts also have long recognized the government's "legitimate need to scoop up large

23   quantities of data, and sift through it carefully for concealed or disguised pieces of evidence."

24   *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010)

25   (en banc) (per curiam), *overruled in part on other grounds as stated in Demaree v. Pederson*,

26   887 F.3d 870, 876 (9th Cir. 2018) (per curiam). But "[b]ecause electronic devices could contain

27   vast quantities of intermingled information, raising the risks inherent in over-seizing data, law

28   enforcement and judicial officers must be especially cognizant of privacy risks when drafting and

1  executing search warrants for electronic evidence." *Schesso*, 730 F.3d at 1042 (citing

2  *Comprehensive Drug Testing*, 621 F.3d at 1177).

3       The cases cited in the parties' briefing help to show how warrants for electronic devices

4  and data have fared under these standards.  First, as illustrated by the courts' decisions in *Moore*

5  and *Hill*, cited above, the government must connect the crimes it suspects to the digital data or

6  devices it seeks.  In *Moore*, the supporting affidavit "failed to explain why evidence of a crime

7  would fairly be found on any electronics."  2023 WL 6372972, at *2.  "[T]he affidavit did not

8  even mention the use of electronics in connection with any crimes."  *Id.*  In *Hill*, the government

9  similarly offered no "facts establishing probable cause for accessing [the defendant's email]

10  accounts."  2022 WL 2644102, at *4.  "The affiant recounted the basic events of the Walgreens

11  incident," allegedly an armed robbery, "and said that, in his experience, [email] accounts 'may'

12  be used for drug trafficking and other criminal offenses."  *Id.*  In the district court's estimation,

13  this was "pure supposition."  *Id.*  "The mere association of [the defendant's] cell phone with the

14  accounts is not in itself probable cause for the government to peruse them for incriminating

15  evidence."  *Id.*

16       By contrast, when the government connects the suspected crimes to the devices or data in

17  question, courts have upheld the resulting searches and seizures.  In *United States v. Schesso*, for

18  example, the government offered evidence showing a computer at the defendant's address had

19  been used to upload a video depicting the sexual abuse of a child.  *See* 730 F.3d at 1043.  Based

20  on that evidence and the broader circumstances, the Ninth Circuit decided the magistrate judge

21  had made the "practical, common sense decision" that "there was a fair probability that

22  contraband or evidence" of sex abuse crimes would be found on the defendant's computer and

23  any other "digital storage equipment" at his address.  *Id.* at 1046.

24       Here, the affidavit connected the suspected crimes to the electronics.  It specifically

25  connected the suspected tax crimes to Loloee's email account and to the company's accounting

26  software.  It connected the suspected immigration and labor crimes to paychecks that had been

27  created by software, and the Special Agent explained why, based on his training and experience,

42

1   officers were likely to find more electronic evidence about the two-color paystubs and their

2   purposes.  In that sense, this case is more like *Schesso* than *Hill* or *Moore*.

3          It is, of course, not enough for a warrant simply to connect the suspected crime to

4   electronics or data.  The warrant's instructions must be limited to evidence of the suspected

5   crimes, to the extent possible.  The Ninth Circuit's decision in *SDI Future Health* offers a helpful

6   example of the dividing line.  In that case, an investigation led the government to believe a

7   business "had engaged in a wide-ranging Medicare fraud," and they believed the business owners

8   "had committed extensive tax fraud."  568 F.3d at 691.  The government obtained a warrant to

9   seize several categories of items; some were overbroad, and some were not.  For example, one

10  category instructed officers to search for and seize "[d]ocuments relating to non-privileged

11  correspondence with consultants."  *Id.* at 704.  This was not an overbroad instruction, *see id.*,

12  even though the business was not entirely "permeated with fraud," *id.* at 705.  "[I]t would have

13  been difficult to specify beforehand which consultants were complicit in the fraudulent

14  [business]."  *Id.* at 704.  The court similarly upheld the warrant's broad instruction to search for

15  "[d]ocuments relating to accounting records."  *Id.*  "[C]onsidering the allegations that [the

16  company] engaged in tax fraud by understating its earnings, it would be difficult to distinguish in

17  the warrant between those records which would provide evidence of the alleged fraud and those

18  that would not."  *Id.* at 705.  Other instructions, by contrast, were overbroad.  For example, the

19  warrant instructed officers to search for and seize "[d]ocuments relating to non-privileged internal

20  memoranda and E-mail."  *Id.* at 704.  This instruction would have swept up memos and emails

21  unrelated to the suspected frauds, so it was overbroad.  *See id.* at 704–05.

22         Here, the scope of the warrants matches the showing of probable cause.  As in *SDI Future*

23  *Health*, this is not a case of a business "permeated" with fraud or other criminal behavior.  At

24  hearing, no one raised any doubts but that Viva supermarkets are legitimate grocery stores.  But

25  the government did show probable cause to believe the stores also were involved in a wide

26  variety of illegal activity designed to reduce wages and tax liability through the employment of

27  undocumented workers.  The affidavit also explained why the government anticipated law

28  enforcement officers were likely to find emails about these suspected crimes; electronic

1 accounting records that supported the government's theory of wrongdoing; physical and

2 electronic human resources and employment records showing the stores had used a deceptive

3 paycheck system; and electronic financial, bank, and tax records.  As the government explains

4 clearly and persuasively in opposition, the affidavit offers probable cause to suspect evidence of a

5 crime would be found in the data and devices identified in each category of information it sought.

6 *See* Warrant Opp'n at 24–35.

7       Loloee's argument that this was a "dragnet search" is not persuasive.  Some instructions in

8 the warrant were more generic, such as the instruction to seize "digital devices or other electronic

9 storage media . . . used as means to commit the violations described above."  Attach. B ¶ 12.  But

10 it would not be reasonable to demand the government limit those categories more than it did, i.e.,

11 by offering examples, referencing specific criminal prohibitions and incorporating the Special

12 Agent's affidavit expressly.  The government could not reasonably have known, for example,

13 which devices in particular were likely to hold relevant evidence, what format that evidence

14 would take, how large items to be seized would be, and which records would provide evidence of

15 the suspected crime and which would not.  As the Ninth Circuit has expressly held, it is

16 permissible for the government to seize an entire computer or device if there is probable cause to

17 believe it will find relevant evidence on that device.  As in *Schesso*, "[t]he government was faced

18 with the challenge of searching for digital data that was not limited to a specific, known file or set

19 of files.  The government had no way of knowing which or how many illicit files there might be

20 or where they might be stored, or of describing the items to be seized in a more precise manner."

21 730 F.3d at 1046.  "These factors, along with the detailed explanation of the need for off-site

22 analysis and recovery, justify the seizure and subsequent off-premises search of [the defendant's]

23 entire computer system and associated digital storage devices."  *Id.*

24       In sum, the warrant here was not overbroad in defining what government agents could

25 search for and seize.

26 ////

27 /////

44

1    **V.     CONCLUSION**

2            For the reasons set forth above, the court **denies** the motion to suppress (ECF No. 68).

3            IT IS SO ORDERED.

4    DATED:  February 28, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE