1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   United States of America                      No. 2:23-cr-320 KJM

12                   Plaintiff,                     ORDER

13        v.

14   Shahriar "Sean" Loloee, et al.,

15                   Defendants.

16

17        The United States executed a search of the Granite Bay, California, home of defendant

18   Shahriar "Sean" Loloee based on warrants alleging Loloee violated various federal labor, tax and

19   immigration law statutes.  During the search, officers from the Department of Treasury and

20   Homeland Security interviewed Loloee.  Loloee now moves to suppress the statements he made

21   during the interview and all information derived from those statements because he claims the

22   officers violated his Fifth Amendment rights under *Miranda v. Arizona*.  384 U.S. 436 (1966).

23   As discussed more fully below, the court **grants** Loloee's motion in part and **denies** in part.

24   **I.        BACKGROUND**

25        At 6:45 a.m. on October 26, 2023, at least eighteen law enforcement agents from the

26   California Department of Justice, the Placer County Sheriff's Office as well as officers from

27   federal Homeland Security Investigations (HSI) and Internal Revenue Service Criminal

28   Investigations (IRS-CI) arrived at Loloee's home in Granite Bay.  Mem. P. & A. in Supp. Mot.

                                                1

1  Suppress (Mem.) at 6–7,[1] ECF No. 69-1.[2]  Loloee was at the residence with his wife and children.

2  *Id.*  The Placer County Sheriff parked his vehicle in the driveway and turned on his police lights.

3  *Id.*  Law enforcement ordered Loloee and his family out of their home at 6:57 a.m.  *Id.*  The law

4  enforcement officers wore tactical gear marked "POLICE."  *Id.* at 8.  While waiting with his

5  family, Loloee asked an IRS-CI agent if he could call his lawyer.  *See* Redacted Tr. of Loloee

6  Interview (Tr.) at 4, ECF No. 86-1 ("I asked downstairs if I could call my attorney and I was told

7  no.").  The agent told Loloee he could not access his phone because law enforcement had seized

8  all electronic devices found at the home.  *Id.*

9      Two armed agents, Robbie Henwood from IRS-CI and Keith Myers from HSI, then

10  escorted Loloee back inside and upstairs to a bedroom (the interview room) where the

11  government had set up a video camera.  Mem. at 8; Tr. at 1.  At approximately 7:30 a.m., Loloee

12  entered the room wearing his pajamas.[3]  Video of Loloee Interview (Video) at 3:37, lodged at

13  ECF No. 97.[4]  Henwood handed Loloee a copy of the search warrant and told Loloee to sit on a

14  chair set up in front of the bed that faced the camera.  *Id.*  Myers and Henwood sat on chairs to

15  the left and to the right of the camera respectively, facing Loloee, and introduced themselves.  *Id.*

16  at 3:37–4:10.  Henwood informed Loloee that he wanted to "make this very clear.  This is not an

17  audit.  This is a criminal matter."  Tr. at 1.

18  /////

19  /////

20  /////

21  /////

---

[1] Pages cited here are those applied at the top right by the CM/ECF system.

[2] Loloee's depiction of the beginning of the search relies on evidence produced in discovery from the United States.  *See* Mem. at 7 n.3.  The United States has not contested these facts in its opposition and the court takes them as true for the purposes of this motion.

[3] The exact timing is unclear.  The video lodged with the court has a time stamp of 7:36 a.m. PDT when Loloee enters the room.  But Henwood, several minutes later, when the video timestamp shows 7:39 a.m. PDT, announces the time as "7:20 AM."  Video at 06:49; Tr. at 3.

[4] The court has reviewed both the video and the transcript of the interview provided by the government.  Unless the court describes non-verbal acts in this order, the court will cite only to the transcript of the interview.

Henwood read Loloee his *Miranda* rights.[5]  *Id.* at 3.  He then asked Loloee if he "underst[oo]d these rights I just read to you." *Id.*  Loloee replied, "Yes, sir." *Id.*  This exchange then followed:

> **Henwood:** Okay.   And I'm reading from Document 5661, Department of the Treasury in-custody Statement of Rights.  Now it says on the card "in-custody statement of rights," but you're not under arrest.
>
> **Loloee:** Okay, thank you.
>
> . . . .
>
> **Henwood:** That being said, are you willing to answer questions and discuss this matter with us?
>
> **Loloee:** Yes.  And at any time, if I feel like I'm not comfortable, I will ask to reach out to my attorney.
>
> **Henwood:** Correct.  That's correct.
>
> **Loloee:** Because I asked downstairs if I could call my attorney and I was told no.
>
> **Henwood:** Well, that's because they've taken your phone away.  If you want to call your attorney, you can call your attorney, you just can't use your phone, which is, you know, in government custody right now,  so–
>
> **Loloee:** But my attorney's number is in my phone.  I don't know it by heart.
>
> **Henwood:** Well, if you need to get your attorney's number from the phone, we can, you can tell us, you know, the name.
>
> **Loloee:** Sure, sure.
>
> . . . .
>
> **Henwood:** So if you wanted to call your attorney tell me right now.

---

[5] "So before we ask you any questions, it is my duty to advise you of your rights.  You have the right to remain silent.  Anything you say can be used against you in court or other proceedings.  You have the right to consult an attorney before making any statement or answering any question, and you may have an attorney present with you during questioning.  You may have an attorney appointed by the U.S. magistrate or the court to represent you if you cannot afford or otherwise obtain one.  If you decide to answer questions now or without a lawyer, you still have the right to stop the questioning at any time." Tr. at 3.  *See Miranda*, 384 U.S. at 444–45.

| | |
|---|---|
| 1<br>2<br>3<br>4 | **Loloee:** I would just like to call my attorney to let him know you're here.  I don't even know who to call to be honest with you.  Like I don't know.  I have one attorney.  Like I don't even know what's going on, so. |
| 5<br>6<br>7<br>8 | **Myers:** We can't advise you on how to proceed or what to do.  All we can do is provide you with a copy of the search warrant.  Feel free to take some time.  Review it.  Let us know if you have questions about it. |
| 9 | **Loloee:** May I? |
| 10<br>11 | **Henwood:** Do you want to take a moment to read the warrant that I've provided you? |
| 12<br>13 | **Myers:** Where are your glasses?  So I can get those for you.  Bedside table, perhaps? |

*Id.* at 4–5.  Myers and Henwood then walked with Loloee to his bedroom where he obtained his glasses, and they then escorted Loloee back to the interview room where he sat down on the same chair.  Video at 10:17–11:13.

