THOMAS A. JOHNSON #119203
Law Office of Thomas A. Johnson
400 Capitol Mall, Suite 2560
Sacramento, California 95814
Telephone: (916) 422-4022
Fax: (916) 442-4262
Email: taj@tomjohnsonlaw.com

Attorney for SHAHRIAR LOLOEE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>SHAHRIAR LOLOEE,<br>Defendant. | Case No.: 2:23-cr-00320-TLN-1<br><br>DEFENDANT'S SENTENCING MEMORANDUM<br><br>DATE: November 19, 2026<br>TIME: 9:30am<br>COURT: Hon. Troy L. Nunley |

## I. INTRODUCTION

Sean Loloee stands before the court on November 19, 2026, for sentencing following a guilty plea to essentially all charges. He entered the plea on April 23, 2026, some seven months ago, six months ahead of trial. He signed a factual basis for the plea and has accepted responsibility for his crimes. The Probation Department has recommended an offense level of 23, and the Government is bound to recommend from the bottom of the USSG, which totals out to 46 months. We ask this court to follow the recommendations and findings of the Probation Report, made final on October 28, 2026. We ask the court to find under 18 U.S.C. 3553(a) that Mr. Loloee's contributions to the community, which span decades, entitles Mr. Loloee to a sentence of 36 months.

/ / /

## II. MR. LOLOEE ACCEPTED RESPONSIBILITY

### A. The Objection to the Three Level Reduction Pursuant to USSG 3(E)1.1 Is Meritless

The Government, in its objection to the final Presentencing Report cited from an outfit called "Newsbank" to argue Mr. Loloee should not receive a level three reduction for acceptance of responsibility. In the "Newsbank" posting, the Government finds that Mr. Loloee has not accepted responsibility. What the Government failed to note is that the entity 'Newsbank' has no authors. It is simply a publication that "consolidates" news. It was unfair to cite such a source, when the publication simply masquerades as a news source. What is factual and specific is that Mr. Loloee essentially "pled to the sheet" as the saying goes for people who admit all charged crimes. He did that. He did that seven (7) months ago. If that were not enough, the next consequential event was the plea of guilty by both the Shams brothers, some four months later.

The colloquy of every plea in front of Your Honor is the same in every case. Are you pleading guilty? Yes. Are you pleading guilty because you are in fact guilty? Yes. Did you have enough time to talk to your attorney? Yes. Is that your signature on the factual basis? Yes. That all occurred in front of Your Honor seven months ago, and after, Mr. Loloee was put under oath and swore to tell the truth. However, for some reason, every single thing, without exception, that Mr. Loloee says, the Government takes issue with, including a plea of guilty and acceptance. So, this time, it's his letter to probation, because it spoke to his personal history, which was all wrong it seems. Then the Government **demands** that Mr. Loloee speak, to "allocute" was how they referred to it.

#### 1. What is Newsbank?

The Government has cited to this publication called 'Newsbank' and offered it as a source to show Mr. Loloee has not accepted responsibility. Having never even heard of the word "Newsbank" before, the defense has learned through an open google search the following: "Newsbank" is just that; a repository. It apparently has a bank or repository of

news. From its website at www.newsbank.com a few critical things can be gleaned. First and most importantly, no actual authors/writers work there. There are no "sourced" stories and authors. "Newsbank" by its own admission, "…consolidates articles, newswires, blogs, videos (presumably YouTube) and any other news source". Newsbank must use an algorithm that "consolidates" information based upon search terms put into the databank. To this day, we have no idea what the Government searched to generate this story.

The Government is citing to this "Newsbank" publication that states "even after resigning he maintained that the charges were false, he defended his labor practices". This however is not a quote from Sean Loloee – it must be some sort of summary. In the Newsbank publication, there is not a single quote from Mr. Loloee.

The Government has rested a massive request upon this court, to deny a three-level reduction for acceptance upon the shoulders of some "databank" from Naples, Florida, three thousand miles from here. This is a window into the Government's argument in this entire sentencing. Not only do they dispute the acceptance of responsibility, they contest the guidelines, but this is their plea agreement. They wrote it and he pled to it, and the guidelines, usually the Government's friend, is now their foe it seems. They plainly, clearly don't think 46 months is enough.

"Newsbank" should never be used as a source because it's basically a version of an AI search. One must assume that "Newsbank" uses AI to produce information, not stories with an author, but information. Again, it is the place the Government comes from in this case. The demand that Mr. Loloee allocute, the citing of "Newsbank", it veers toward dictating how Mr. Loloee should speak and act in their opinion. The defense is asking the court to not only reject the "Newsbank" source but find that is without merit.

## B. Mr. Loloee Has Admitted His Criminality

Sean Loloee said in writing that he is guilty (Exhibit A, Letters from Shariar Loloee). He said it in court under oath and the argument that Mr. Loloee does not accept responsibility is simply, completely hollow. He will say it again in court because he

understands the nature of his conduct as he said at the time of the plea. Not to put too fine a point on it, Mr. Loloee made a $300,000 restitution payment before he was ordered to do so. That seems to say acceptance.

He pled guilty and admitted it. The fact that the guidelines are what they are in this case, they knew or should have known.

## III. THE APPROPRIATE SENTENCE IS 36 MONTHS

Shahriar Loloee ("defendant"), by and through his attorney, Thomas A. Johnson, respectfully submits this Sentencing Memorandum and recommends that the Court impose a custodial sentence of 36 months. As set forth below, this sentence is justified given the considerations of 18 U.S.C. § 3553, subdivision (a).

Mr. Loloee is fifty-five years old, and he has no prior criminal history, and he is married with two children, ages 10 and 14. His family depends on him entirely, since his wife is unable to work due to a medical disability. Mr. Loloee contributions over the past two decades are remarkable. The stories of these 24 writers show a man with deep and consistent care for others. If there is a single word to describe the theme found in all these letters, it would be compassion. He anticipates that his incarceration will result in the closure of his stores, which will additionally affect more than 200 employees and their families. These hardships, when combined with his lack of criminal history, in addition to other factors discussed below, justify the sentence he respectfully requests of this court.

## IV. THE PROCEDURAL HISTORY

On April 23, 2026, Shahriar Loloee (Sean) pled guilty to seven counts of a 58-count Superseding Indictment. Count 1 charged Conspiracy to Defraud the United States and to Violate 18 U.S.C. §§ 1546 (Immigration Document Fraud) and 1505 (Obstruct Justice), in violation of 18 U.S.C. § 371; Count 2 charged Conspiracy to Defraud the Internal Revenue Service, in violation of 18 U.S.C. § 371; Counts 44-46 charges False Tax Return, in violation of 26 U.S.C. § 7206(1); Count 53 charged Wire Fraud, in violation of 18 U.S.C.

§ 1343; and Count 54 charged Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). He has agreed to pay restitution in the amount of $1,198,486.71 to the United States Small Business Administration and $239,660.00 to the IRS. He has also agreed to forfeit 1,022,365.94 from three separate bank accounts. (PSR, p. 33, para. 176-177.)

There is a written plea agreement pursuant to Rule 11(c)(1)(A) and (B), for which the government has agreed to recommend that Mr. Loloee be sentenced to the low end of the applicable guideline range as determined by the Court. The guideline calculations are advisory only, pursuant to established case law. Of the multiple co-defendants in this case, two pled guilty, and one proceeded to trial, resulting in conviction. Mr. Loloee is currently out of custody, and he has been on pretrial supervision since December 15, 2023. According to Pretrial Services, he has demonstrated satisfactory compliance with all conditions of release, maintained full-time employment, met with and complied with his Pretrial Services officer as directed, and incurred no violations while on supervision.

## V. **ARGUMENT**

Sentencing calls for an "individualized assessment based on the facts presented." (*Gall v. United States* (2007) 552 U.S. 38, 50.) "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, and sometimes magnify, the crime and the punishment to ensue." (*Ibid*, citation omitted.) That word, *human*, is at the core of sentencing. It is precisely why no form of artificial intelligence, or an online search can ever substitute for the judgment of a federal district court judge. The answer to what is right and wrong, what sentence is truly justified or not, lies deep in the court's unique ability to judge an entire person's life. The guidelines are merely there to advise on a possible course of action.