The agents proceeded with their questioning.  Loloee began asking the agents questions relating to types of electronic records they were searching for at his three Viva Supermarket stores located in different parts of Sacramento.  *See* Tr. at 6–8.  The agents told Loloee they were looking for electronic records pertaining to his business.  *See id.*  Loloee then made an offer: "I mean, I can, you know, reach out to the stores, and let them know you guys want to take the computers and everything." *Id.* at 8.  Loloee was concerned about agents breaking the locks on the doors at the stores.  *See id.* at 9.  He believed there was no one at his Rancho Cordova store who had a key to the office that contained the computers and offered to contact "Shah Shams," who had a key to the office, so he could go to the store and open it for the agents there.  *Id.* at 11.  Because Loloee did not remember the number, but had it saved on his phone, the agents called for the phone to be brought up to the interview room. *See id.* at 12.

Henwood proceeded with further questioning of Loloee as follows.

| | |
|---|---|
| 29<br>30 | **Henwood:** [S]o there's one other thing.  Like legally, I have to advise you of before and [sic] tell us anything.  Okay? |
| 31 | **Loloee:**  Okay. |

4

1                **Henwood:** So there's a law. Sec–Title 18 of the United States Code,
2                Section 1001. In layman's terms, that law, that statute, makes it a
3                felony to knowingly and willfully lie to federal investigators.

4                **Loloee:** Sure.

5                **Henwood:** So it's very important that you're completely truthful
6                with us because, again, we're on the record.

7                **Loloee:** Sure.

8                **Henwood:** If you say anything to us that we can prove later is a flat
9                out lie.

10              **Loloee:** Sure.

11              **Henwood:** There could be a felony charge for that.

12 *Id.* at 14. Henwood then told Loloee he had a "list of questions" he was going to go over with

13 him beginning with Loloee's medical history. *Id.* Then Loloee asked about his family. *Id.* at 15.

14 Henwood replied:

15                They're all free to go. So nobody's under arrest. If your wife
16                wants to take the kids to school, she's more than welcome to go and
17                take them to school. She can head over to Lifetime Fitness, do
18                whatever. I mean, they're all free to go if they want to go
19                somewhere.

20 *Id.* Then Loloee's phone arrived. *Id.* Henwood asked Loloee, "So I'm going to have to ask you

21 for instructions because I don't want you to touch your phone." *Id.* Henwood asked Loloee, "So

22 how do I unlock your phone?" *Id.* Loloee then gave Henwood the code and instructions on how

23 to unlock the phone. *Id.* at 15–16. He gave the code to the agents again several minutes later

24 after Loloee told them the combination to one of the safes at his stores was stored on his phone.

25 *Id.* at 30.

26      After discussing Loloee's Duckhorn Drive office building—and whether it had two

27 separate addresses—this exchange took place:

28              **Loloee:** Can I call my attorney?

29              **Henwood:** Yes, I mean, it's up to you.

30 /////

5

1      **Loloee:** Just because again, I've no idea what's going on, so I'm a
2      little bit in the dark.  I don't know, like I'm a little bit in the dark . . .

3      **Henwood:** You can call them now or you can call them after we
4      talked a little bit.  It's up to you, when you want to call them . . .

5      **Loloee:** Let me just, I would like to call my attorney.  And just let
6      her know that you're here.

7  *Id.* at 36–37.  Loloee called twice but the attorney did not answer.  *See id.* at 37.  Loloee left a

8  voicemail, asking her to call him back.  *Id.* 37–38.  Then this exchange immediately followed:

9      **Henwood:** So, I guess now is the question.  Do you want to wait for
10      her to call you back or—do you want to discuss what's going on?

11      **Loloee:** Let's discuss, because I mean, literally, I'm in a loss because
12      I don't know what's going on and I am kind of curious.

13  *Id.* at 38.  The agents proceeded to ask Loloee a variety of questions relating to his business,

14  where he kept his business records, who he employed at his business, his history of being audited

15  by the IRS, where he worked on a daily basis, how much cash his stores take in on a monthly

16  basis versus how much they receive on credit, who insures his stores, how he pays his employees

17  and whether he employed undocumented immigrants at his stores.  *See id.* at 38–64.  Loloee's

18  phone then rang.  Video at 1:55:57.  The agents saw the name on the caller identification to be a

19  "Sandy."  Tr. at 64.  Loloee stated, "That's the attorney."  *Id.*  The agents went outside of the

20  room while Loloee spoke with his attorney.  Video at 1:57:30.  After Loloee hung up, they came

21  back in the room and Loloee informed the agents, "I was just advised by my attorney not to talk

22  and not be tape recorded.  And one of them, I guess, is on her way here right now."  Tr. at 67.

23  The agents then immediately ended the video recording and the interview.  *See id.* at 67–68.

24  Agent Henwood noted the time to be 9:35 a.m. just before he shut the camera off.  *Id.* at 68.

25  **II.    PROCEDURAL BACKGROUND**

26        On the same day Agents Henwood and Myers interviewed Loloee and executed a search

27  at his Granite Bay home, officers from the same federal agencies also executed search warrants at

28  Loloee's corporate offices on Duckworth Drive in Sacramento, his Sacramento home, and three

29  Viva Supermarket stores in Sacramento.  Each of the stores is an "S corporation" and Loloee is

1   the sole shareholder and president of each.  Loloee Decl. ¶ 3, ECF No. 105.  In executing the

2   searches, the agents relied on seven warrants that incorporated an affidavit prepared by Henwood

3   that claimed the government had probable cause to search for evidence relating to the violation of

4   several federal laws, including laws against hiring those without permission to work in the United

5   States, laws punishing forced labor, tax statutes, and criminal prohibitions against making false

6   statements to the government, wire fraud, and conspiracy.[6]  *See* Aff. ¶ 8, ECF No. 125-1 (citing 8

7   U.S.C. §§ 1324, 1324a, 1324c, 18 U.S.C. §§ 371, 1001, 1324, 1343, 1589 and 26 U.S.C.

8   §§ 7201, 7202, 7206(1) and 7206(2)).