### A. <u>The Particular Circumstances of Mr. Loloee's Family Justify Significant Leniency to Minimize an Unjustified, Serious, and Long-Lasting Negative Impact on His Children Through the Absence of their Father</u>

It is within this tradition of sentencing that the defense feels called upon to address the most serious impact of the sentence imposed in this case. Mr. Loloee has accepted responsibility for his actions, and he is prepared to accept the consequences of them, too. Tragically, it is not upon him that the most difficult consequence of this case falls. It is upon his children. It is the brutal reality of sentencing in this case. One we should face with eyes open, not shut or averted. Though this is true perhaps in many other cases, as one could dismiss this discussion with, "Well, a lot of people have children. We still have to impose sentences." With respect, we are not here to discuss other cases. This memorandum pertains to *this* case, this man, Sean Loloee, his wife, and their children.

Mr. Loloee's son, Pasha, is fourteen years old and he just started his freshman year of high school. His wife, Maryam, is correct, as she wrote in her letter to the court, that these next four years will be among the most important years of his development. She writes,

> "Pasha talks openly with Sean about school, sports, friends, new friendships, and now even dating. These are conversations that many teenagers hesitate to have with their parents, yet Pasha feels comfortable going to his father because Sean listens to him without immediately judging him." (See Exhibit B, Letter from Maryam Seirafi.)

This deserves a moment of pause. Any custodial sentence of a significant length is going to deprive this fourteen-year-old boy of the guidance that he desperately needs during an extremely difficult time in a young person's life and likely instill in him a deep sadness due to the absence of his father, and one can only hope, not anger. He is fortunate to have this sort of relationship with his father, and it is exactly what he needs to not just do well in high school, but to do well in life. These are the years in which he will lay the foundation for his future. This fourteen-year-old boy does not deserve to have his father taken away from him when he needs him most. It is not just about his mental health, but his ability to

grow into an emotionally regulated, balanced, well-adjusted, happy, motivated adult capable of maintaining healthy relationships among his peers and within society.

Sean Loloee is more than just an involved father. Maryam's letter is more than just a description of his participation in their lives. It is a small window into the deep bond that these two children share with their father, and how they are growing through that bond to find motivation, success, joy, and the ability to grow into healthy young adults. There is undoubtedly so much more that cannot fit within the bounds of Maryam's letter. An entire life. A family's love. For it is not simply Sean Loloee alone that will endure this sentence. If it were, this entire argument would not exist. We must look to the entire human impact here; else we perpetuate a falsehood that it does not exist.

Maryam Seirafi wrote to this court about a time when Pasha qualified for the Junior Olympics in four swimming events.

> "[Loloee (Sean)] and Pasha had been waking up at five o'clock in the morning to go to the local gym for additional training. Sean made that commitment alongside his son because he wanted Pasha to understand that achievement requires discipline, sacrifice, and perseverance.

After Pasha's final race, he ran toward Sean, wrapped his arms around him, and said:

"Dad, we did it."

Maryam wrote that those four words have stayed with her. And it is clear why they did – she explains,

> "At fourteen years old, Pasha already understands that his father is not simply someone cheering from the sidelines. Sean is the person who has been there through the early mornings, the exhausting practices, the disappointments, and the achievements."

Maryam knows she can't be that same "we" with Pasha. Pasha's established, strong bond with his father is not something that she can simply step into if he is gone.

> "Your Honor, I am deeply afraid of what it would mean for Pasha to go through his high school years without his father's daily guidance."

Maryam is right to feel this way.

> "There will be decisions about friendships, relationships, school, college, and life that he will need help navigating. There will be moments when he needs advice from the man he admires most. There will be times when he makes mistakes and needs his father to help him learn from them. I can love and support Pasha with all my heart, but I cannot replace the unique relationship he has with his father."

Not every child is so fortunate to have what Pasha has. It is invaluable. This is where it all lands, on the children. This is where the real impact of this case hits. The government will have been made financially whole following payment of restitution. But Mr. Loloee's children will never be made whole from the undeserved and quite possibly enormous, irreversible impact that losing their father for a significant amount of time, at this critical time in their lives, will have on them. His absence for a significant length of time will have an effect that is difficult to predict, impossible to measure, and could create ripples of anguish far into the future. If this fourteen-year-old boy has no man that he trusts and looks up to that he can turn to with his deepest, most difficult conflicts, questions, and struggles, knowing that he won't be immediately judged, he will likely turn inward and face them alone with what mental and emotional capabilities fourteen-year-olds boys in this technological era have on their own while enduring high school. For Pasha, his father's presence over the next four years is more valuable than the state's interest in punishment and deterrence. That is what sentencing by a human is for – to find justice and make a difficult, compassionate decision.

Ayla, Mr. Loloee and Maryam's ten-year-old daughter, will lose her father too.

> "Even at her age, Sean still reads to her before bedtime. It is one of their special routines, something she looks forward to and something that makes her feel loved and secure. Sean taught her how to play basketball. When he is watching a basketball game, Ayla wants to be right there beside him. I sometimes wonder whether she is as interested in the game as she is in simply being close to her father. When Sean comes home, she cannot wait to tell him about her day. She wants to share every detail, every story, every experience."

This is a girl who is just a few years away from high school herself, and the onslaught of social media. These are precious years that she can never get back.

> "And every Sunday morning, Ayla wakes up at six o'clock because she knows it is time for her walk with Daddy. Together, they walk approximately two and a half miles to the local coffee shop. To someone else, it may seem like a simple morning walk. But to Ayla, it is something she looks forward to all week. It is uninterrupted time with her father, when she has his complete attention and can talk about anything she wants. These are the moments that create a child's sense of security. They are the memories that shape how a little girl understands love, trust, and family."

All of that would be ripped away from her with a long custodial sentence. She will not understand why, and like Pasha, it will leave her with unresolved grief, loneliness, and heartbreak as she moves into adolescence – a terrible combination.

Maryam went on to describe how when Mr. Loloee is gone for business trips, Ayla is withdrawn and not herself, and when he returns home,

> "I wish Your Honor could see the transformation. The moment she sees him, her face lights up. Her smile returns. Her energy returns. She runs to him, hugs him, and suddenly the house feels alive again. This is what happens when her father is away for only two or three days. I cannot bring myself to imagine what a much longer separation would do to her. I worry about the bedtime stories that would stop, the Sunday morning walks that would disappear, the basketball games they would no longer watch together, and all the little moments that seem ordinary until they are taken away."
>
> "Those moments are her childhood. Once they are gone, we cannot give them back to her."

The defense humbly and respectfully asks this court, is the government's interest in punishment and deterrence, in this case, on these facts with no criminal history, worth more than that? When the government has been repaid, when Mr. Loloee completes any punishment imposed, what recourse do these children have? The answer is none. They do not deserve to be ignored. There is no assumption that they will be fine that honestly rings

true. The defense pleads with this court to grant a downward departure, if not for Mr. Loloee, for *them*.

It is not just Pasha and Ayla that Mr. Loloee would leave behind if he is incarcerated for a significant amount of time. He would leave everything on his wife's shoulders, with no one to help her. Maryam wrote,

> "Your Honor, one of my greatest concerns is that we do not have other family members who could step in and help us raise our children if Sean were incarcerated. We do not have an extended family support system to rely upon."

With her disability, she is unable to work, and even ordinary household responsibilities are difficult for her.

She wrote that she is *afraid*.

> "I am afraid of not being able to provide everything they need physically and emotionally. I am afraid of Pasha having to grow up too quickly. I am afraid of Ayla withdrawing into herself because she misses her father. … We have not yet spoken to our children about the possibility of their father being incarcerated. I pray every day that we will not have to tell them that the person who has always been there for them will no longer be coming home each evening."

This is where it all comes home. No one there to help Pasha train, to give him a reason to try, to believe in the good in the world, to be there for him when what he really needs is his father. For these children to be so fortunate as to have a father like him, and then to have him disappear, in one day, in one instant, it is very difficult. The defense asks that this court consider how the guidelines know nothing of Maryam, Pasha and Ayla. They know nothing of bedtime stories, Sunday morning walks, and children who exclaim, "Dad, we did it." The guidelines are not human, but we are, and the expectation that guidelines create should not constrain our humanity, or what we know in our hearts to be true and right. That is the calling of sentencing.

Maryam wrote,

> "I understand that many families face hardship when a loved one is sentenced. I do not believe our pain is more important than anyone else's. But I respectfully ask the

> Court to recognize our particular circumstances: two young children at critical stages of development, a mother unable to work because of a medical condition, and no extended family support system to help us through a prolonged separation. Sean's absence would not simply mean losing part of our household income. It would mean losing the person who holds our family together."

That is what a custodial sentence means in this case: an unraveling, not just of Mr. Loloee, but his family. An adult can endure. But the defense fears for these children. This is not an argument that no one with children can be incarcerated. We are not talking about other cases. We are talking about *this* case. Maryam is right – and in our hearts we know what she is saying is true. In these particular circumstances, a downward departure is justified. The utmost leniency is justified for these children, on these facts, with no physical harm caused, and no criminal history.