9        In December 2023, a grand jury charged Loloee and an employee of Viva Supermarkets,

10  Karla Montoya, with conspiracy to defraud the government, immigration crimes, obstruction of

11  Department of Labor proceedings, falsifying records, and wire fraud.  *See generally* Indictment,

12  ECF No. 1.  A few months later, in a superseding indictment, the government added charges

13  against two more Viva employees: Mirwais Shams, allegedly the companies' controller and

14  auditor, and Ahmad "Shah" Shams, who allegedly worked as the companies' human resources

15  manager, among other responsibilities.  *See* Superseding Indictment ¶¶ 7–8, ECF No. 33.  The

16  superseding indictment also added charges for willful failure to collect and pay taxes, filing false

17  tax returns, money laundering, and perjury.  *See generally id.*  According to the superseding

18  indictment, Viva stores had hired workers who did not have authorization to work in the United

19  States for many years, among other reasons "because it was Loloee's view that undocumented

20  workers were easier to control," and because hiring undocumented workers allowed Viva stores

21  to reduce labor and tax costs.  *See id.* ¶¶ 18–20.  The government alleges Loloee and the other

22  defendants paid employees off the books, manipulated time sheets, falsified tax documents,

23  obstructed investigations into these practices, and made false statements to federal investigators,

24  among other things.  *See id.* ¶¶ 23–57.

25  /////

---

[6]  The warrants and respective applications can be found on the dockets of the respective "sw" cases, Nos. 23-1070, 23-1071, 23-1072, 23-1073, 23-1074, and 23-1075.  Redacted copies are available on the docket of this action at ECF No. 125-1 through 125-7.  Each application attaches an affidavit by Henwood, which the court cites as "Aff." in this order.

1       Loloee now seeks to suppress all of the statements he made while being interviewed by

2  Henwood and Myers, including providing the passcode to his phone, as well as the resulting

3  search of Loloee's phone and all fruits of that search.  ECF No. 69; Mem. at 6.  The government

4  opposes the motion, arguing the interview did not implicate Loloee's Fifth Amendment rights

5  because, notwithstanding being read an "In-custody Statement of Rights," *see* Tr. at 4, he was not

6  in custody, and did not unequivocally ask to speak to an attorney.  *See* Opp'n at 2, ECF No. 86.

7  As part of their two major arguments, the government also briefly argues Loloee was not being

8  interrogated for the first 49 minutes of the interview, *see id.* at 16–17, and Loloee waived his right

9  to an attorney at the very beginning of the interview, *see id.* at 14–15.  In the alternative, the

10  government argues Loloee voluntarily gave his passcode to the agents and the government would

11  have inevitably found the passcodes to his phone because they found the same passcodes in the

12  Duckhorn office building.  *See id.* at 2.  The matter is now fully briefed.  *See* Reply, ECF No.

13  102.

14       Co-defendant Mirwais Shams seeks to join Loloee's motion, arguing he will "object [to]

15  statements he personally gave to agents during and after the search warrants were served . . . ."

16  Mirwais Shams' Joinder in Co-Defendant Loloee's Mot, to Suppress Statements at 1, ECF No.

17  80.  As the government points out in opposition, however, the "circumstances of each interview

18  was unique" and a court's analysis of a Fifth Amendment suppression motion is "fact-bound" to

19  each circumstance.  *See* Opp'n Mirwais Shams' Joinder at 1, ECF No. 87; *see, e.g.*, *Oregon v.*

20  *Elstad*, 470 U.S. 298, 318 (1985) ("[T]he finder of fact must examine the surrounding

21  circumstances and the entire course of police conduct with respect to the suspect" when

22  determining if the suspect provided statements voluntarily).  The court denies Mirwais Shams'

23  motion to join Loloee's motion to suppress as it would need to evaluate Shams' desire to suppress

24  statements he made to the government independently from Loloee's suppression claim.

25       On October 22, 2024, the court heard oral argument on Loloee's motion.  Audrey

26  Hemesath, Matthew Thuesen, and Samuel Stefanki appeared for the government.  Mins. Mot.

27  Hr'g (Oct. 22, 2024), ECF No. 118.  Sherry Haus, Thomas Johnson, and Kevin Rooney appeared

28  for Loloee.  *Id.*  Michael Long appeared for Mirwais Shams.  *Id.*  The court also heard argument

1   on Loloee's motion to suppress the results of the searches conducted at his homes, the Viva

2   Supermarket Stores and at his Duckhorn Office on October 26, 2023, based on Fourth

3   Amendment grounds.  *See* ECF No. 68.  In a separate order, the court has found these searches

4   were based on probable cause, were sufficiently specific and did not violate Loloee's Fourth

5   Amendment rights.  *See generally* Order (Mar. 3, 2025), ECF no. 145.

6   **III.   LOLOEE'S *MIRANDA* CLAIM**

7          Under the Fifth Amendment, the government must inform the accused of his right to have

8   counsel present during a custodial interrogation.  *See Rodriguez v. McDonald*, 872 F.3d 908, 920–

9   21 (9th Cir. 2017) (citing *Miranda*, 384 U.S. 436).  If the accused unequivocally requests the

10  presence of his counsel, the interrogation must end unless the accused, on his own initiative,

11  knowingly and intelligently waives the right to counsel.  *Id.* at 921 (citing *Edwards v. Arizona*,

12  451 U.S. 477 (1981)) ("[A] finding that a post-invocation admission is voluntary is not sufficient

13  to demonstrate waiver."); *see United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) ("The

14  prosecution bears the burden of proving by a preponderance of the evidence that a defendant

15  knowingly and intelligently waived his *Miranda* rights.").  Here, it is undisputed that the

16  government informed Loloee of his *Miranda* rights, including his right to counsel.  *See* Tr. at 3.

17  The court must first therefore determine if Loloee was in custody and if Loloee's interview with

18  Henwood and Myers was an interrogation.  *See Maryland v. Shatzer*, 559 U.S. 98, 103–04 (2010)

19  (citing *Miranda*, 384 U.S. at 456–67).  If the court finds there was a custodial interrogation, it

20  must then assess whether Loloee unequivocally requested his attorney to be present.  *See id.* at

21  104.  If the court finds Loloee unequivocally requested an attorney, it must then determine

22  whether Loloee reinitiated the interrogation and did he waive his right to counsel. *See Smith v.*

23  *Illinois*, 469 U.S. 91, 95 (1984) (citing *Edwards*, 451 U.S. at 485, 486 n.9.)  Finally, if the court

24  finds Loloee did not waive his right to counsel, it must then ask if Loloee nevertheless provided

25  his passcode to the government voluntarily such that the court need not suppress the fruits of his

26  statement providing the code.  *See Oregon*, 470 U.S. at 318.  The court addresses each question in

27  turn.

28  /////

9

### A.  Custody

A person who is not arrested may be in "custody" for the purposes of *Miranda* if the circumstances surrounding the questioning would suggest to a reasonable person that he was "not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  When a government interview takes place inside the suspect's home, such as what happened to Loloee on October 26, 2023, the court examines four factors:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

*United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008).  The court can also consider five additional factors:

> (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.