Maryam wrote,

> "I am not asking Your Honor to forget the seriousness of this case. I am asking you to consider the full measure of the man before you and the lives that would be profoundly affected by his absence. Please allow Pasha the opportunity to have his father beside him as he grows into a young man. Please allow Ayla to continue experiencing the love and security that only her father can give her. And please allow our family, which has no extended family support system here, to remain together while Sean fulfills whatever obligations the Court determines are just."

A mother's hope for her children, that deserves to be heard.

### B. Mr. Loloee's Difficult Family History Justifies Leniency, and His Perseverance and Hard Work Over Time Demonstrates that He Remains Capable of Positive Contributions to Society

Sean Loloee was born in Iran in 1970, where his father was the Chief Executive Officer (CEO) of one of the largest private banks in Iran. When he was nine years old, his family experienced the Iranian Revolution firsthand. His father was arrested by the new government and disappeared for approximately six months. During that time, as a small child, Mr. Loloee and his family had no idea where his father was, what torture he might

be enduring, or whether he was still alive. (PSR, p. 25.) The everyday horror of that is unfathomable. When he was eventually released, Mr. Loloee wrote to this court,

> "He was left on our doorstep in the middle of the night with serious injuries, including broken bones and the physical effects of months of mistreatment."

He had been repeatedly interrogated because of suspicions regarding his position and perceived ties to the former government of Iran. This led to the difficult decision that their family would have to flee Iran in the hope of finding safety elsewhere. (See Exhibit A, Letters from Shariar Loloee.) Unable to leave the country by plane, their family fled by land through Pakistan.

> "The journey took approximately eight days and remains one of the most difficult experiences of my life. We endured hunger, lack of water, dangerous travel conditions, and uncertainty about whether we would ever reach safety." (Exh. A.)

They were abandoned by their driver in Pakistan and had to hide from pirates with no food or water. (PSR, p. 25.) They were in constant fear of the Islamic Revolutionary Guard Corps (IRGC) who manned the borders and they had to pay a fee at each checkpoint they crossed. (PSR, p. 25.) When they finally arrived in Pakistan, his family eventually obtained visas to travel to Portugal, except for him. (PSR, p. 25.) Except for Mr. Loloee, then still just a child. His family had to choose whether to return to Iran with him or leave him behind. (Exh. A.) An unimaginable choice that no parent should ever have to make – that no child should ever have to bear.

> "At fourteen years old,"

> the same age that Pasha is now,

> "Saying goodbye to my family was one of the hardest moments of my life. I remember seeing my mother cry and watching my father struggle to hold back tears. It was the first time I had ever seen him do so."

They went to Portugal, and left him behind to travel to Turkey, alone. (Exh. A.) Mr. Loloee, still just a young child just beginning his adolescence, continued on to a United Nations refugee camp in Turkey on his own. No mother, no father, no siblings, no one to protect him, to guide him, to hold him and tell him everything would be okay. Just utterly alone and defenseless. Mr. Loloee told probation during his interview that he witnessed fights, stabbings, drug use, and that he was the victim of an attempted assault during that time. (PSR, p. 26.)

> "Life in the refugee camp was harsh and often dangerous. Violence was common, and survival required constant vigilance. There were moments when I feared for my safety and future." (Exh. A.)

The trauma that he endured, and still carries to this day, from his time as a child alone in a refugee camp is something no guideline can capture or account for. Having no country to call you own, living in fear day to day, had to have a huge impact on Sean Loloee. He had to learn to fight for every single thing. He stands here today, a proud and loving father with no criminal history. He committed crimes. And yet he has endured so much, built a life and a family to be proud of, and he deserves some understanding for having done so despite his traumatic childhood.

After a year of the living nightmare that was the refugee camp, Mr. Loloee was finally able to reunite with his family in Portugal. Two years later, their family obtained visas to immigrate to the United States. They arrived in Southern California around 1984-1985 with almost nothing. It was a stark contrast to the more comfortable conditions that they had enjoyed in Iran prior to the revolution. In a one-bedroom apartment in Riverside, California, they were at least finally together, and most importantly, safe.

> "My parents taught us hard work, education, integrity, and perseverance were the keys to building a better future." (Exh. A.)

He went to high school in Riverside, where he had difficult acclimating to the new, diverse cultures within the United States, with no ability to speak English. He told

probation about how he was spat on and compared to a terrorist. (PSR, p. 26.) He found it difficult to integrate into any social group until he began playing basketball and soccer, after which he was able to develop friendships and become involved in multiple school-based organizations. He ultimately graduated from high school with several awards. Again, despite his hardships, he persevered and succeeded, with the support of his family.

Mr. Loloee attended college at the University of Riverside, where he majored in biology and volunteered on weekends at Riverside Community Hospital. He applied for medical school after college, but had some doubts about his career path, and instead decided to pursue entrepreneurship by purchasing a van and selling produce in Los Angeles. His father did not approve and cut ties with him, which was devastating, but Mr. Loloee again persevered. He learned confidence on his own and within a year, leased a warehouse, and within three years, he was involved in produce wholesale distribution. Mr. Loloee would travel to the Los Angeles produce markets in the early morning hours, purchase produce, and deliver it to independent grocery stores. His father eventually admitted that he was proud of him, and they were able to reestablish their relationship. (PSR, p. 26; Exh. A.)

> "Through hard work and persistence," he wrote, "the business grew into a larger wholesale operation serving supermarkets and restaurants throughout California. Over time, I expanded into retail grocery operations. Since establishing businesses in Sacramento in 2008, I have been committed to creating jobs, serving underserved communities, and providing access to fresh food. I believe that more than one thousand jobs have been created through the businesses I have owned or operated over the years."

Mr. Loloee had come to the United States not just for safety, but to pursue the American Dream. And despite all the horrors he had witnessed and endured, from finding his father bloodied on their doorstep, to his year alone in the terrifying refugee camp in Turkey, to being spat on and called a terrorist in American high school, he had *finally made it, and* his father was proud of him. (Exh. A.)

Mr. Loloee wrote,

> "I have always viewed my businesses a more than places of employment. I viewed them as opportunities to improve people's lives. Throughout my career, I have helped employees purchase vehicles, pay medical expenses, support family emergencies, pursue education, and achieve personal goals. I tried to create a workplace environment where people felt valued and respected."

The government has its own contradictory narratives on this point, as set forth in the PSR through some employee claims, but the real world is more complex than concluding one side is wholly right or wholly wrong. Both sides of a story can be true and valid in some respects, and it is true that Sean Loloee was regarded by many as a good boss. It can be true that Mr. Loloee wanted to do good by offering people employment who had few options, and true that he took excessive and illegal actions at times. (Exh. A.)

### C. **<u>The Attestations of Mr. Loloee's Benevolence Cover His Entire Life/Work History and Cannot Be Overstated</u>**[1]

The letters the court has received come not from a group of friends, or a single family. These individual stories are unique in that each occasion Mr. Loloee chose to act, for each of them, with genuine compassion. The stories are genuine, remarkable acts by Mr. Loloee and no two stories are the same. These are histories of actual events, where Sean Loloee stopped everything to help a person or family.

#### 1. **<u>The Letter of Maryam Seirafi Speaks Volumes about Sean Loloee</u>**

Maryam wrote,

> "When Sean and I began our life together, we did not have financial security. At one point, we lived in a motel for approximately four months. I remember the uncertainty and the fear of not knowing what tomorrow would bring. But I also remember that Sean never lost hope. He believed that with hard work and determination, we could build a better future. When he opened Viva Supermarkets, he worked seven days a week for the first six years. There were no weekends, very few vacations, and countless long nights. He sacrificed his own comfort and personal time because he believed that he was building something important, not only for our family but also for the employees and communities that would eventually depend on his stores." (Exh. B.)

[1] Included as Exhibits A-Y

> "There were times when I wished he would slow down, when I wanted him to spend more time at home and take care of himself. But I also understood what drove him. He wanted our children to have opportunities he never had. He wanted to create jobs. He wanted to give families in underserved neighborhoods access to fresh food and affordable groceries. People may look at his businesses and see supermarkets. I look at them and remember the years of sacrifice, the sleepless nights, the financial struggles, and the determination of a man who refused to give up."

That drive in Mr. Loloee has always been special, as his wife makes clear in her letter, and it shows in the fact that he was able to persevere through the extreme hardships of his childhood.