*United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) (quoting *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)).

The court finds Loloee was in custody for the purposes of *Miranda*.  First, at least eighteen police officers were present at Loloee's home on October 26, 2023.  Mem. at 16.  Their clothing displayed the word "POLICE."  *Id.* at 8.  At least three were armed, including Henwood and Myers.  *See* Video at 3:05, 3:25, 3:44.  A Placer County Sheriff's vehicle was parked in the driveway and had its lights on.  *Id.* at 7.  The officers had a substantial and confrontational presence in Loloee's home.  *See Craighead*, 539 F.3d at 1085 (finding eight armed police officers inside suspect's home would make a "reasonable person . . . feel that his home was dominated by law enforcement agents and that they had come prepared for a confrontation").  The government concedes this factor "weighs the most heavily in Loloee's favor."  Opp'n at 10.

/////

1      Second, a reasonable person in Loloee's situation would not have felt free to leave.

2  Henwood and Myers and at least one other agent in the room were armed.  *See* Video at 3:05,

3  3:25, 3:44.  Henwood read him Treasury's "In-custody Statement of Rights."  Tr. at 4.  While it is

4  not entirely clear from the video, it appears the door of the interview room was kept shut.  *See id.*

5  at 3:38, 11:08.  Further, when Loloee wanted his glasses, he was not free to go and obtain them

6  himself.  *See id.* at 10:17.  Instead, the two armed agents escorted him to his bedroom and then

7  back to the interview room.  *See id.* at 10:17–11:13.  As the Ninth Circuit has noted, "Restraint

8  amounting to custody may also be inferred where law enforcement officers permit the suspect to

9  move around the house for brief periods but insist on escorting and monitoring him at all times."

10  *Craighead*, 539 F.3d at 1085–86 (collecting cases).  The government argues Loloee was not

11  restrained because he was not put in handcuffs.  *See* Opp'n at 11.  But as noted above, a suspect

12  might not feel free to leave even if the government has not physically restrained him.  The

13  government also argues Loloee felt free to leave because he was able to take a phone call from his

14  lawyer in the hallway.  *See id.*  But that mischaracterizes the record, which shows the agents

15  leaving the bedroom  and then monitoring Loloee from the hallway while Loloee took the phone

16  call with his attorney inside the bedroom.  *See* Video at 1:57:30–1:57:35; Tr. at 65–68.

17      Third, Loloee, was isolated from his family and others during the interview.  *See generally*

18  Video.  As the Ninth Circuit noted in *Craighead*, isolation might be the "crucial factor that would

19  tend to lead a suspect to feel compelled to provide self-incriminating statements."  *Craighead*,

20  539 F.3d at 1086–87 (citing *Miranda*, 384 U.S. at 445–46, 449–50).  Here, officers escorted

21  Loloee away from his family garbed in pajamas and brought him to the interview room alone.

22  Mem. at 19; Video at 3:37.  He remained alone with the officers for the duration of the interview.

23  *See generally* Video.  The government argues Loloee was comfortable because he was

24  interviewed in a bedroom and that he did not know the government had refused to allow his wife

25  to come and see him.  Opp'n at 12.  Loloee might not have known his wife was denied entry, but

26  he did know he was alone with federal agents after having been escorted away from his family.

27  Further, it is not clear what if any benefit Loloee derived from being isolated in a bedroom, as

28  /////

1    opposed to a different room, considering the presence of armed federal agents who were

2    recording his answers.

3          Fourth, as the government acknowledges, Loloee was never informed he was free to

4    leave.  *See* Opp'n at 10.  While Henwood and Myers told Loloee he was not under arrest, they did

5    effectively tell him he was in custody as they read him the Department of the Treasury's "In-

6    custody Statement of Rights."  Tr. at 4.  Myers and Henwood also told Loloee his wife and

7    children were free to leave, without mentioning him.  *See id.* at 15.  A reasonable inference from

8    that statement—especially given Loloee's isolation—was that he was not free to leave.  *See id.*.

9    The government argues that the agents' telling Loloee he was not under arrest "greatly reduce[d]

10   the chance that he would reasonably have believed he was nevertheless in custody."  Opp'n at 10

11   (citing *Craighead*, 539 F.3d at 1082–89).  But in *Craighead* itself, the defendant was told "he was

12   not under arrest, that any statement he might make would be voluntary, and that he would not be

13   arrested that day regardless of what information he provided."  539 F.3d at 1078.  Officers in

14   *Craighead*, further, even told the suspect he was "free to leave."  *Id.*  Nevertheless, the court

15   found that, based on the totality of the circumstances—including the presence of armed agents—,

16   "a reasonable person . . . would not have actually felt he was free to leave."  *Id.* at 1089 (internal

17   marks omitted).  The same is true here.  Given the presence of armed agents, Loloee's isolation

18   from his family in a bedroom with the door closed with his phone being monitored, and the

19   government's conspicuous silence about whether Loloee himself was free to leave, a reasonable

20   person in his position would not have felt he was free to leave.

21         The government argues the interview was similar to an interview police conducted in

22   *United States v. Bassignani*, 575 F.3d 879, 885–87 (9th Cir. 2009).  Opp'n at 12.  In *Bassignani*,

23   the Circuit found the interview was not custodial after evaluating the five factors identified in the

24   *Kim* case, reviewed above.  *See* 575 F.3d at 883–84 ("(1) the language used to summon the

25   individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the

26   physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of

27   pressure applied to detain the individual." (quoting *Kim*, 292 F.3d at 974)).  The police confronted

28   a suspect at his place of work, escorted him to a conference room and questioned him over the

1  course of two and a half hours. *See id.* The Circuit found the interview to be non-custodial

2  because the police had not cordoned off the area, had told the suspect he was not under arrest, and

3  did not confront the suspect with his guilt. *See id.* In other words, "the second, third, and fifth

4  *Kim* factors therefore strongly suggest that the interrogation was not custodial." *Id* at 887.

5         The court is not persuaded the interview in *Bassignani* is sufficiently similar to Loloee's

6  interview for that case to have persuasive force here. First, the police interview in *Bassignani* did

7  not take place in the suspect's home early in the morning, and therefore the Ninth Circuit did not

8  apply the *Craighead* factors. *See Craighead*, 539 F.3d at 1082 (noting usual test for determining

9  whether interrogation was custodial "does not quite capture the uniqueness of an interrogation

10 conducted within the suspect's home"). Second, to the extent the interview of Loloee and the

11 interview in *Bassignani* were factually similar in some respects, the similarities are those that

12 point towards a custodial interrogation. For example, agents instructed Bassignani to go to the

13 interview room. *Bassignani*, 575 F.3d at 884. The Ninth Circuit found he did not attend the

14 interview voluntarily and thus the first *Kim* factor favored a finding of a custodial interrogation.