Mr. Loloee, despite these convictions, is a person of great character. We do not underestimate the impact of his crimes, but Sean Loloee, at his core, is a man whose life is filled with acts of compassion toward others. But that is not a condemnation of the person themselves, especially not in this case. There is ample evidence in the character letters provided to this court that Sean Loloee is, in fact, a good person and remains capable of making positive contributions to society, as he has done in the past. A significant custodial sentence that takes away his capability to provide for his family, by the likely shuttering of all his stores, is not likely to create a positive impact. Losing his only ability to gain an income will not contribute to his ability to pay restitution, put his children through college, or help them with their own financial futures, as many young people in today's economy require. We need not ignore the real impact of sentencing, in fact, we must embrace it. When Maryam lost her dentistry career due to her disability, she was heartbroken.

> "There were nights when I would begin crying without even knowing how to explain what I was feeling. I worried about our family's future. I worried that all the financial responsibility would now rest on Sean's shoulders. I worried that I had become a burden. But Sean never once allowed me to feel that way." (Exh. B.)

> "He would sit beside me, hold me, and tell me how proud he was of everything I had accomplished. He reminded me that my value as a person, a wife, and a mother had nothing to do with whether I could continue to practice dentistry. He would tell me that he loved me unconditionally and that we would face everything together. Sometimes, while he was comforting me, he would begin crying himself. I will

> never forget those moments. … The thought of losing his daily presence is frightening beyond anything I can adequately express." (Exh. B.)

In reading the character letters provided to this court, it becomes clear that the love and care that Sean Loloee has for his wife and children does not stop at his own home. He cares for his neighbors, for people he doesn't know. Perhaps because he can't bear the feeling of leaving anyone behind, that anyone should suffer like he did as a child. Though the refugee camp is gone, left decades in the past, it is reasonable to suspect that the drive to survive, to protect, to find the *good*, still persists in him. It is a quality that is invaluable in a member of our society, and it renders him capable of continuing to create a positive impact not just for himself and his family, but for others, along with a renewed respect for the law as a result of his experience with this case.

Maryam wrote,

> "For approximately three years, Sean would go to Roseville Road in Sacramento on Sunday mornings to provide breakfast to homeless individuals and families. There were no cameras, no reporters, and no publicity. He did not do it because he was a businessman or city council member. He did it because he believed that people who were struggling deserved dignity, kindness, and a warm meal."

It is not difficult to discern where that may have come from in him. There were times when he did not have kindness and a warm meal. (Exh. B.)

> "I remember when then-Mayor Darrell Steinberg learned about Sean's efforts and suggested that he speak publicly about what he was doing. Sean declined. He explained that he was not helping people to receive publicity or political recognition. He was going it because it was the right thing to do."

Maryam described another instance in which,

> "One of his associates became ill and was unable to work. Sean continued keeping that employee on payroll for approximately six months while he recovered. He wanted to make sure the employee and his family had financial support during a difficult period. On another occasion, an associate needed help paying for his immigration attorney. Sean paid the entire attorney's bill. That employee and his family are now United States citizens." (Exh. B.)

> "Sean understood what it meant to come to American hoping for a better life, and he wanted to help another family achieve that dream. These were not decisions made for publicity or business advantage. They were acts of compassion."

Maryam continued,

> "When Sean told me he wanted to run for Sacramento City Council, I strongly discouraged him. I told him politics could be ugly and that he was too trusting. I worried that his willingness to see the good in people would make political life difficult for him. … He told me that we had been blessed with two wonderful children, and that when he looked at the children growing up in North Sacramento, he saw the same potential he saw in Pasha and Ayla. He saw hardworking families, strong values, and communities filled with people who wanted a better future for their children. But he also saw obstacles that made it harder for many of those children to succeed. He wanted to help change that." (Exh. B.)

> "One incident from 2019 has stayed with me," Maryam wrote, "During a severe rainstorm, an elderly woman in her late seventies who lived in his district called Sean around one o'clock in the morning. Water was building up around her home, and she was frightened that it would flood. Sean got out of bed and drove to her house. He picked her up and drove her to her daughter's home so she would be safe. Then he returned to the woman's property and waited until city staff arrived and addressed the flooding. He could have referred her to someone else and gone back to sleep. Instead, he went himself. That is how Sean has always understood public service. When someone needed help, he believed it was his responsibility to do what he could." (Exh. B.)

**2. <u>The Act of Compassion for Bobby Gosal</u>**

Maryam is not the only witness to Sean Loloee's empathy and willingness to help others, to such a degree that is rare in our society. Bobby Gosal, owner of the Four Points Sheraton Hotel in Natomas, Sacramento, also wrote a letter to the court. He has known Mr. Loloee since 2019, and he wrote that Mr. Loloee believes,

> "That people living in poverty deserved the same attention, opportunities, and respect as citizens of more affluent communities." (Exhibit C, Letter from Bobby Gosal)

Again, it is not difficult to see where this belief may have come from in Loloee.

> "I knew of many activities and efforts he undertook to help residents in his underserved district, yet he never seemed interested in having cameras present or

> receiving public recognition. He did not need publicity or applause to do something good for others." (Exhibit C, Letter from Bobby Gosal)

Mr. Gosal shared a particular experience with the court that reinforces the person that Maryam describes Sean Loloee as.

> "During the construction of my hotel, four semi-trucks carrying furniture, fixtures, and equipment arrived for delivery. There was an issue requiring coordination with city and fire officials, and it was a Saturday. I could not reach my own elected representative, so I called Sean for help even though my hotel was outside his district." (Exh. C)

> "Sean immediately asked me to give him a few minutes. He contacted the fire chief and city managed and helped resolve the situation so the deliveries could proceed. He personally took responsibility for helping us through the problem. What makes this experience so meaningful is what could have happened without his intervention. The trucks would have unloaded our furniture and equipment in the middle of the parking lot while it was raining. The potential damage and disruption could have delayed our construction by weeks, possibly months, at a substantial financial cost. … Sean never once asked me for a campaign contribution, a business favor, or anything else in return. Not once. He helped because he believed it was the right thing to do. That experience earned my lasting respect."

He also described how when Mr. Loloee decided to not seek reelection, he returned campaign money to donors.

> "The Sean Loloee I know is a man who works tirelessly, cares deeply about his family, stands up for underserved communities, and helps others without expecting anything in return." Mr. Gosal knows him to be a good man. (Exh. C)

**3. <u>Dawn Cannon Knows Mr. Loloee As Kind and Selfless</u>**

Dawn Cannon, who has known Sean Loloee for 13 years through their children, also wrote a letter to the court. She wrote that she has

> "come to know him not only as a loving and devoted father, but also as an extraordinary friend and an incredible example of what it means to live with kindness, integrity, and selflessness…His absence will leave a profound void, causing severe psychological distress and instability for Pasha and Ayla during their critical developmental years, as well as significantly compromising his family financially. … I respectfully ask that the Court take his deep devotion to his children,

> his role as a provider, and his overall character into account, and grant him as much leniency as possible in his sentencing."

There are times when such leniency is justified, and in these particular circumstances, it is the right thing to do. The outpouring of support for Mr. Loloee is not just a summary of kind words; it is evidence that he is a *good person*. That he is *not* the sort of person for which imposing a significant custodial sentence is necessary to achieve the purposes of sentencing. (Exhibit D, Letter from Dawn Cannon)

**4. <u>Hamidreza Kazemi Knows Mr. Loloee's Work Ethic</u>**

The letter from Hamidreza Kazemi echoes Dawn Cannon's words. Ms. Kazemi has known Sean Loloee personally for over 15 years.

> "Over that time, I have come to know him as the most hardworking, responsible, and family-oriented man I have known. … One of the things I have always respected about Shahriar is his dedication to providing for his family and anyone in his circle. He has worked extremely hard to build and operate his businesses, creating opportunities not only for himself but also for the many people who depend on those businesses for their livelihoods. He takes his responsibilities seriously, and I have always viewed him as someone who puts the needs of his family and those around him first. … I recognize that no one is perfect, and people can find themselves in circumstances that have life-changing consequences. I sincerely hope that Shahriar will be given the opportunity to continue supporting his family, and demonstrate through his actions that he can put this situation behind him. I respectfully ask that you consider the impact this matter has on his family and take that into account." (Exhibit E, Letter from Hamidreza Kazemi.)

**5. <u>The Compassion Shown to Kathy Sabour</u>**

Kathy Sabour, who has known Sean Loloee for 20 years, wrote to this court that,

> "Over the course of our friendship, I have known Sean to be generous, hardworking, thoughtful, and deeply devoted to his family and the people around him. He is someone who values his relationships and has shown a willingness to step forward when someone he cares about needs help."

She writes about a time when she was preparing to move and selling as many of her belongings as possible to raise the money she needed, including a salvaged vehicle.