15 *See id.* Here, Henwood and Myers escorted Loloee away from his family to a bedroom they had

16 set up as an interview room and the government does not argue Loloee went with the two agents

17 voluntarily. *See* Opp'n at 14. Both Bassignani and Loloee were interviewed for roughly two and

18 a half hours. *See id.* at 12. The Ninth Circuit found this length of time "weigh[ed] in favor of

19 finding that Bassignani was in custody." *Bassignani*, 575 F.3d at 886. Crucially, the key

20 difference between the interview in *Bassignani* and the interview in question here is the Ninth

21 Circuit found the overall environment in the former case was not under the complete control of

22 the police. *See id.* at 885 (distinguishing case from facts in *Kim*, 292 F.3d at 971, in which the

23 court found a police interview custodial at the place of a suspect's work when the place of work

24 was transformed into a "police-dominated atmosphere"). Here, Loloee's home became a "police-

25 dominated atmosphere," by virtue of eighteen police officers present on scene and in the family

26 home, armed officers escorting Loloee and interviewing him, and the restrictions the officers

27 placed on Loloee such that he was not free to retrieve his phone or his glasses or move around his

28 own home of his own accord. *See* Mem. at 6–8.

1    Finally, the government argues the interview was not custodial because it was conducted

2    in a calm and respectful manner, because Loloee was not intimidated by the environment and

3    because Loloee is a sophisticated businessman who was "aware of his constitutional right not to

4    participate in the interview." Opp'n at 12–14. But as Loloee points out in reply, these factors are

5    more important to a voluntariness analysis than to a custodial analysis. Reply at 7. And the cases

6    the government cites address voluntariness and not whether an interview was custodial. *See*

7    *United States v. Hopkins*, 859 F. App'x 810, 812 (9th Cir. 2021); *United States v. Walker*,

8    742 F. App'x 284, 285 (9th Cir. 2018).

9    The court finds Loloee was in custody during the interview with government agents for

10   the purposes of *Miranda*.

11   **B.    Interrogation**

12   "[N]ot all statements given by a person in custody are entitled to *Miranda* protection.

13   Rather, interrogation 'must reflect a measure of compulsion above and beyond that inherent in

14   custody itself.'" *Bradford v. Davis*, 923 F.3d 599, 618 (9th Cir. 2019) (quoting *Rhode Island v.*

15   *Innis*, 446 U.S. 291, 300 (1980)). "[P]olice officers' express questioning or its functional

16   equivalent" constitutes interrogation when they "should have known [their words or actions] were

17   reasonably likely to elicit an incriminating response . . . ." *Id.* (quoting *Innis*, 446 U.S. at 302))

18   (alterations in original).

19   Here, Agents Henwood and Myers made multiple statements reflecting "a measure of

20   compulsion above and beyond that inherent in custody itself." *Id.* At the start of the interview,

21   Henwood told Loloee, he wanted to "make this very clear. This is not an audit. This is a criminal

22   matter." Tr. at 1. Then Henwood told Loloee that before he asked him questions, he needed to

23   know the rights of a person in custody, suggesting the questions that followed could potentially

24   be incriminating. *Id.* at 4. Later Henwood explicitly told Loloee that if he answered untruthfully,

25   he could be prosecuted for a felony. *Id.* at 14.

26   A reasonable person in Henwood and Myers' position would have known the questions

27   they were asking were reasonably likely to elicit incriminating responses. *See Bradford*, 923 F.3d

28   at 618. Henwood, for example, asked Loloee how to unlock his phone. *See* Tr. at 15. Agents

14

1  had already seized the phone subject to the search warrant because the government believed it

2  would find incriminating information on the phone.  *See generally* Aff.  And Henwood was the

3  author of the affidavit attached to the warrant, so he could not claim ignorance of its allegations.

4  *See id.*  Obtaining the access code to the phone in and of itself could potentially reveal

5  incriminating information, once the phone was unlocked.  *See id.*  The other questions Henwood

6  and Myers asked all pertained to the allegations set forth in the warrant affidavit, including that

7  Loloee had potentially committed tax and immigration-related crimes through his Viva

8  Supermarket businesses.  *See id.*; Tr. at 38–64.

9      The government argues that the first "49 minutes of the interview was not an

10  interrogation" because the officers were asking routine questions and helping Loloee retrieve his

11  glasses.  Opp'n at 16–17 (citing *Mickey v. Ayers*, 606 F.3d 1223, 1235 (9th Cir. 2010)).  In

12  *Mickey*, the small talk at issue involved discussions between the police officers and the suspect

13  about their families.  606 F.3d at 1235.  Here, in contrast, the back and forth between the agents

14  and Loloee always related to the alleged crimes: the searches of the Viva Supermarkets and the

15  warrant for the search of the Granite Bay home.  *See generally* Tr.  Further, the officers knew or

16  should have known that obtaining Loloee's password to his phone could or likely would yield

17  incriminating evidence.  Theirs was not a casual conversation.

18      The court finds the interview of Loloee was an interrogation for the purposes of *Miranda*.

19      **C.    Request for Counsel**

20      Before applying Fifth Amendment protections under *Miranda*,  "courts must determine

21  whether the accused actually invoked his right to counsel."  *Smith*, 469 U.S. at 95.  Invocation of

22  counsel for the purposes of *Miranda* requires, "at a minimum, some statement that can reasonably

23  be construed to be an expression of a desire for the assistance of an attorney."  *Davis v. United*

24  *States*, 512 U.S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)).  "[A]

25  suspect is required neither to use any magical formulation to invoke his rights nor to express his

26  desire to obtain counsel with lawyer-like precision."  *Robinson v. Borg*, 918 F.2d 1387, 1393 (9th

27  Cir. 1990).  When a suspect asks for a lawyer, "[i]t is an unambiguous request for a lawyer, no

28  matter how you slice it.  The statement is unequivocal—it is not a maybe or a perhaps—it is an

15

1    invocation of the Fifth Amendment right to counsel." *Sessoms v. Grounds*, 776 F.3d 615, 617

2    (9th Cir. 2015).