> "Sean stepped in to help. He arranged to pick up the vehicle, took care of selling it, and handled the arrangements for me when I was already overwhelmed. What

> touched me even more was that he also paid for my plane ticket so I could travel to visit them and spend time with my best friend. He did not have to do any of this. He saw that I was going through a difficult time and chose to help in a meaningful, practical way. I have never forgotten that kindness. It is one example, among many, of the generosity and personal care that I have experienced from Sean over the years." (Exhibit F, Letter from Kathy Sabour)

Ms. Sabour knows the family well and believes that, for the children, the possibility of losing the daily presence of their father would be

> "devastating. A father's love, guidance, and involvement cannot simply be replaced, and I worry deeply about the lasting emotional impact his absence could have on them. … I beg the Court to consider the family who depends on him, the employees whose livelihoods are connected to his businesses, and the ways he has shown up for people in his personal life, when determining his sentence." (Exh. F)

Thus, in letter after letter, the people who care about Sean Loloee in his family are deeply aware of the profoundly serious effect that his incarceration will have on his children, and they are all unfortunately right to be worried for them. It would be devastating. Thus, we return again to the question at the core of this sentencing, is that justified?

### 6. **<u>Mel Demoff Attests to Mr. Loloee's Commitment to Community</u>**

Mel Demoff, Executive Director of the Bach Viet Association, also wrote a letter to this court, in which he expressed his deep appreciation to Sean Loloee's Viva Supermarket company for his ongoing partnership with the program since 2020. The Bach Viet Association is a Sacramento Employment and Training Agency (SETA) Refugee Program, which helps refugees succeed through partnerships with businesses and other organizations. Mr. Demoff wrote,

> "Your support in providing employment opportunities for our clients, many of whom are refugees with limited English proficiency and little prior work experience, has been invaluable. The training and guidance your team offers to these new employees are not just commendable; they are essential in helping them forge meaningful careers and develop a sense of belonging and dignity. Your commitment to inclusivity and patience is reshaping lives and making a tangible difference in our community." (Exhibit G, Letter from Mel Demoff.)

> "Since the inception of our partnership in 2020, VIVA Supermarket has successfully hired over 75 individuals through our initiative. This achievement underscores the effectiveness of our collaboration. Many of these employees have transitioned into new roles, while others have thrived in their positions, even gaining promotions. The opportunities you provide are a testament to the kind of partnership that drives real change. Furthermore, your active involvement in community initiatives and charitable efforts amplifies our collective impact and demonstrates your leadership in social responsibility. We are eager to continue this vital mission together." (Exh. G)

If the stores close without Mr. Loloee to run them, or otherwise fall into ruin and failure, all of those opportunities for future refugees, and those he has already hired, will vanish. There is still so much more good that Mr. Loloee can do.

**7. <u>Additional Summaries of Mr. Loloee's Character</u>**

Including the letters quoted at length above, there are a total of **<u>twenty-four character letters</u>** attached to this brief. This outpouring of community support, from friends and business associates, many of whom have known Sean Loloee for more than a decade, is strong evidence that he is a well-respected member of the community who has gone out of his way countless times to help others. The following includes only portions of those letters.

His son's martial arts teacher, Master Amitis Pourarian, explains that,

> "Sean has voluntarily supported several of my charitable initiatives. One example is our Blessing Bags Project, through which we collected food, clothing, and essential supplies for individuals and families in need. Sean contributed to these efforts, and I personally witnessed him picking up bags we had assembled and delivering them to local churches and community organizations for distribution to those less fortunate. His willingness to give his time and effort to help others, without seeking recognition or anything in return, left a lasting impression on me."

He notes how much he values the role of a supportive and present father and that,

> "Sean has consistently demonstrated that commitment through his active involvement in his son's martial arts training, athletic pursuits, and personal development. … My interactions with him have consistently reflected kindness, generosity, respect, and genuine concern for others. The Sean Loloee I know is someone who contributes positively to the lives of those around him." (Exhibit H,

Letters from Master Amitis Pourarian and Parmis Pourarian.)

Parmis Pourarian similarly wrote that,

> "Whenever I have reached out for support in my charitable endeavors, he has been willing to help." She runs a nonprofit organization called Power of 100 Women, which works to bring people together to help those who are struggling and assist other charitable organizations in making a difference. "Sean has been among those who have supported by efforts over the years. I have personally witnessed his generosity and willingness to contribute to causes that help people in need. … When I think about Sean's two young children and the possibility of their father being absent during such important years of their lives, my heart truly goes out to them. Children do not get these years back. The everyday moments, the guidance, the encouragement, the comfort of knowing their father is there – these are irreplaceable parts of growing up. I worry deeply about the emotional toll his absence could have on them." (Exh. H.)

Darius Turner, founder of the DT Foundation, wrote to share his personal experience with the support Mr. Loloee has provided to youth in the Del Paso Heights community by sponsoring food for multiple youth football camps, helping them to provide meals for the hundreds of young people that participated in the program between 2013 and 2016, and allowing them to direct their limited resources to other camp needs.

> "I respectfully ask the Court to consider this part of Sean's history and his contributions to our community along with all of the other information before the Court." (Exhibit I, Letter from Darius Turner)

Jaime and John Zezini, two longtime friends of Mr. Loloee, also wrote letters on his behalf. Jaime wrote that,

> "Over the nine years that I have known Sean, he has always presented himself with the utmost respect, kindness and support for those all around him…. Sean often goes out of his way to ensure our community members and children have what they need to succeed in daily life. … I know in my heart that there was no malicious intent behind his misjudgments. No one is perfect and Sean was only trying to do the best for his community. John wrote that Loloee is "a kind, caring, loyal, genuine and the ultimate family man. … He has a good heart, and he has consistently shown compassion, generosity, and a willingness to be there for others in their time of need. … His love and willingness to be there for every moment of his children's lives is unmistakable. I admire his commitment to his children and his wife. From what I have personally observed, he is committed to his role as a father and takes that

responsibility seriously." (Exhibit J, Letters from Jaime and John Zezini.)

Christina Juarez, who has known and worked with Mr. Loloee for almost 18 years, wrote that she was hired as a cashier at Viva Supermarket in November 2008. After a week,

> "I knew I had found something special. I had found more than a job. I had found a workplace where employees were treated like family. … One experience I will never forget happened when my family sold our home in North Highlands and decided to purchase a home in Rocklin. We discovered that we were short of the money needed for our down payment. I casually mentioned our situation to Sean, never expecting him to do anything about it. Without hesitation, he told me to let him know if we needed help. When I did, he handed me a check within 48 hours to cover the shortage. No contract, no promissory note, no conditions. He simply trusted me and wanted a better future for my family. … He did it because that is the kind of person he is. My family and I will never forget his generosity." (Exhibit K, Letter from Christina Juarez)

In another instance, when Ms. Juarez needed to leave work immediately to pick up her daughter from school for medical reasons, Mr. Loloee rushed in to cover her shift and then called later to check on her and her daughter. By 2014, she had become a store manager.

> "Sean personally invested his time in teaching us the grocery business, including ordering merchandise, working with vendors, negotiating prices, managing employees, controlling inventory, and understanding profit margins. He would often tell us that he wanted us to learn everything about the business so that one day we could open our own supermarkets."

She wrote that in 18 years, she never saw him lose his temper, become angry with an employee, or treat someone disrespectfully. He would ask how they and their families were doing, and though she knows some employees have reported negative experiences,

> "those descriptions do not reflect the Sean I have known for almost 18 years. I have seen his character through his everyday actions, his generosity when nobody was watching, and his willingness to help others without expecting anything in return."

This rings true because she is not the only one saying that – generosity and kindness without expectation of anything in return. A consistent theme.

In a five-page letter, Veronica Smith wrote to this court that she has known Sean Loloee personally and professionally since 2014, and that she has spent more than 20 years

working in community and economic development in the Sacramento region.