3          The court finds Loloee unequivocally invoked his right to counsel when he informed

4    Henwood, "I would just like to call my attorney."  Tr. At 5.  Both the Ninth Circuit and other

5    circuit courts of appeals have consistently found a suspect asking or expressing a desire to call his

6    attorney to be an unequivocal invocation of their right to counsel, even if the suspect uses

7    language that appears tentative or uncertain.  *See Tobias v. Arteaga*, 996 F.3d 571, 580–81

8    (9th Cir. 2021) (collecting cases); *Sessoms*, 776 F.3d at 626 (finding statement, "There wouldn't

9    be any possible way that I could have a—a lawyer present while we do this?" is an unequivocal

10   request for counsel); *United States v. De La Jara*, 973 F.2d 746, 750–751 (9th Cir. 1992) ("Can I

11   call my attorney" deemed an unequivocal request for counsel); *Alvarez v. Gomez*, 185 F.3d 995,

12   998 (9th Cir. 1999) ("Can I get an attorney right now, man?" an unequivocal request for

13   counsel); *Smith v. Endell*, 860 F.2d 1528, 1529 (9th Cir. 1988) ("Can I talk to a lawyer" is

14   unequivocal request for counsel); *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005) ("Can I

15   have a lawyer?" is unequivocal request for counsel); *United States v. Hunter*, 708 F.3d 938,948

16   (7th Cir. 2013) ("Can you call my attorney?" is unequivocal request for counsel); *United States v.*

17   *Jackson*, 70 F.4th 1005, 1010 (7th Cir. 2023) ("I'd rather have a lawyer" is unequivocal request

18   for counsel) .  Loloee's initial statement at the beginning of the interview, "I would just like to

19   call my attorney" is as unequivocal as the requests in *Sessoms, De La Jara*, *Alvarez*, *Smith*, *Lee*,

20   *Hunter*, and *Jackson*.  *See* Tr. at 5.

21         The government argues Loloee's request was equivocal because he stated he wanted "to

22   let him know you're here," after he made his request for counsel to the agents.  Opp'n at 16.  The

23   government cites to a case decided by the Ninth Circuit, *United States v. Doe*, as support.  170

24   F.3d 1162, 1166 (9th Cir. 1999).  In *Doe*, before the police officers had a chance to begin reading

25   the suspect his rights, the suspect asked, "What time will I see a lawyer?"  *Id.* at 1164.  The Ninth

26   Circuit found this statement, given its timing, to be ambiguous because the Fifth Amendment

27   only protects "the particular sort of lawyerly assistance that is the subject of *Miranda*."  *Id.* at

28   1166.  Because the suspect posed the question before the interrogation even began, the Ninth

1    Circuit found the statement was ambiguous in that the suspect could have wanted the lawyer for

2    the interrogation or for some other reason.  *See id.*  Here, however, Loloee's statement does not

3    suffer from the same kind of ambiguity: he expressed a desire to call his attorney immediately.

4    *See* Tr. at 5.  Further the interrogation had already commenced, as Loloee made his request

5    immediately after Henwood read him his rights under both *Miranda* and under the Department of

6    Treasury Guidelines.  *See* Tr. at 3–5.  A reasonable person would think Loloee's request related

7    directly to the interrogation he had been advised was about to begin.

8           Where the Ninth Circuit has found a suspect's statements to be ambiguous, it has often

9    found multiple meanings within the suspect's potential request.  For example, in *United States v.*

10   *Rodriguez*, after police informed him of his right to remain silent, a suspect stated, "I'm good for

11   tonight."  518 F.3d 1072, 1076 (9th Cir. 2008).  "I'm good for tonight" can have two potential

12   meanings: the suspect might be saying "I'm good [to talk] for tonight" or "more idiomatically,

13   that the speaker is declining or refusing an offer—roughly the equivalent of 'no thanks.'"  *Id.* at

14   1077.  Here, Loloee asserted he "would just like to call my attorney."  Tr. at 5.  The statement

15   contains one meaning: he wants to speak with his lawyer.

16          Further, his subsequent statements do not render his desire for counsel equivocal.  He was

17   unsure who he would call, for example.  *See id.*  But not being sure of whom to call does not

18   make the wish to talk to an attorney equivocal: he was just unsure of how to execute his request.

19   In *Alvarez*, for example, the suspect, immediately after asking if he could get an attorney, then

20   asked his interrogators if they had a lawyer "right now" that could be appointed to him.  *See* 185

21   F.3d at 996.  The Ninth Circuit found that not knowing where or how to obtain the lawyer did not

22   render the request for counsel unequivocal.  *See id.* at 998.  Loloee also expressed his inability to

23   understand what was going on.  *See id.*  But not understanding what is happening is why people

24   want lawyers: they need counsel to help them navigate unclear and complex situations.  Loloee

25   also expressed a desire to "let them know you are here."  *See id.*  That statement similarly does

26   not render the desire for counsel equivocal: the police were in his home interrogating him and a

27   reasonable person should have understood Loloee wanted to consult counsel before proceeding

28   with the interrogation.  Further, the Seventh Circuit has recently addressed a similar situation in

1    *United States v. Jackson, supra*.  *See* 70 F.4th at 1005.  There, the suspect told his interrogating

2    officers "I'd rather talk to a lawyer."  *See id.* at 1010.  But before the officers could respond, the

3    suspect continued talking by stating, "What is there more I can do to help myself?"  *See id*.  The

4    court found the subsequent statement did not render the request for counsel equivocal.  *See id*. at

5    1011.  The subsequent statements only pointed to initiation and waiver.  *See id*.

6        The government cites a case from the First Circuit, *United States v. Carpentino*, 948 F.3d

7    10, 24–25 (2020), that found a suspect's request for counsel to be ambiguous.[7]  *See* Opp'n at 16.

8    In *Carpentino*, police arrested a suspect, read him his *Miranda* rights, and then ended the

9    interrogation when the suspect unequivocally invoked his right to counsel.  *See id.* at 17–18.  The

10    police then put the suspect in a holding cell.  *See id.* at 18.  The suspect then waved at a camera to

11    get a guard's attention and asked to reinitiate the conversation with the police.  *See id.*  Upon

12    returning to the interview room, the suspect then said, "Uhm, I kinda need a phone call to my

13    lawyer, too."  The First Circuit found this request to be ambiguous because "too" could mean the

14    suspect both wanted to speak with the police and wanted to let his lawyer know he was detained.

15    *See id*. at 24.