> "One of the things I witnessed repeatedly was Sean's generosity. I personally watching him write checks from his own account to support local nonprofit organizations. I watched him donate food, drinks, water, and other supplies when community organizations needed help. A nonprofit organization that I founded was itself the beneficiary of Sean's generosity, and he became one of our most consistent supporters." At times, with her professional background in vetting non-profits for funding purposes, "I often found myself encouraging Sean to establish boundaries, ask more questions, and understand that he could not help everyone simply because they asked." (Exhibit L, Letter from Veronica Smith)

> "Because of my professional background in community and economic development, I understand what it means when a full-service grocery store invests in an underserved community. I understand what happens when communities lack access to fresh and healthy food, and I understand how difficult it can be to attract meaningful private investment into neighborhoods that have experiences years of disinvestment. That is part of how I first came to know Sean. Viva Supermarket brough something to North Sacramento that the community needed: access to fresh food and a full-service grocery option. It also created jobs, generated economic activity, and represented private investment in a community where attracting that investment was not always easy. I do not believe that contribution should be treated as incidental. … Grocery stores are more than places to purchase food. They can be anchors. Access to a quality grocery store affects food access, neighborhood vitality, employment, and the economic ecosystem surrounding it. … There was not then, and there is not now, a line of people with resources waiting to fill Sean's shoes." If the stores close, they will not be easily replaced, and the entire community suffers. (Exh. L)

As with so many others, Mr. Loloee helped Ms. Smith personally, too:

> "There was a period in my life when I was going through an extremely difficult divorce and custody battle. … During some of my worst days, he was there. He helped me financially when I needed help. He supported me emotionally when I felt overwhelmed. Most importantly, he made sure I knew somebody had my back at a time when I did not always feel that anyone did. He became a big brother to me during a period of my life when I desperately needed one. Sean taught me a great deal about resilience during those years. … And there was nothing for Sean to gain from being there for me. There was no public recognition, no political benefit, and no audience. He simply saw someone he cared about struggling, and he made sure I did not struggle alone. I will never forget that."

She later worked for him as his Chief of Staff on the Sacramento City Council. She wrote,

> "The man before you is more than the conduct that brought him before you." (Exh. L)

Micah Grant, principal of Alexi Public Relations in Sacramento, previously ran Sean Loloee's campaign for Sacramento City Council District 2 in 2020. After he was elected, Mr. Grant's firm continued to provide communications and community-facing support for his Viva Supermarket stores.

> "From my experience, Sean was always willing to step in when something needed doing. He worked to provide jobs for at-risk youth and was deeply embedded in the neighborhoods his stores serve. … While he was on the City Council, he was wholly committed to enhancing District 2. His vision was to bring enterprise, opportunity, and basic services back into the district, places where people could shop, work, and build a life without having to leave their own neighborhood. For years, his stores were the first full-service grocer in what had long been a food desert…When I visited his stores, I saw a warm and loving environment where employees seemed fulfilled and enjoyed their work. The people who worked there appeared to take pride in what they were doing, and the atmosphere reflected someone who cared about the people around him." (Exhibit M, Letter from Micah Grant)

Maria Lopez was hired as a courtesy clerk in 2009, when she was a single mother raising four children.

> "What surprised me most was how approachable and caring Sean was as the company's owner. Unlike other employers I had worked for, he treated everyone with kindness and respect, regardless of their position."

When she was eager to move from a one-bedroom apartment to a two-bedroom apartment, her request to Sean for $1,000 in advance pay was met with a $2,500 check, and instructions to only pay the original $1,000. The additional $1,500 was a gift.

> "I cannot describe how I felt at that moment. Here was a man who had known me for only three weeks, yet he cared enough to help me and my children when we were so close to losing everything. Nobody, not even my own family, had ever done anything like that for us. I went home and cried, thanking God that someone like Sean had come into our lives."

> "Sean's generosity did not stop there. Every Christmas, Thanksgiving, and on my children's birthdays, he found ways to help us. And I was not the only one, I personally saw him help other employees and customers going through difficult times. He never made anyone feel embarrassed for needing help, and he never expected anything in return."

One of Ms. Lopez's sons had a serious medical condition, and she was allowed to leave work immediately whenever he needed her, and that Mr. Loloee made sure she was paid for the hours she missed.

> "For a single mother trying to keep a roof over her children's heads, that compassion meant everything." He taught her many aspects of the grocery business, gave her raises, and "never made me feel that being a courtesy clerk was all I could ever be."

When she met her husband and moved to Bakersfield in 2017, he gave her an additional $2,000 with her final paycheck to help with the move.

> "To this day, he still calls every couple of months just to ask how my husband, my children, and I are doing. When he learned that my husband had become sick last year, he reached out to check on us. After all these years, he still cares."

Ms. Lopez concluded,

> "I respectfully ask Your Honor to consider granting Sean probation or another sentence that would allow him to remain with his family and continue helping others. … I am living proof of the difference his kindness can make. When I think about where my children and I were in 2009 and where we are today, I know that Sean played an important part in giving us a better future. I will never forget what he did for us, and neither will my children. Some people help others because they have something to gain. Sean helped us simply because we needed help. That is the Sean Loloee I know, and that is the man I respectfully ask Your Honor to consider when deciding his sentence." (Exhibit N, Letter from Maria Lopez.)

Keven Ferreria wrote to the court that Mr. Loloee's contributions:

> "include support for the business community, nonprofit organizations, neighborhood associations, youth organizations, and senior programs. During the COVID-19 pandemic, he demonstrated exceptional leadership by providing meals to hundreds of families in need within his business community." (Exhibit O, Letter from Keven Ferreria)

Dayans Peraza, who started as a cashier at Viva Supermarket in 2017 and now works as an assistant manager, wrote that,

> "Sean believed in me, encouraged me, and personally took the time to teach me the grocery business." She wrote that she has never seen him raise his voice or lose his temper with anyone, and that he is "patient, approachable, and treats everyone with kindness and respect. … As a mother of two young children, I especially appreciate how much Sean understands the struggles of working parents… even suggesting

> that mothers work during school hours so they can be home when their children return. … He believes in people, sometimes even before they believe in themselves. That is why so many employees stay with us for years. We often see employees leave their jobs and return a few months later because they miss the way they were treated here." (Exhibit P, Letter from Dayans Peraza.)

Lamar Jackson, a resident of the neighborhood where Viva Supermarket first opened in 2008, described Sean Loloee as being at the store constantly, rather than just opening a business and leaving others to run it.

> "Weekdays, weekends, Thanksgiving, Christmas, it did not seem to matter. He was there working, speaking with customers, helping employees, and making sure the store was serving the community properly."

As with so many others, Mr. Jackson had a particular experience to share with the court: he gave his son, Trent, an opportunity that helped shape his young life. Mr. Loloee hired him to work at Viva Supermarket, with the understanding that his work schedule needed to accommodate his education. It gave his son,

> "an opportunity to learn responsibility, develop a work ethic, and understand the value of earning his own money while continuing his education. I watched Trent become more independent and confident. By his junior year, he had earned and saved enough money to pay for his own braces. He was also able to purchase his first car with some financial help from me. … As a father, I will always be grateful to Mr. Loloee for giving my son that first opportunity." (Exhibit Q, Letter from Lamar Jackson)

Then, when the COVID-19 pandemic happened, Mr. Jackson recounted that:

> "Mr. Loloee provided free breakfast burritos every Saturday and Sunday morning to children from our local schools. I know this firsthand because all three of my children received those meals. … To some, a breakfast burrito may not seem like much. But to a parent, knowing that someone in your community cares enough to make sure children have something to eat means a great deal. And when that kindness is extended week after week, it becomes something you never forget."

When Mr. Loloee became their City Council representative,

> "I saw that same dedication to the community continue. … At Mama Marks Park, he helped secure funding to restore a water attraction that had been broken for approximately 15 years. He also worked to address long-neglected facilities at Robla Community Park, including the bathrooms, which helped bring attention to recreational facilities our community had gone without for years. These

improvements meant a great deal to families in Del Paso Heights. Our children deserve safe, functioning parks and places to enjoy themselves just like children in other parts of Sacramento."

Mr. Jackson further wrote that he continues to shop at Viva Supermarket and

"Even today, I find the employees friendly, respectful, and helpful. … I believe a person's character should be judged by the totality of his life, including how he has treated others, the opportunities he has created, and the difference he has made in the lives of people around him. In my experience, Mr. Loloee has been a hardworking, caring, and generous man who has given a great deal to our community. … I sincerely hope that the Court will extend compassion and leniency and consider a sentence that allows him to remain with his family and continue making positive contributions to the community. I know I am only one resident speaking on his behalf, but I believe my experiences reflect the feelings of many people whose lives have been touched by his work and generosity."

Mari Velochiski writes in her letter, which is included as (Exhibit S):

"Your honor, because of my medical condition, I must follow a very strict diet of fresh unprocessed foods. I even raise chickens so I can have fresh eggs. Approximately ten years ago, I approached Sean and asked whether he could help me with fresh produce. Without hesitation, he agreed and began providing me with produce at no charge."

"Another experience I will never forget happened when my daughter was getting married. We ordered a wedding cake and dessert from Viva, but as the wedding expenses increased, I decided we needed to cancel the desserts. When Sean learned why, he insisted that we keep them and told they would be his wedding gift to my daughter. He provided desserts for 120 guests at absolutely no charge. I was overwhelmed by his generosity."