16        The court finds the context of *Carpentino* is different from this case.  In *Carpentino*, the

17    suspect indicated he wanted to reinitiate the interrogation by waving at a video camera and by

18    telling a guard he wanted to speak with the detectives.  *See* 948 F.3d at 18.  A reasonable person

19    might think, even given the suspect's concurrent request for counsel, the suspect wanted to speak

20    with the police.  Here, by contrast, the interrogation took place after eighteen law enforcement

21    officials entered Loloee's home early in the morning and after two armed officers escorted Loloee

22    away from his family to an isolated bedroom.  *See* Mem. at 6–8.  Loloee did not voluntarily

23    initiate the interview, and a reasonable person would not think he wanted to go ahead and speak

---

[7] On March 24, 2025, the government provided notice to the court of *United States v. Rodriguez-Arvizu*, 130 F.4th 1125 (9th Cir. 2025), a recently decided Ninth Circuit *Miranda* case. *See* ECF No. 146.  The government claims *Rodriguez-Arvizu* addresses a suppression issue when a defendant does not unambiguously invoke his right to counsel.  *See id.* at 1.  The court is not persuaded *Rodriguez-Arvizu* is relevant to this case as the Ninth Circuit only addressed one question relating to *Miranda* on appeal: whether a suspect can invoke their right to counsel by failing to sign a waiver of rights form.  *See* 130 F. 4th. at 1134.

1  with the government without counsel present after he requested the opportunity to speak with an

2  attorney, especially as he had already requested to speak with an attorney before the interrogation

3  even began. *See* Tr. at 4–5.

4      The court finds Loloee unequivocally requested counsel for the purposes of *Miranda*

5  when he informed Henwood, "I would just like to call my attorney." Tr. at 5.

6      ### D.    Initiation and Waiver

7      Once a suspect unequivocally invokes his right to counsel, "courts may admit his

8  responses to further questioning only on finding that he (a) initiated further discussion with the

9  police, and (b) knowingly and intelligently waived the right he had invoked." *Smith*, 469 U.S. at

10  95 (citing *Edwards*, 451 U.S. at 485.) The government cannot show initiation through the

11  suspect's answers to its continued questioning after the suspect unequivocally invokes their right

12  to counsel. *See Edwards*, 451 U.S. at 485. Instead, the suspect must "himself initiate[] further

13  communication, exchanges, or conversations with the police." *Id.* The rule as established in

14  *Edwards* is a prophylactic against badgering by the police and is a "'bright-line rule,' expressing

15  the 'relatively rigid requirement that interrogation must cease' through 'clear and unequivocal'

16  guidelines to law enforcement." *Rodriguez*, 872 F.3d at 925 (quoting *Arizona v. Roberson*,

17  486 U.S. 675, 681 (1988)).

18      If the government shows the suspect initiated the interrogation after he unequivocally

19  invoked his right to counsel, it must then also prove the suspect waived his rights. "Waiver of

20  Miranda rights must be voluntary, knowing, and intelligent." *Garibay*, 143 F.3d at 536 (quoting

21  *United States v. Binder*, 769 F.2d 595, 599 (9th Cir. 1985)). There is a presumption against

22  waiver and "[t]he prosecution bears the burden of proving by a preponderance of the evidence

23  that a defendant knowingly and intelligently waived his *Miranda* rights." *Id.* (citing *Colorado v.*

24  *Connelly*, 479 U.S. 157, 168 (1986)). The "government's burden to make such a showing is

25  'great'and the court 'indulges every reasonable presumption against waiver of fundamental

26  constitutional rights.'" *Id.* at 537 (quoting *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir.

27  1984)).

28  /////

1    The government makes no explicit argument Loloee reinitiated the interrogation after he

2    unambiguously invoked the right to counsel.  Even if it had, the government has not met its

3    "great" burden to prove by a preponderance of the evidence Loloee voluntarily and knowingly

4    waived his right to counsel.  *See Garibay*, 143 F.3d at 536.

5            The government argues only that Loloee waived his right to counsel during this colloquy:

6            **Henwood:** That being said, are you willing to answer questions and
7            discuss this matter with us?

8            **Loloee:** Yes.  And at any time, if I feel like I'm not comfortable, I
9            will ask to reach out to my attorney.

10    Opp'n at 14–15 (citing Tr. at 4).  But Loloee unequivocally requested an attorney after this initial

11    colloquy.  *See id.* at 5.  The government needs to show Loloee reinitiated the interrogation and

12    waived his right to counsel after he unequivocally requested an attorney—at least if it wanted the

13    court to deny suppression for the vast majority of the interview.  *See Smith*, 469 U.S. at 95.  Thus,

14    this waiver only applies to statements Loloee made before he later requested counsel.  The court

15    finds Lololee knowingly waived his rights up until he unequivocally requested counsel.

16            The government may use in its case-in-chief Loloee's answers to Myers and Henwood's

17    questions (comprising pages 1–4 of the transcript of the interrogation) up until he unequivocally

18    requests an attorney (reflected at the very top of page 5 of the transcript).  The court finds the

19    government has not met its burden to show Loloee waived his right to counsel for the remainder

20    of the interrogation.

21        **E.    Voluntariness**

22            Whether or not the court should suppress the fruits of certain of a suspect's statements,

23    when the suspect provides the statements in violation of his Fifth Amendment rights under

24    *Miranda,* ultimately depends on whether the suspect gave the statements in question voluntarily.

25    *See Oregon*, 470 U.S. at 318.  To determine whether a suspect gave a statement voluntarily, "the

26    finder of fact must examine the surrounding circumstances and the entire course of police conduct

27    with respect to the suspect . . . ."  *Id.*  "The fact that a suspect chooses to speak after being

28    informed of his right is, of course, highly probative."  *Id.*  The surrounding circumstances must be

1    such that a suspect's "will was overborne." *United States v. Gamez*, 301 F.3d 1138, 1144 (9th

2    Cir. 2002) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)).  When determining

3    whether a subject's free will was overborne, courts examine "the youth of the accused, his

4    intelligence, the lack of any advice to the accused of his constitutional rights, the length of

5    detention, the repeated and prolonged nature of the questioning, and the use of physical

6    punishment such as the deprivation of food or sleep."  *United States v. Haswood*, 350 F.3d 1024,

7    1027 (9th Cir. 2003).  "The government bears the burden of establishing that the statements made

8    post-*Miranda* warnings were voluntary, despite the violation of *Miranda* rights."  *See Walker*,

9    742 F. App'x at 285 (citing *Haswood*, 350 F.3d at 1027).