"I have watched Sean treat customers and employees with genuine respect."

"I worry that if Sean is incarcerated and his supermarket closes, many families like mine will lose a vital part of our community."

Pedro Vascuz states in his letter, included as (Exhibit R):

"Our business relationship began when Sean approached our company about supplying products to his supplying products to his supermarkets. For the first five years, I interacted with him almost every week. Over those years, I developed a great deal of respect for him, not simply because he was a successful businessman, but because of the way he treated people."

"…yet Sean agreed to help me. On one occasion, he placed an additional order of approximately $10,000 simply because he knew it would help me reach my goal.

He remembered that I needed help, and he came through for me. I have worked with many business owners over the years, but few would make that kind of gesture for a vendor's sales representative. Sean understood that behind every business relationship is a person trying to support a family and make a living."

"Your Honor, after 15 years of doing business with Sean, I believe his character is best demonstrated by the respect, fairness, and generosity he has consistently shown others."

Mahdis Abadian and Ashkan Azarkeyvan stated in their letter (Exhibit X):

"In our experience Sean is calm, kind, approachable, and generous… for example, he has occasionally brought our family fresh baked bread from his grocery store simply as a thoughtful gesture. Although small, these acts reflect the warmth and generosity we have consistently seen in him."

"Based on our direct and sustained experience with Sean, we know him to be trustworthy and a man of integrity. We respectfully ask the court to consider our firsthand experience and the positive role he has played in the lives of our family and others in the community."

Irma Gomez stated in her letter (Exhibit V):

"My name is Irma Gomez, and I am writing to respectfully ask Your Honor to consider leniency when sentencing Sean Loloee. I have known Sean for approximately seven years as a customer of Viva Supermarkets."

"I will never forget an experience I had at Viva on November evening. I was purchasing groceries for my family's dinner, and when I reached the register, I realized I was $16 short. I was embarrassed because I would not be paid until Friday. As I searched through my purse, I explained that I might need to put some groceries back. Sean happened to be nearby and approached me with kindness and respect. When he realized what was happening, he took out his bank card and paid the $16 himself. He simply told me to pay him back whenever I could…What touched me the most was not the money, but how he protected my dignity. He never made me feel embarrassed or ashamed."

Alajandro Gutierrez stated in his letter (Exhibit U):

"But what I want to share with Your Honor is not simply my opinion of Sean. It is something he did for my family that I will never forget. In 2008, I approached Sean and asked whether he had any job openings for my daughter, who has a disability…Rather than making my daughter feel that he was doing her a favor, Sean told her how happy he was that she had applied and that they had been looking for someone to fill the position. To this day, I believe he may have created that opportunity just to help her. But he never made her feel that way. Instead, he made her feel wanted, needed, and capable."

> "I also want Your Honor to understand what Sean's supermarkets mean to our community. For many families in North Sacramento, Viva is much more than a grocery store. It provides access to fresh food at competitive prices in a neighborhood where affordable grocery store options are limited. If Viva were to close, many residents, including elderly people and families without reliable transportation, would face a significant hardship."

Mike Brown stated in his letter (Exhibit T):

> "I first met Sean when I applied for an assistant manager position. From our first interview, I was impressed by his professionalism and his willingness to invest time in his employees".
>
> "However, what I remember most happened approximately one month after I started working for him. My wife was involved in a car accident, and the person responsible did not have insurance. We needed $5,000 to repair her car, and I did not know where to turn. I approached Sean and asked whether he'd be willing to lend me the money".
>
> "Your Honor, I understand that you have an important responsibility in determining Sean's sentence. I can only speak about the man I personally knew as my employer. He was a leader who believed in second chances, helped people during difficult times, and treated his employees with dignity and respect."

The outpouring of support is incredibly unique in this case. The letters are consistent in their description of Mr. Loloee as a kind and generous person who helps those in need with no expectation of anything in return. That indicates an innate goodness born out of hardship and a wish that others do not suffer as he once did. This man, who has worked so incredibly hard to achieve the American Dream, is *sharing* it with others. Out of genuine love and kindness towards others, and not in pursuit of any sort of personal benefit. That is an incredibly rare sort of person. It appears that despite his illegal business practices, he was motivated by a moral desire to help others, and he did so, for many, many people, in incredibly meaningful ways that have stayed with them years later. He has inspired, supported, comforted, and provided for individuals, their families, and entire communities in a way that few people do. He is *exceptional*, as demonstrated by these numerous letters, and he deserves exceptional leniency as a result. For the man who never asked anything in return, in his darkest day, as others have pleaded for him, may this court grant him mercy. And if not for him, then for his children.

**8. <u>Mr. Loloee's Plea Encompassed the Aggregate Harm Taken into Account in The Guideline Calculations</u>**

The Government objects to the base offense level of 6 instead of 7. The difficulty with that is this is the Government's Plea Agreement. There are no stipulations to guideline calculations, and the Government dictated the terms of the agreement. The Probation Department correctly responded to the Government's objection. The Statutory Index of 18 U.S.C. § 1956 tells the court the appropriate sentence is under 2S1.1, not 2B1.1, as explained by the Probation Department: "Despite the underlying offense of Wire Fraud being used to calculate the base offense level, it is not the offense of conviction for Count 54. There is a two-prong application to determine the base offense level under USSG § 2B1.1(a)(1) directing that a base offense is '7 *if (A) the defendant was convicted of an offense reference to this guideline*; and (B) that the offense of conviction has a statutory maximum term of imprisonment of 20 years or more.' According to USSG § 2B1.1, comment. (n.2)., 'referenced to this guideline' for purposes of subsection (a)(1), means specifically referenced in Appendix A (Statutory Index). In this case, the first prong is not met as Money Laundering is not referenced to guideline § 2B1.1 and no changes were made."

Mr. Loloee has pled guilty to *seven* counts and will bear those felony convictions for the rest of his life, along with the numerous obstacles they will forever pose for him and his family, though they may be difficult to ascertain in their entirety now. By accepting responsibility in this manner, he has not merely pled to a small portion of his actions, but essentially all of them. He has embraced that in his entire scheme to hire undocumented workers and avoid taxes and other labor costs he rightfully owed, he committed serious financial crimes, defrauded the government, denied his workers' wages that they should have been paid, and conspired with others in doing so. The PSR states that even if Mr. Loloee had not pled, and had instead been convicted on all counts, <u>"it does not appear his guidelines would have increased as the aggregate harm is already taken into account in the guideline calculations."</u> (PSR, p. 33, para. 175.)

In trying to keep these stores open, Mr. Loloee committed crimes. He lost his way and failed to follow labor and tax laws. Somewhere in him is arguably still the person shuddering in a dark refugee camp, fearing for his life. We can draw a reasonable inference suspect that the extremes that he endured in childhood contributed to an excessive desire to achieve, to crawl out of that refugee camp alive, to maintain stability, to find safety in the same sort of financial success that he experienced as a child before the Iranian Revolution, not just for him, but for his own children, and even for others. This began when he was the child left behind. All of that built on an experience of being the one left behind.

We can also understand that this grew in him a desire for success. The fear lingered and he always had to fight. Though Mr. Loloee's actions in this case were nonetheless wrong and criminal, a vital part of sentencing is understanding his human failings, where they may have come from, and how we can nonetheless sympathize with and understand this.

He has **seven** federal felony convictions to bear on his name for the rest of his life that declare so. He is incredibly ashamed and devastated for the impact that this has had, and will continue to have, on his family. But again, in the tradition of sentencing that calls on us to look at the bigger picture, we should dare to speak some truths. He has agreed to pay full restitution for the losses described above. Undocumented workers play a significant role in supporting this country's agricultural and construction industries, among many other necessary jobs, thus, that portion of his conduct is not an extremely uncommon or especially morally heinous offense, though it remains wrong. Most of all, however, Mr. Loloee fears the impact that a custodial sentence will have upon his children far more than himself, as does his wife, and their fears are well-grounded. They are not irrational, as discussed at length above.

It is his children who will suffer the most as a result of this case if a significant custodial sentence is imposed. Of course, that is unintended, but it is nonetheless true. Averting our eyes does not avoid that. So, we *must* ask – what sentence is justified given the facts of this case? What impact is justified, and what is worth sparing? What can still

be achieved through means other than a significant custodial sentence? Do we accept and perpetuate a world that ignores the impact that a certain sentence will have on these children? If sentencing were merely about calculations, rigid rules, meeting expectations, and maintaining consistency despite the realistic differences in cases that those guidelines cannot capture, our jobs could be done by computers. Yet sentencing is far more than that. It is an ancient practice, imbued by centuries of public trust that the sentence imposed will be what is *right*. Only the human heart can feel that. We should not hesitate to use it.