10        Here, the court finds the government has met its burden with respect to its argument

11    focused on the passcode to Loloee's phone and has established Loloee gave his statement

12    providing the passcode voluntarily in spite of being in custody and having requested counsel.  His

13    statement came after Henwood and Myers read Loloee his *Miranda* rights.  *See* Tr. at 5.  Making

14    a statement after such a warning is "highly probative" the statement was made voluntarily.  *See*

15    *Oregon*, 470 U.S. at 318.  Loloee gave officers the code to his phone and to his safes during a part

16    of their conversation that he initiated with Myers and Henwood.  *See* Tr. at 15–16; Opp'n at 18.

17    The interview setting was not overtly coercive.  *See* Opp'n at 12–13.  There is no evidence of

18    factors at play recognized as coercive, such deprivation of food or sleep.  *See generally* Video.

19    As the government also points out, Loloee is an adult and a business owner and his age and

20    station in life suggest he was aware of the implications of providing certain information to law

21    enforcement.  *See* Opp'n at 19 n.6 (citing *Haswood*, 350 F.3d at 1027).  Finally, Loloee does not

22    contest the voluntariness of his statement. *See* Reply at 9–10.  He claims only that the fruits of the

23    search using the passcode should be suppressed to the extent that the government not be able to

24    use them in its case in chief.  *See id.*  The court addresses this claim below.

25        Loloee seeks suppression of all the information the government found on his phone

26    because he argues the government unlawfully obtained the code to his phone during his

27    interrogation.  Mem. at 24.  District courts in the Ninth Circuit have recognized the law is unclear

28    regarding whether the government can use "the fruits of a cell phone passcode obtained in

1  violation of *Miranda*" in its case-in-chief. *United States v. Booker*, 561 F. Supp. 3d 924, 940

2  (S.D. Cal. 2021); *compare United States v. Maffei*, No. 18-0174, 2019 WL 1864712, at *8–9

3  (N.D. Cal. Apr. 25, 2019) (suppressing both statements and fruits) *with United States v.*

4  *Hernandez*, No. 18-CR-1888, 2018 WL 3862017, at *4 (S.D. Cal. Aug. 13, 2018) (finding

5  government could still use fruits of statements taken in violation of suspect's *Miranda* rights

6  because suspect made statements voluntarily).

7       The government argues the court should follow the Supreme Court's plurality opinion in

8  *United States v. Patane,* in which three members of the Court held the "'the exclusion of

9  unwarned statements . . . is a complete and sufficient remedy' for any perceived *Miranda*

10  violation" and "[t]here is therefore no reason to apply the fruit of the poisonous tree doctrine

11  . . . ." 542 U.S. 630, 641–42 (2004) (internal marks and citations omitted). The Ninth Circuit has

12  held the concurring opinion written by Justice Kennedy is the controlling opinion in *Patane*, not

13  the plurality opinion, and this court is not bound by the plurality's holding regarding the fruits of

14  statements given in violation of *Miranda*. *See Tekoh v. County of Los Angeles*, 985 F.3d 713,

15  721–22 (9th Cir. 2021), *rev'd and remanded on other grounds, Vega v. Tekoh*, 142 S. Ct. 2095

16  (2022) ("Justice Kennedy's opinion did not echo the plurality's broader discussion of *Miranda*,

17  and it thus controls."). Nevertheless, Justice Kennedy's concurring opinion also holds courts are

18  not required to suppress the fruits of an interrogation in violation of *Miranda*. *See Patane*,

19  542 U.S. at 645 (Kennedy, J., concurring).

20       Elsewhere, the Ninth Circuit has concluded, "Where there is no evidence of coercion or a

21  denial of due process in elicitation of the statements, the object of the fifth amendment

22  exclusionary rule—assuring trustworthiness of evidence introduced at trial—is not served by

23  barring admission of the derivatively obtained evidence or statements." *United States v.*

24  *Gonzalez-Sandoval*, 894 F.2d 1043, 1048 (9th Cir. 1990) (citing *United States v. Sangineto-*

25  *Miranda*, 859 F.2d 1501, 1517 (1988) (holding "a failure to administer *Miranda* warnings,

26  without more, does not automatically require suppression of the 'fruits' of the uncounseled

27  statement")). As noted above, the court finds the government did not coerce Loloee into giving

28  the government the passcode to his phone. Reading *Gonzalez-Sandoval* together with the

22

1  concurring opinion in *Patane,* this court is persuaded it should not suppress the information on

2  Loloee's cell phone because Loloee voluntarily provided his cell phone code to the government

3  when the government asked for it.[8]  *See* Tr. at 15–16.

4        Loloee would have the court apply the holding of a district court in another circuit, in the

5  case of *United States v. Djibo*, 151 F. Supp. 3d 297 (E.D.N.Y. 2015).  In that case, the district

6  court suppressed both statements attributed to the suspect, including his provision of the code to

7  his phone, and the information the government obtained from his phone, which the government

8  seized after it had violated the suspect's *Miranda* rights.  *See id.* at 307–09.  But in *Djibo*, the

9  court found a  Fourth Amendment violation of the seizure of the suspect's phone as well as the

10  government's violation of the suspect's *Miranda* rights.  *See id.*  Here, the government had a valid

11  search warrant to seize Loloee's phone and thus his Fourth Amendment rights are not implicated.

12  *See generally* Order (Mar. 3, 2025).  Even if *Djibo* were persuasive, it was decided on facts not

13  analogous to those here.

14  **IV.    CONCLUSION**

15        For the reasons stated above, the court **grants** Loloee's motion in part and **denies** it in

16  part.

17        • The government is barred from using in its case-in-chief Loloee's statements

18          given on October 26, 2023, as reflected beginning on page 5 of the transcript

19          (ECF No. 86-1, top right pagination), from the time he unequivocally requests a

20          lawyer until the end of the interrogation.

21        • The government may use in its case-in-chief Loloee's responses given on

22          October 26, 2023, reflected on pages 1–4 of the transcript (ECF No. 86-1, top

23          right pagination), up to the point Loloee unequivocally requests a lawyer.

24  /////

---

[8] Given that the court will allow the government to use the information obtained from Loloee's cell phone because he gave the government the cell phone code voluntarily, the court does not reach the government's argument that it would have inevitably discovered Loloee's cell phone code based on documents it found in its execution of the search warrant for the Duckhorn Office building.  *See* Opp'n at 19–20.

1      • The government may use the information obtained from Loloee's cell phone in its

2         case-in-chief.

3      This order resolves ECF Nos. 69, 80.

4      IT IS SO ORDERED.

5   DATED: April 25, 2025.

_____

SENIOR UNITED STATES DISTRICT JUDGE