**9. <u>Avoiding Disparate Sentencing Outcomes</u>**

Lastly, 18 U.S.C. § 3553(a) calls upon the court to avoid disparate sentencing outcomes. Using a data analyzer is not the same as citing to a case as precedent but may have some value. In utilizing the online USSC Interactive Data Analyzer, under the "Sentencing Outcomes" and subsequent "Sentence Length" sections, filtering for fiscal years 2022-2025, California, Eastern District, "tax" crime type, and a criminal history category of I, the data shows that of the 22 cases that match those filters, 95.5% of defendants were sentenced to less than two years, with an average sentence length of 9 months. If we look at 2020-2025, criminal history category I, with the primary guideline being § 2T1.9 (as applied in this case to Group I, Count 1(a) and 2 for Conspiracy to Defraud the United States and Conspiracy to Defraud the IRS, two cases match the result and both defendants were sentenced to less than two years, with no average sentence length in months, indicating they were sentenced to probation, since the tool specifies that probation is calculated as zero months. The tool shows they were sentenced to 36 months of supervised release.[2]

For the Group 2 offenses specified in the PSR, to include Count 1(b), 1(c), and 1(d), Conspiracy to Commit Immigration Document Fraud and Conspiracy to Obstruct Justice, the guideline specified is § 2X1.1. If we enter that into the filter, and maintain 2020-2025,

---

[2](U.S. Sentencing Commission, Interactive Data Analyzer, https://ida.ussc.gov/analytics/saw.dll?Dashboard [as of November 8, 2026.])

criminal history category I, within the Eastern District of California, only one case appears, with that person also being sentenced to no time in custody and 24 months of supervised release. For the Group 3 offenses, Counts 44-46 for False Tax Returns, the guideline specified is § 2T1.1. With the same filters, 82.6% of defendants among the 23 cases matching those filters were sentenced to less than two years, with an average sentence length of 13 months, and an average supervised release period of 24 months. Therefore, the sentence recommended by the defense in this case of 36 months of imprisonment would be similar to these other cases of similarly situated defendants, thus avoiding unwarranted sentencing disparities. The PSR acknowledges that Mr. Loloee is statutorily eligible for probation, but that he would not be eligible under the applicable advisory guidelines. (PSR, p. 31-32, para. 165; p. 32.)

**10. <u>Affording Adequate Deterrence to Criminal Conduct</u>**

In a study published in May 2016 by the Office of Justice Programs of the National Institute of Justice, with a disclaimer that its views do not necessarily reflect that of the U.S. Department of Justice, researchers came to five conclusions about deterrence:

1. The *certainty* of being caught is a vastly more powerful deterrent than the punishment.
2. Sending an individual convicted of a crime to prison isn't a very effective way to deter crime.
    - Prisons are good for punishing criminals and keeping them off the street, but prisons may have the opposite effect in some scenarios: inmates learn more effective crime strategies from each other and time spent in prison may desensitize many to the threat of future imprisonment.
3. Police deter crime by increasing the perception that criminals will be caught and punished.
    - Strategies that use the police as "sentinels," such as hot spot policing, are particularly effective.
4. Increasing the severity of punishment does little to deter crime.
5. There is no proof that the death penalty deters criminals.[3]

[3] National Institute of Justice, Five Things About Deterrence (May 2016) <https://www.ojp.gov/pdffiles1/nij/247350.pdf> [as of November 8, 2026].

These conclusions ring true on common sense alone. Another businessman who may be in a similar position to where Mr. Loloee was prior to this case, who may be considering taking similar actions, is unlikely to use the U.S. Sentencing Commission's Interactive Data Analyzer tool to find out what sort of sentences are likely to be imposed for certain illegal conduct. However, they are likely to hear if other similar businesses were raided or investigated for similar violations, which has already been accomplished in this case, without any need for a lengthy sentence. This is similar to the broken-windows theory of neighborhood crime: the more broken windows in the neighborhood, the more crime there is, because of the perception that there is a lack of enforcement, care, and investment in safety. Shifting the responsibility of deterrence to the length of an imposed sentence is generally ineffective, as the report explains.

Thus, while statutory law calls for the court to consider what *sentence* affords adequate deterrence, when the government is already expending efforts to investigate these sorts of offenses and root them out when they occur, a sentence of probation or well below the suggested guidelines can still fulfill the need for adequate deterrence, since the initial enforcement itself that truly drives deterrence, not the procedural details that follow years later. Moreover, research shows, and common sense follows, that draconian increases in sentences imposed do not result in more effective deterrence. Therefore, in considering this factor, the sentence recommended by the defense of 36 months or less in custody would afford adequate deterrence.

**11. The Importance of Viva Stores in Underserved Neighborhoods**

Mr. Loloee stands convicted of seven felonies, yet the impact of the Viva Stores remains. The dream of opening stores in poor neighborhoods is still present, it remains. While Mr. Loloee has admitted his crimes, he nonetheless has been an integral part of these poor areas for going on two decades. In an article posted February 11, 2016, on the Sacramento Bee, https://www.sacbee.com/news/business/article23693611.html , the author quoted then City Councilman Allen Warren,

> "You think of some of the things people take for granted – like grocery stores and banks; they don't exist here".

Long time Del Paso Heights resident, Mary Watts, stated upon the opening of a Viva Store, "the residents are going to love it".

1. **<u>The Location of the Stores in Underserved Neighborhoods was a Deliberate Choice</u>**

The first store to open was in 2008 at 4211 Norwood Ave. in Sacramento. This is Del Paso Heights, where there have been decades of poverty and families fighting to raise families who then leave. It is unfortunately a place where crime and difficulty has been ever present.

Mr. Loloee opened the Norwood Ave. store in 2008 when there wasn't a Whole Foods, Bel Air, Raley's, etc. in sight. To this day, these high end, expensive stores would never move into Del Paso Heights. Mr. Loloee did. He offered fresh produce, quality beef, 100% natural poultry, baked goods from scratch, and so on. The store carries over 19,000 items for sale. Many of the residents don't even drive to the store, they walk. Mr. Loloee estimates that 50% of his customers walk to the store, they either only have a single car per family, or they simply do not own a car.

By 2021-2022, Mr. Loloee even established a shuttle service so senior citizens could get to the store. The North Sacramento store has been open for eighteen (18) years and has served approximately 2,500 people/receipts per day. They are open 365 days per year. In the past 18 years, that means approximately 15,000,000 transactions. That's just one store. Mr. Loloee's store has certainly met the needs of this underserved neighborhood and still does today. So, to say that Mr. Loloee's conduct which he pled guilty to, defines him, is simply not true, not in the least bit true.

Mr. Loloee opened a store on 3845 Marysville Blvd., in North Sacramento. This is considered the Haginwood area, again an underserved neighborhood, but selling the same food to a similar population. Both of these locations are considered to be in a "Food

Desert". A Food Desert is in an area that is "low income and low access geographic area where residents have limited access to affordable, nutritious, and fresh food." A Food Desert has a poverty rate of 20% or higher, and 80% of those people are below the median family income.

A person cannot own and operate in this sector without having a deeply held concern for the poor. Mr. Loloee's concern for others is palpable. It just comes out of the letters and images of the stores (Exhibit Z – Photos of Viva Supermarkets). The pictures depict what Viva offers; healthy food for families.

Then finally, Mr. Loloee opened the store in Rancho Cordova, 10385 Folsom Blvd in 2016. Taken in combination, these three stores have served hundreds and hundreds of thousands of people, most of whom are struggling financially. Mr. Loloee's altruism, his compassion for others is seen in three distinct places: his home, his work, and his community work. To characterize him or label him only as a criminal is simply not true.

There are different sides to this same person. While he did commit criminal conduct for which he stands before the court, he is nonetheless a deeply compassionate man. He is all of these things: convicted, guilty, compassionate, caring, selfless, charitable, generous, and human.

## VI. <u>CONCLUSION</u>

In light of the sentencing factors to be considered by the court pursuant to 18 U.S.C. § 3553(a), the nature and circumstances of the offense, the mitigating circumstances discussed, the need to avoid sentencing disparities in comparison to other similar cases, the history and characteristics of Mr. Loloee himself, and the particular circumstances of his family, 36 months or less in custody would be justified in this case.

DATED: November 13, 2026 Respectfully submitted,

/s/ Thomas A. Johnson
THOMAS A. JOHNSON
Attorney for Shahriar Loloee